| | | |
|---|---|---|
| **Z.J.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. _____** |
| | ) | |
| **THE VANDERBILT UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT THE VANDERBILT UNIVERSITY'S NOTICE OF REMOVAL

Defendant the Vanderbilt University ("Vanderbilt") hereby removes this action from the Circuit Court of Davidson County, Tennessee, 20th Judicial District, to the United States District Court for the Middle District of Tennessee under 28 U.S.C. §§ 1331 and 1441, and as grounds for its removal states as follows:

## BACKGROUND

On May 5, 2017, plaintiff Z.J., a former Vanderbilt student, filed a complaint in the Circuit Court of Davidson County, Tennessee, 20th Judicial District against Vanderbilt. On May 12, 2017, Plaintiff filed an Amended Complaint. The Circuit Court entered an order allowing Plaintiff to proceed under a pseudonym and placed the original complaint under seal.[1] Vanderbilt was served with the summons and original complaint on May 11, 2017 and received the Amended Complaint on or about May 12, 2017.

Z.J.'s amended complaint purports to assert ten causes of action: (1) breach of contract, (2) promissory estoppel, (3) declaratory judgment under Title IX of the Education Amendments of 1972 ("Title IX") and the Jeanne Clery Disclosure of Campus Security Policy and Campus

---

[1] A copy of the amended complaint, filed May 12, 2017, the two orders of the Circuit Court, and all other papers filed after May 12, 2017 in this matter are attached as Exhibit A.

Crime Statistics Act (the "Clery Act"), (4) defamation, (5) damages under Title IX, (6) negligence *per se*, (7) violations of Title IX and the Clery Act, (8) gross negligence, (9) intentional infliction of emotional distress, and (10) unjust enrichment. Each of these ten causes of action is based on Z.J.'s assertion that Vanderbilt mishandled a complaint against him by another student claiming that Z.J. had violated Vanderbilt's Sexual Misconduct Policy.

## BASIS FOR REMOVAL JURISDICTION

Any civil action initially filed in state court "of which the district courts of the United States have original jurisdiction" may be removed to the local federal district court. 28 U.S.C. § 1441(a). Because the Amended Complaint contains claims arising under Title IX and the Clery Act, it falls with the federal courts' original "arising under" jurisdiction under 28 U.S.C. § 1331 and may be removed. Additionally, Vanderbilt has met all procedural requirements for removal.

**I.    Removal Is Proper Under 28 U.S.C. § 1331 Because The Amended Complaint Contains Claims Arising Under Federal Law**

This suit could have originally been brought in federal court as a "civil action[] arising under the Constitution, laws, or treaties of the United States." Specifically, the original Complaint and the Amended Complaint contain claims based on Title IX of the Education Amendments of 1972 and the Clery Act, Am. Compl. ¶¶ 133-143, 154-158. 163-165, and invoke an "implied private right of action" under Title IX, Am. Compl. ¶ 155. Because "federal law creates the cause of action," these claims "aris[e] under" federal law and are properly heard in federal court. *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 808 (1986). Courts in the Sixth Circuit regularly permit removal of actions founded upon Title IX; this suit is no exception to the general rule. *See, e.g. Tumminello v. Father Ryan High Sch., Inc.*, 2017 WL 395016 at *1 (6th Cir. Jan. 30, 2017) (suit joining Title IX claims with state-law claims removed

2

to federal court); *Moore v. Murray State Univ.*, No. 5:12-CV-00178, 2013 WL 960320 at *2 (W.D. Ky. Mar. 12, 2013) (same).

This Court's jurisdiction upon removal extends to Plaintiff's state-law claims, as well as his claims founded on federal law. Because the state-law claims "form part of the same case or controversy" as the Title IX and Clery Act claims, they fall within the supplemental jurisdiction of this Court. 28 U.S.C. § 1367. A federal court "has jurisdiction over an entire action, including state-law claims, whenever the federal-law claims and state-law claims in the case 'derive from a common nucleus of operative fact.'" *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343 (1988) (quoting *Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)). All of Plaintiff's claims are based on Vanderbilt's handling of another student's sexual misconduct complaint against Z.J. under Vanderbilt's Sexual Misconduct Policy, and they are all properly before this Court.

## II. All Procedural Requirements For Removal Have Been Met

Vanderbilt has satisfied all procedural requirements for removal. Defendant has attached hereto as **Exhibit A** a copy of the Amended Complaint, filed May 12, 2017, the two orders of the Circuit Court, and all other papers filed after May 12, 2017 in this matter. 28 U.S.C. § 1446(a).[2] Vanderbilt's time to respond to the complaint has not expired, and it has not yet served or filed an answer. No additional motions or proceedings are pending before the Tennessee Circuit Court. This Notice of Removal is timely because it is filed less than thirty days from May 11, 2017, the date when service of the original Complaint on Vanderbilt was affected. 28 U.S.C. § 1446(b). The action is removable to this Court because the Middle District of Tennessee is the district in which the state action was pending. 28 U.S.C. §§ 1441(a), 1446(a).

---

[2] Given that the Circuit Court placed the original complaint under seal, Defendant included in Exhibit A only the Amended Complaint.

Upon filing this Notice of Removal, Vanderbilt will promptly file a Notification of Filing of Notice of Removal with the Davidson County Circuit Court Clerk. 28 U.S.C. § 1446(d). By filing this Notice of Removal, Vanderbilt does not waive any defenses that may be available to it (including without limitation any defenses relating to service, process, jurisdiction, and venue) and it does not concede that the allegations in the Amended Complaint state a valid claim under any applicable law.

## CONCLUSION

WHEREFORE, the case now pending in the Circuit Court of Davidson County, Tennessee, 20th Judicial District, Civil Action Docket No. 17C1122, is hereby removed to the United States District Court for the Middle District of Tennessee pursuant to 28 U.S.C. §§ 1331 and 1441.

Dated this 12th of June, 2017.

Respectfully submitted,

BASS, BERRY & SIMS

By: s/ Tim K. Garrett
Tim K. Garrett (BPR# 012083)
150 Third Avenue South, Suite 2800
Nashville, Tennessee 37201
(615) 742-6200
tgarrett@bassberry.com

Sheree C. Wright (BPR# 011195)
Senior Associate General Counsel
Office of the General Counsel
Vanderbilt University
2100 West End Avenue, Suite 750
Nashville, TN 37203
Sheree.wright@vanderbilt.edu

*Attorneys for Defendant*

4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was forwarded via the Court's Electronic Mailing System and has been served by United States mail, postage prepaid, to

Rob McKinney
One Washington Square, Suite 400
214 Second Avenue North
Nashville, TN 37201
rob@maymckinneylaw.com

*Attorney for Plaintiff*

on this 12th day of June 2017.

s/ Tim K. Garrett                    

Tim K. Garrett

Copy

| | |
|---|---|
| Z. J., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2017-C-1122 |
| | ) JURY DEMAND |
| (THE) VANDERBILT UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |

## AMENDED COMPLAINT

Comes now Z.J. [1], hereinafter referred to as "Plaintiff," by and through counsel, and for his Amended Complaint against (The) Vanderbilt University, hereinafter after referred to as "Defendant Vanderbilt," would respectfully assert the following:

### NATURE OF ACTION

1.    This is an action for declaratory relief and for damages, pursuant to T.C.A. § 29-14-101, *et seq.*, arising out of the Defendant Vanderbilt's unlawful conduct that resulted in the wrongful expulsion of Plaintiff, a former student of Defendant Vanderbilt. Defendant Vanderbilt's actions violated both federal and state law, and denied Plaintiff a meaningful standard of due process and equal protection, concerning the allegations of sexual misconduct made against Plaintiff.

2.    The actions of the Defendant Vanderbilt, just three days before Plaintiff's graduation, were arbitrary and biased against the Plaintiff, resulting in the loss of his ROTC scholarship and causing him to incur monies now owed to Vanderbilt due the loss of said scholarship, ruining his future career in the Army as an officer, as well as, compromising the Plaintiff's emotional health and well being by the entire ordeal. Thus, the Plaintiff brings this

---

[1] Although not a minor, a pseudonym is used throughout this document in order to protect the identity of the Plaintiff and accuser. *See e.g., State v. Lynn*, 2009 WL 1812419, at *1, n.2 (Tenn. Crim. App. 2009). This pseudonym does not represent any admittance or guilt towards any statements set forth herein that were made by Plaintiff, A.H. or by the additional witnesses.

1

Ex. A

cause of action for violation of Title IX of the Education Amendments of 1979, among other things, and state law.

3.     The Plaintiff further asserts the Defendant Vanderbilt breached the written and implied contract each party entered into to provide a college degree to Plaintiff if the Plaintiff fulfilled his college credits and requirements. The Plaintiff suffered damages as a result of the breach by Defendant Vanderbilt.

## JURISDICTION AND VENUE

4.     This Court has personal jurisdiction over Defendant Vanderbilt because it regularly does business and engages in other persistent courses of conduct in Nashville, Davidson County, Tennessee.

## PARTIES

5.     Z. J.,[2] hereinafter referred to as the "Plaintiff," was, and at all times pertinent hereto, a citizen and resident of a state other than Tennessee, and over the age of eighteen years.

6.     (The) Vanderbilt University, hereinafter referred to as "Defendant Vanderbilt," was, and at all times pertinent hereto, a private university in Nashville, Davidson County, Tennessee. The agent for service of process for Defendant Vanderbilt is The Office of General Counsel, 305 Kirkland Hall, Nashville, Tennessee 37240-0001. The principal address is 305 Kirkland Hall, Nashville, Tennessee 37203.

## FACTS

### A. Vanderbilt University

7.     The Defendant Vanderbilt's corporate charter was originally issued in 1872, and has only been amended one time in 1873. Vanderbilt University is self-governed under a Board of Trustees and is located in Nashville, Davidson County, Tennessee. Vanderbilt's mission

---

[2] Although not a minor, a pseudonym is used throughout this document in order to protect the identity of the Plaintiff and accuser. *See e.g., State v. Lynn,* 2009 WL 1812419, at *1, n.2 (Tenn. Crim. App. 2009). This pseudonym does not represent any admittance or guilt towards any statements set forth herein that were made by Plaintiff, A.H. or by the additional witnesses.

2

Copy

statement provides that "[I]n pursuit of [our] goals, Vanderbilt values most highly intellectual freedom that supports open inquiry, equality, compassion, and excellence in all endeavors."

8.      Defendant Vanderbilt admitted Plaintiff to the freshman class beginning with the Fall Semester of 2012. In order to fund his own college education, Plaintiff applied for, complied with, and received a continuing ROTC scholarship for three years of undergraduate studies.

9.      During Plaintiff's sophomore year of undergraduate studies, he did not meet the academic requirements for the scholarship. However, Plaintiff worked hard to meet the academic standing requirements and the scholarship was reinstated.

10.     Plaintiff received the ROTC scholarship throughout three years of his enrollment at Defendant Vanderbilt, which equated to approximately One Hundred Thirty-Six Thousand Dollars ($136,000.00) towards Plaintiff's tuition, room, board, and other expenses.

11.     At the time of the events in question in 2016, Plaintiff was approaching the end of his four years at Defendant Vanderbilt. Specifically, Plaintiff was set to graduate in less than two months when a complaint was made against Plaintiff.

12.     On May 10, 2016—after Plaintiff had completed all of the necessary academic requirements and three days before Plaintiff's graduation and Army commissioning—Defendant Vanderbilt expelled Plaintiff from Vanderbilt University.

**B. Events of March 19, 2016**

13.     On Saturday, March 19, 2016, Plaintiff and A.H.[3] separately attended a St. Patrick's Day tailgate at the Zeta Beta Tau ("ZBT") fraternity house on Defendant Vanderbilt's campus. Neither party was aware that the other party was attending the tailgate festivities. Both individuals were at least twenty-one (21) years of age at the time.

---

[3] Although not a minor, a pseudonym is used throughout this document in order to protect the identity of the accuser. *See e.g., State v. Lynn*, 2009 WL 1812419, at *1, n.2 (Tenn. Crim. App. 2009). This pseudonym does not represent any admittance or guilt towards any statements set forth herein that were made by Plaintiff, A.H. or by the additional witnesses.

3

Copy

14.　Around mid-afternoon, Plaintiff and A.H. crossed paths, and subsequently agreed to go to Plaintiff's dormitory suite. The two individuals were seen via surveillance tape entering the elevator in Plaintiff's dormitory building at 4:13 p.m.

15.　On March 19, 2016, Plaintiff and A.H. engaged in consensual kissing and petting.[4] Both individuals were clothed during the consensual petting.[5]

16.　At some point during their interaction, Plaintiff asked A.H. if she wanted to engage in sexual intercourse. A.H. responded "No" to Plaintiff because she was intoxicated and the two did not know each other well enough. A.H. subsequently asked Plaintiff if he knew her name. After Plaintiff responded with a close version of her name, A.H. stood up from the bed and became visibly upset.

17.　In an effort to console A.H., Plaintiff reached to the back of A.H.'s neck with his hand to gently sit A.H. back down on the bed.[6] The Plaintiff remained in his upright, seated position during this time. As Plaintiff did so, he inadvertently and non-maliciously placed his thumb and/or fingers on the side, possibly close to the front, of A.H.'s neck. A.H. confirmed in initial reports that the Plaintiff's hand touched her neck for "a few seconds."

18.　Following this, A.H.'s became even more upset to the point she began to have a panic attack. It was at that time that she informed Plaintiff that his hand on her neck "triggered" unpleasant memories of a past encounter that involved the individual's hands being around her throat. Plaintiff recalls A.H. being genuinely apologetic and stating, "I'm sorry, it's just that

---

[4] The consensual "petting" consisted of Plaintiff touching A.H.'s buttocks, breasts, and neck area. A.H. and Plaintiff were also kissing during this time. A.H.'s hands were either on Plaintiff's shoulders or in a neutral position.
[5] The Final Investigative Report from Vanderbilt's EAD provides that Plaintiff initially stated that none of their clothes were off, and he did not go under A.H.'s bra or shirt during the petting. During Plaintiff's second interview with the EAD, the EAD told him about A.H.'s statement regarding her being undressed, which made Plaintiff second guess his memory and provide the following: "The idea that all of A.H.'s clothes were ever off was not familiar to him, and that he can't remember as it was a month and a half ago. 'If anything, her shirt was off, but I don't think I took anything off.'" Thus, overall, Plaintiff does not believe A.H. was undressed whatsoever.
[6] Plaintiff understood why A.H. would be upset about getting her name wrong. Plaintiff consistently asserts that he was not angry with A.H. for refusing to participate in sexual intercourse.

4

Copy

hands on my neck are a trigger." A.H. confirmed in initial reports having providing Plaintiff with this information.

19.    Due to the fact that the panic attack caused A.H. to hyperventilate and cry, thus making it even more difficult for her to catch her breath, Plaintiff ceased physical contact with A.H. except for that he held her shoulders in an effort to console and calm her down so her breathing would return to normal.

20.    During this time, Plaintiff gave A.H. some water and suggested to A.H. that she should wait to leave until she had calmed down and her breathing returned to a normal state as he was concerned about her if she left in such condition. Plaintiff described himself as feeling helpless and unsure of how to act in this type of situation.

21.    A.H. left Plaintiff's dormitory suite. According to the surveillance tape, A.H. left the room at approximately 6:06 pm. A.H. took the elevator down to the lobby, entered the restroom and at approximately 6:30 pm, left the restroom and exited the dormitory building while on her cell phone.

22.    Upon returning to her own dorm room, it is believed that A.H. went straight to the bathroom and began to take a shower. According to A.H.'s roommate ("Student 1")[7], A.H. started calling out for Student 1 while A.H. was in the shower. Student 1 found A.H. in the same panic state she was in when she left Plaintiff's apartment, i.e., crying and hyperventilating. At this time, A.H. said to Student 1, "He choked me." Student 1 then pressed A.H. for details of what had happened, which A.H. refused to give. No further conversation about the topic happened that night.[8]

---

[7] In order to protect her privacy and identity, Vanderbilt used this pseudonym throughout its reports. This document will follow the same procedure. *See, e.g., State v. Lynn,* 2009 WL 1812419, at *1, n.2 (Tenn. Crim. App. 2009). As aforementioned, this pseudonym does not represent any admittance or guilt towards any statements set forth herein that were made by A.H. or by the additional witnesses.
[8] Conflicting statements were provided regarding this. Based on Student 1's written statement, A.H. provided more details about that night, the following morning.



### C. Events of March 20-21, 2016

23.     According to the report of a Vanderbilt social worker, Student 1 continued to press A.H. until she finally told Student 1 what happened.[9] Student 1 encouraged A.H. to get checked out at Vanderbilt University Hospital ("Hospital").

24.     The Vanderbilt Police Department was notified by Vanderbilt University Hospital staff after treating A.H. at the hospital. The Vanderbilt Police Department investigated A.H.'s charge of sexual assault and produced a report.

25.     In addition to providing her statement to the Vanderbilt Police, A.H. filed a formal charge with Vanderbilt's disciplinary system, claiming that Plaintiff sexually assaulted her.

26.     Upon information and belief, as well as, at the request of A.H., the Vanderbilt Police Department never referred the charge to the Metropolitan Nashville Police Department of Nashville, Davidson County, Tennessee.

27.     Based upon information and belief, no criminal charges were ever brought against the Plaintiff by A.H., on behalf of A.H., Metropolitan Nashville Police Department or the District Attorney's Office.

### D. Federal Statutory and Regulatory Requirements Concerning Allegations of Sexual Assault

28.     The issue of sexual assaults on college and university campuses is addressed by two separate acts of Congress: (1) Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 (hereinafter collectively referred to as "Title IX"); and (2) The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f) (hereinafter referred to as "The Clery Act").

---

[9] As aforementioned, the timing of Student 1's additional questions is conflicted, but based on Student 1's written statement, she found out more information from A.H. the following morning.

**Copy**

### 1. Title IX

29. Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities. Title IX specifically states:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

20 U.S.C. § 1681(a) (1972).

30. Programs or activities specifically refer to "all the operations of-- . . . (2)(A) a college, university, or other postsecondary institution, or a public system of higher education; . . . ." 20 U.S.C. § 1687 (2002). Thus, any public or private university that receives federal funding must agree to operate all of its programs or activities in compliance with Title IX and its respective regulations. This agreement is known as an "assurance of compliance." 34 C.F.R. § 106.4(a)-(c).

31. According to Vanderbilt's 2015 Financial Report,[10] Vanderbilt is a recipient of federal funds, which makes Vanderbilt bound by Title IX and its regulations. In Vanderbilt's Student Handbook,[11] Vanderbilt mentions Title IX and its compliance with its standards and regulations. Specifically, in Vanderbilt's 2015-2016 Student Handbook it states: "Several federal and state laws impose special obligations on the University. Some include: . . . Title IX of the Education Amendments of 1972 . . . ."[12] Thus, upon information and belief, Vanderbilt has executed an assurance of compliance.

32. Sexual harassment is a form of sex discrimination prohibited by Title IX that can occur between a student and "a school employee, another student, or a non-employee third

---

[10] This report is accessible by the public on Vanderbilt's website: https://finance.vanderbilt.edu/report/.

[11] Vanderbilt's Student Handbook is accessible by the public on Vanderbilt's website. Plaintiff and counsel reviewed the 2012-2013 version of the Student Handbook, as well as the 2015-2016 version Student Handbook. These handbooks were issued when Plaintiff enrolled at Vanderbilt, and when Plaintiff was charged by the EAD, respectively. http://www.vanderbilt.edu/student_handbook/.

[12] http://www.vanderbilt.edu/student_handbook/.

7

Copy

party." For Title IX purposes, sexual harassment is defined as unwelcomed conduct of a sexual nature, which includes sexual intercourse, sexual assault, and rape.[13]

33.    The United States Department of Education requires every college and university subject to regulations under Title IX to "adopt and publish procedures for resolving complaints of sex discrimination, including sexual violence."[14] Each college and university may use student disciplinary procedures, "but any procedures for sexual violence complaints must afford [] a prompt and equitable resolution."[15] Moreover, "*[n]ondiscriminatory* policies and procedures are **required** by the Title IX regulations."[16]

34.    The Department of Education also asserts that "[a]ll students are protected by Title IX, regardless of whether they have a disability, are international or undocumented, and regardless of their sexual orientation and gender identity."[17] Thus, the procedures adopted by a college or university that is covered by Title IX must "ensure the Title IX rights of the complainant," as well as "accord[] due process to both parties involved . . . ."[18]

35.    The Department of Education asserts that each school "must conduct an adequate, reliable, and impartial investigation."[19] The Department of Education asserts that the parties have the following rights:

   a.   The right to be notified of the timeframes for all major stages of the investigation.
   b.   The right to present witnesses and evidence.
   c.   [The] school must resolve the complaint based on what they think is more likely than not to have happened (this is called a preponderance-of-the-

---

[13] U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX*, at 3 (January 19, 2001).
[14] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Know Your Rights: Title IX Requires Your School to Address Sexual Violence*, at 1-2 (April 29, 2014).
[15] *Id.*
[16] U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX*, at iii (January 19, 2001) (emphasis added).
[17] U.S. Dep't of Education, Office for Civil Rights, *Know Your Rights: Title IX Requires Your School to Address Sexual Violence* at 1-2 (April 29, 2014).
[18] U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX*, at 22 (January 19, 2001).
[19] U.S. Dep't of Education, Office for Civil Rights, *Know Your Rights: Title IX Requires Your School to Address Sexual Violence* at 1-2 (April 29, 2014).

8

evidence standard of proof). [The] school cannot use a higher standard of proof.

    d. The right to be notified in writing of the outcome of [the] complaint and any appeal, including any sanctions that directly relate to you.

    e. If [the] school provides for an appeal process, it must be equally available for both parties.

    f. The right to have any proceedings documented, which may include written findings of fact, transcripts, or audio recordings. [20]

36.    The Department of Education, Office for Civil Rights, describes sexual harassment as a "threat[ to] a student's physical or emotional well-being, [an] influence [on] how well a student does in school," and states that it can "make it difficult for a student to achieve his or her career goals."[21]

37.    The Department of Education, Office for Civil Rights includes "Gender-based Harassment, Including Harassment Predicated on Sex-Stereotyping" in their *Revised Sexual Harassment Guidance* (2001). A portion of the text reads as follows:

> The guidance clarifies that gender-based harassment, including that predicated on sex-stereotyping, is covered by Title IX if it is sufficiently serious to deny or limit a student's ability to participate in or benefit from the program. Thus, it can be discrimination on the basis of sex to harass a student on the basis of the victim's failure to conform to stereotyped notions of masculinity and femininity. Although this type of harassment is not covered by the guidance, if it is sufficiently serious, gender-based harassment is a school's responsibility, and the same standards generally will apply. We have also added an endnote regarding Supreme Court precedent for the proposition that sex stereotyping can constitute sex discrimination. [22]

38.    Under Title IX, "the school must make sure that all designated employees [involved in the investigation] have adequate training as to what conduct constitutes sexual harassment and are able to explain how the grievance procedure operates."[23]

---

[20] *Id.*

[21] *Id.*

[22] U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX*, at v (January 19, 2001).

[23] *Id.* at 21.

9

**Copy**

## 2. The Clery Act

39.     In addition to Title IX, the Clery Act requires schools receiving federal funding to create and publish procedures for complaints involving charges of sexual assault. Each school must have the details of such procedures published in a statement of policy,[24] such as a Student Handbook. The policy must set forth:

> [p]rocedures for institutional disciplinary action in cases of alleged domestic violence, dating violence, sexual assault, or stalking, which shall include a clear statement that—
>> (I) such proceedings shall—
>>> (a)(a) provide a prompt, fair, and impartial investigation and resolution; and
>>> (b)(b) be conducted by officials who receive annual training on the issues related to domestic violence, dating violence, sexual assault, and stalking and how to conduct an investigation and hearing process that protects the safety of victims and promotes accountability;
>> (II) the accuser and the accused are entitled to the same opportunities to have others present during an institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by an advisor of their choice; . . . .[25]

40.     Under the Clery Act, a "forcible" sexual offense is defined as "[a]ny sexual act directed against another person, forcibly and/or against that person's will; or not forcibly or against the person's will where the victim is incapable of giving consent."[26]

41.     Vanderbilt mentions the Clery Act throughout the last two pages of its Student Handbook for the school year of 2015-2016.[27]

## E. Vanderbilt's Procedures Concerning Allegations of Sexual Assault

42.     Vanderbilt's 2015-2016 Student Handbook sets out written policies and procedures that the university follows, and expects its students and employees to also follow. It provides, "The University generally prohibits discrimination or harassment (including sexual

---

[24] 20 U.S.C. § 1092(f)(8)(A)(ii) (2013).
[25] *Id.* (8)(B)(iv)(I)-(II) (2013).
[26] 34 C.F.R. Pt. 668, Subpt. D., App. A.
[27] http://www.vanderbilt.edu/student_handbook/.

10

Copy

harassment) based on race, sex, religion, color, national or ethnic origin, age, disability, military service, sexual orientation, gender identity or gender expression."[28]

43.     Shortly thereafter, Vanderbilt sets out the duties and the commitments of the Equal Opportunity, Affirmative Action, and Disability Services Department ("EAD"), which is the department that oversees any complaints regarding sexual assault, pursuant to Title IX. The Student Handbook sets out the following:

> The EAD serves as a resource in the following capacities:
> - To assist in keeping the administration informed of the University's obligations under state and federal equal opportunity laws;
> - To coordinate and monitor the University's Affirmative Action Program in compliance with equal opportunity laws;
> - To serve as a source of information for faculty, staff, and students who may have questions or complaints pertaining to equal opportunity in employment practices, University-sponsored programs and activities, and educational opportunities;
> - To provide training to the Vanderbilt community on issues of equal opportunity and affirmative action; and
> - To coordinate services for persons with disabilities.[29]

44.     Chapter 7 of Vanderbilt's Student Handbook is titled "Sexual Misconduct and other Forms of Power-Based Personal Violence Policy" (hereinafter "Sexual Misconduct Policy"). It includes the following:

> In compliance with federal law, including the provisions of . . . Title IX of the Education Amendment of 1972, . . . Vanderbilt University does not discriminate against individuals on the basis of their race, sex, sexual orientation, gender identity, religion, color, national or ethnic origin, age, disability, military service, or genetic information in its administration of educational policies, programs, or activities; admissions policies; scholarship and loan programs; athletic or other University-administered programs; or employment.[30]

45.     Chapter 7 of Vanderbilt's Student Handbook applies to allegations regarding sexual discrimination, sexual misconduct, sexual harassment, and power-based personal violence involving students.

---

[28]   All quotations concerning the Vanderbilt Student Handbook are from Vanderbilt's website: http://www.vanderbilt.edu/student_handbook/.
[29]   *Id.*
[30]   *Id.*

11

46. Vanderbilt asserts that the University will take "prompt and effective action to address allegations of sexual misconduct and power-based personal violence, and will resolve complaints in a timely and fair manner."[31]

47. Vanderbilt asserts that all faculty and staff immediately undergoes training in the following upon employment:

    a. The University provides training on nondiscrimination laws and policies including those covering sexual misconduct and power-based personal violence, as an essential part of new faculty and staff orientation.

    b. EAD provides in-person training as well as an online module for faculty members entitled *Golden Opportunity, Golden Obligation* regarding Title IX, sexual misconduct, and reporting obligations.

    c. EAD, the Office of Student Accountability, Community Standards, and Academic Integrity (Student Accountability) and the Project Safe Center also provide training to faculty, staff, and students on sexual misconduct and power-based personal violence and the University's policies that address these issues.[32]

48. Vanderbilt's Student Handbook sets forth that "Tennessee law requires all medical personnel to report to law enforcement when a victim seeks treatment for injuries related to a violent crime, including sexual assault."[33]

49. The following offenses and definitions are in Vanderbilt's Student Handbook under the Sexual Misconduct Policy:

    a. **Non-Consensual Sexual Intercourse**: is any vaginal and/or anal penetration—however slight—by a penis, object, tongue, or finger, and/or oral copulation (mouth to genital contact), by any person upon another without effective consent.

    b. **Non-Consensual Sexual Contact**: is any contact of a sexual nature—however slight—with the breasts, buttocks, groin, genitals, mouth, or other body part of another, by any person upon another without effective consent. Sexual touching also includes an individual causing someone else to touch him/her/they with, or on, any of these body parts.

---

[31] *Id.*
[32] *Id.*
[33] All quotations concerning the Vanderbilt Student Handbook are from Vanderbilt's website: http://www.vanderbilt.edu/student_handbook/.

12

Copy

c. **Dating Violence**: is sexual or physical abuse or the threat of such abuse committed by a person who is or has been in a social relationship of a romantic or intimate nature with the person against whom the violence is perpetrated. The existence of a social relationship of a romantic or intimate nature may be determined by the length of the relationship, the type of the relationship, the frequency of the interactions between the persons involved in the relationship, and other relevant contextual factors. Dating violence does not include acts covered under the definition of domestic violence.

50.    The Student Handbook also clarifies the following definitions:

a. *Force* includes physical force (such as pushing, hitting, pinning down), threats (direct or indirect expressions of intent to inflict harm to self or others), *intimidation* (implied or direct threats), and/or other forms of coercion.

b. *Blacking out* is an amnesia-like state that may be brought on by drugs, heavy drinking, or intoxication: blacking out is not necessarily incompatible with the ability to engage in simple or even complex behavior. Afterwards the person has no recollection of all or part of the events that occurred during the blackout. There is a distinction between passing out (falling asleep or becoming unconscious) due to drug or alcohol use and blacking out in that a person in a blackout remains conscious and operative.

c. *Effective consent* is consent that is informed and freely and actively given. Effective consent requires mutually understandable words or actions indicating a willingness to engage in mutually agreed-upon sexual activity.[34]

51.    The sanctioning process for Sexual Misconduct Policy violations is as follows:

a. The sanctioning determination will be made based on the information contained in the EAD investigative report, with particular regard for the nature of the incident and *the respondent's reported cooperation and candor, and the respondent's disciplinary history (if any).*

---

[34] All quotations concerning the Vanderbilt Student Handbook are from Vanderbilt's website: http://www.vanderbilt.edu/student_handbook/.

Case 3:17-cv-00936   Document 1   Filed 06/12/17   Page 18 of 55 PageID #: 18

b. The range of sanctions for any student found responsible for **Non-Consensual Sexual Intercourse** is suspension to expulsion, depending on all of the relevant facts and circumstances.

c. Sanctions for **Non-Consensual Sexual Contact** . . . **Dating Violence** . . . will range from disciplinary probation to expulsion, depending on all of the relevant facts and circumstances.[35]

52. In Vanderbilt's Sexual Misconduct Policy, they assert that "Vanderbilt takes reports of sexual misconduct and power-based personal violence seriously. How the University responds depends upon a variety of factors, including the wishes of the victim, the facts and circumstances of the specific incident, to whom it was reported, and the University's obligations under applicable federal and state laws." [36]

53. Vanderbilt states that the "EAD staff is trained annually and on an ongoing basis on issues related to sexual harassment, sexual misconduct, and power-based personal violence, and in conducting investigations in a manner that protects the well-being and safety of the complainant, the respondent, and the University community."[37]

54. When determining whether to conduct an investigation concerning sexual misconduct allegations, "the Title IX Coordinator will consider the interests of the complainant and the University's commitment to a safe and nondiscriminatory environment for all members of the University community. . . . the Title IX Coordinator will consider a variety of factors, including, but not limited to, the complainant's desire for confidentiality, information concerning any previous allegations involving the respondent, *the likelihood of repeated offenses*, evidence that the alleged misconduct is part of a pattern of misconduct and the University's ability to

---

[35] *Id.* (*italics* emphasis supplied).
[36] *Id.*
[37] *Id.*

14

ensure that the alleged misconduct does not contribute to the creation of a hostile environment for any students."[38]

55.　During the investigation, the "EAD will ask the complainant for information about the incident. Supporting documents, such as videos, emails, photos, or text messages, or messages through social media . . . and any other evidence should be preserved. If witnesses were present or have relevant knowledge, it is important to identify them, state what they may know, and inform EAD how they can be contacted. In no circumstances will mediation be used to resolve cases of sexual assault or power-based personal violence."[39]

56.　The Sexual Misconduct Policy further sets out that "the EAD investigator will inform the respondent of the allegations, the status and/or initiation of an investigation, and the possibility of sanctions, and will provide the student alleged to have engaged in misconduct with an opportunity to respond to the allegations, ask questions, provide information, and *offer names of witnesses or other people with relevant information. . . . Supporting documentation and information may be collected from the complainant, respondent, and witnesses.*"[40]

57.　Furthermore, the Sexual Misconduct Policy states, "[i]f the complainant or the respondent learns of, or remembers, any additional information during the course of the investigation, *he/she/they should notify the EAD investigator immediately.*"[41]

58.　Vanderbilt uses the preponderance of the evidence standard of proof, as required by Title IX, which they define as "'more likely than not that the policy was violated.'"[42]

59.　Moreover, "[a]t the conclusion of the investigation, and prior to making a determination, ₍EAD will prepare a preliminary investigative report. The preliminary investigative report will contain a summary of the information and documents EAD considers

---

[38] All quotations concerning the Vanderbilt Student Handbook are from Vanderbilt's website: http://www.vanderbilt.edu/student_handbook/ (emphasis supplied).
[39] *Id.*
[40] *Id.* (emphasis supplied).
[41] *Id.* (emphasis supplied).
[42] *Id.*

15

**Copy**

relevant. The complainant and respondent will each have the opportunity to review a copy of the preliminary investigative report."[43]

60.     Once the EAD comes to a decision, they will submit a final investigative report. "The final investigative report will contain a summary of the information and documents on which the final determination is based and will address, to the extent EAD considers appropriate, *any comments received from the complainant or respondent. The comments from the complainant and respondent will also be attached as an exhibit.*"[44]

61.     Vanderbilt asserts that they "endeavor[] to complete the investigative process within 60 calendar days from the time the Title IX Coordinator determines that an investigation will go forward."[45]

62.     The appeals process is as follows:

a.     Student parties have the right to appeal the determination by EAD and the sanction (if any) rendered by the Director of Student Accountability.

b.     The Appeals Board is "composed of members appointed by the Chancellor (or the Chancellor's designee), as follows: a Chair for each division . . . who are members of the tenured faculty and who each may act in the other's absence, disability, refusal, or inability to serve; and thirty-eight general members appointed by the Chancellor (or the Chancellor's designee), who serve on both academic and co-curricular cases and who are faculty members at the rank of Assistant Professor or higher, selected among the schools . . . . Two full-time students from each of the ten schools of the University also serve. Both faculty and students are appointed for two-year terms, which should be staggered to the extent practical, to ensure continuity."

c.     The four grounds for appeal are as follows:

---

[43] All quotations concerning the Vanderbilt Student Handbook are from Vanderbilt's website: http://www.vanderbilt.edu/student_handbook/.
[44] *Id.* (emphasis supplied).
[45] *Id.*

16

- Procedural irregularities sufficient to affect the determination by EAD and/or the sanction imposed by the Director of Student Accountability.
- Insufficient information to support the determination by EAD.
- New information that was not reasonably available for presentation to EAD, the introduction of which could reasonably be expected to affect EAD's determination.
- Harshness of the sanction imposed by the Director of Student Accountability sufficient to show an abuse of discretion.

d. One of the three Appellate Officers will be designated by the panel as the Chair of the appeal.

e. When the Appellate Officers receive a petition, the Chair notifies all persons who were sent formal notification of EAD's determination and the sanction (if any) that a petition for appeal has been filed.

f. Upon notification that an appeal has been filed, EAD and/or the Director of Student Accountability will provide to the Appellate Officers the final investigative report, and other information reviewed and relied upon in making their determinations.

g. As part of the notification, the Chair forwards a copy of the petition to EAD's Title IX Coordinator and Director and Director of Student Accountability as well as the non-petitioning student. EAD and/or the Director of Student Accountability may submit written comments within ten (10) calendar days of receiving it. The non-petitioning student may also submit a response within the same time period.

h. . . . The Appellate Officers decide by majority vote whether to affirm, modify, or reserve the determination by EAD and/or the sanction imposed by the Director of Student Accountability or to remand the case to EAD and/or the Director of Student Accountability with instructions. [46]

---

[46] All quotations concerning the Vanderbilt Student Handbook are from Vanderbilt's website: http://www.vanderbilt.edu/student_handbook/.

17

### F. The Complaint Against Plaintiff and the EAD Investigation

#### 1. Reported Details of the Events:

63. As aforementioned, A.H. and Student 1 went to Vanderbilt Hospital on March 20, 2016 after A.H. explained to Student 1 that her throat was hurting her and she started noticing bruising on her breasts and neck area.

64. The reports of what A.H. told Vanderbilt's Equal Opportunity, Affirmative Action, and Disability Services office ("EAD"), Student 1, the Vanderbilt Police Department officers, as well as, the Vanderbilt social worker are conflicting. A summary of each report is provided below, in the order the statements were taken. Each changes' emphasis is supplied.[47]

   a. **Vanderbilt Police Narrative #1:**
   - "A.H. stated that there was consensual petting that occurred in the room with no sexual penetration. *A.H. stated that Plaintiff became angry and placed his hand at her neck and shoved her to the ground. A.H. stated that she was able to break free of Plaintiff's grasp and his hands were only 'there for a few seconds.'* A.H. stated that she did not lose consciousness at any point. During the incident A.H. stated that she began to have a panic attack and Plaintiff had her stay in his room until she was calm. A.H. stated that she left and returned to her dorm room."

   b. **Vanderbilt Adult Emergency Department social worker:**
   - This is the officer's summary of the social worker's statements.
     i. *"The social worker stated that while inside the dorm room A.H. was kissing the male student when he attempted to penetrate her. She stated that A.H. told him no, and he became violent. She stated that the male bit A.H. on the breast, choked her, and slammed her face to the floor."*
   - This information is Student 1's report quoted by the social worker.
     i. "'A.H. stated that her and Plaintiff were making out and things started to get more sexual. A.H. said that she told Plaintiff that she did not want to have sex with him. *She said that this made*

---

[47] The names have been changed for protection of identity.

*him angry and he shoved her to the ground and started to beat her up. A.H. said that after he stopped he started to apologize. Saying that it was ok and that he didn't mean it. A.H said she left the room in a hurry leaving behind a flask.'* . . . Student 1 stated that Plaintiff was a friend of A.H.'s ex-boyfriend. . . . A.H.'s ex-boyfriend has been confirmed as a member [of the same fraternity that held the party Plaintiff attended]."

c. **Vanderbilt Police Narrative #2:**[48]

- This conversation occurred between the second officer and the Vanderbilt social worker.

    i. "I asked if A.H. mentioned any unwanted sexual contact and she said no but was told that the subject was upset that she no longer wanted to continue the light consensual petting or have sex. *This is what sparked the assault and the injuries to her head and that he grabbed her neck and it was sore to the touch.*"

- Later in the conversation, the social worker told the officer "that no vaginal penetration had occurred and that heavy petting had been involved.

    i. *When he wanted to have sex and she refused he became angry and grabbed her around the throat and choked her and also caused her to hit her head on the floor. When she had a panic attack he attempted to get her to calm down and she left after doing so. He was attempting to have her calm down before leaving the room due to her outburst that was loud.*"

- This conversation occurred between the second officer and the first officer.

    i. "While [at Plaintiff's] they conducted some consensual petting and when he wanted to go further she refused. *She indicated to the Officer that he became angry and placed his hands around her neck for a few seconds and shoved her to the ground.*"

---

[48] The Vanderbilt social worker spoke with this officer and stated that "she was informed by the triage nurse of a Vanderbilt student who said she had been physically assaulted by a student that she had met at a party and gone to his room."

19

Copy

d. **Vanderbilt Social Worker's Written Statement:**

- "A.H. told him 'no' and Plaintiff became very angry with her and physically assaulted her. *A.H. states he grabbed her around her throat and choked her, along with hitting her head on the floor.*" "Plaintiff told her to stop crying and attempted to calm her down because she could leave his room. *Once she had calmed down some, she was able to leave and go to her dorm room.*"

e. **Student 1's Written Statement:**[49]

- "*A.H. told me the guy had choked her* and that she had bruising. She told me [his name] and that they were both drunk, and that she told him she didn't want to have sex. *She said he tried to calm her down before she left the room because this had spurred a panic attack.*" "She kept trying to justify his actions but what he did was a violation of basic human rights. She was not respected and harmed instead, and it breaks my heart. *I later heard, just now, in the hospital room, that he said 'I don't want you to leave this room crying.'* That made me livid. He obviously wants to cover his butt because he knows he screwed up big time. There was no mention of sexual assault."

f. **A.H.'s Written Statement:**

- "I loosely knew him from my friend group. . . . When I told him that I did not want to have sex with him, he became very angry and frustrated. *He proceeded to try to convince me to hook up and forcibly groped me.*" "*When I got mad he tried to choke me by grabbing my neck and cutting off my air. At this point I threw him off and tried to get dressed to leave.* He realized I was hysterical and wouldn't let me leave until I calmed down." "I was drunk at the time and so was the guy so my memory is spotty."

g. **Vanderbilt EAD's Report:**[50]

- "3/21/16: EAD sent an email to A.H. requesting a meeting. A.H. responded as follows: 'I am not interested in being involved at this time but I do want to give permission for the EAD office to use my police report statement, medical records, and photo evidence.'"

---

[49] Student 1 and A.H. wrote their written statements together while in the same room.
[50] Although this does not provide information about her case, it is relevant to other facts that were provided several weeks later by A.H. to the EAD.

20

65. The first reporting officer's statement provides the following statements:

   a. "Officer [] observed A.H.'s injuries and took photos for evidence. There was obvious bilateral bruising to the breast tissue ad a small 1-1 1/2 inch hickey around A.H.'s sternum. A.H.'s neck was stiff and there was apparent pain to the anterior neck region with very light bruising on either side. A.H. stated that there was some bruising to her inner thighs but she was unsure if it was because of the assault and was uncomfortable having them examined. A.H.'s nurse [] had observed the victim's thighs and stated there were tiny pinpoint bruises, but did not feel that they were related to the incident." "Metro Nashville Sex Crimes Detective [] responded and spoke with the victim and ruled out any non-consensual contact."

66. Plaintiff provided a statement to the Vanderbilt Police. It was as follows:

   a. "Plaintiff said that two things occurred that upset A.H. and that one was his inability to remember her name and the second was she had an anxiety attack after he touched her neck area during petting. He stated that she became irate and started to scream. He said that he had also been touching her neck area which caused her to panic due to previous misfortunes according to him. He said she had been a victim of some type of assault related to choking and that upset her when he had his hand around her neck. He conducted an illustration on me and it was apparent that he was heavy handed. He said that he did not intentionally choke her but was holding her shoulders while trying to calm her down. He was advised of the bruising seen in her neck and breast area. He took responsibility for 'heavy handed petting' and said that he believes he was with her and that frighten her." "He said that he was disrespectful to her and made fun of not knowing her name and when he should have been apologetic he was an 'asshole.' He gave a written statement and stated that no penetration was made to the vaginal area and that he touched her breast and butt area during the consensual petting."

67. Plaintiff's written statement provided the following:

   a. "At no point on Saturday did I intend to hurt you or force you to do anything against your will." "Nothing I did was meant to be hostile or malicious, and if you could forgive me for even putting that possibility in the air, I would appreciate it." "I am sorry for forgetting your name, and then making a joke about the situation. I should have been more considerate and compassionate. I'm sorry if my hands on your neck caused you to feel unsafe at any time. I'm sorry if at any point you felt taken advantage of."

## 2. Events of the Vanderbilt EAD Investigation

68. On April 11, Plaintiff had his first interview with EAD.

69. On April 13, EAD provided A.H. with a list of questions to answer in writing. She returned her responses the next day.[51]

70. On April 15, A.H. provided EAD a written narrative summary of the events.[52]

71. On April 20, Plaintiff had his second and final interview with the EAD.

72. Throughout the investigative process, A.H. provided new information to the EAD. It is important to make note that these statements were provided three weeks after the initial incident.[53]

   a. A.H. estimated that she had maybe 8 drinks over the course of a couple of hours. She described herself as not being "a mess," but "very inebriated." She recalled having a couple of mixed drinks and a couple of shots. A.H. stated that she stopped drinking alcohol for a while and was drinking water. A.H. also recalled having a mixed drink at the fraternity party, and that it was a lot stronger than she realized.

   b. A.H. said that she recalled being in Plaintiff's room and suddenly her clothes being off. They were "kissing and petting and it was consensual at that point."

---

[51] The Final Investigative Report provided by the EAD did not mention when A.H. decided to be involved in the investigation. The EAD did not provide any copies of the list of questions they gave her or her responses to the questions.
[52] The EAD did not provide any copies of A.H.'s written narrative summary of the events.
[53] All statements are quoted from the Final Investigative Report provided by the EAD. With the exception of the names, nothing else has been changed.

22

Copy

c. A.H. said that she began to get concerned when Plaintiff began to grope her aggressively. "He started grabbing my breast very hard, to the point where I screamed in pain."

d. A.H. stated that she told Plaintiff multiple times that she did not want to have sex. According to A.H., the exchange went as follows:

A.H: I don't want to have sex.

Plaintiff: Why not?

A.H.: Because I'm drunk.

Plaintiff: I am too. It doesn't matter. It's not like you're a virgin.

A.H.: You don't even know my name.

Plaintiff: Isn't it like []?

A.H.: See? This is why we shouldn't have sex.

e. A.H. said that Plaintiff kept saying that he was mad at her for coming back to his room with no intention of having sex. She said she told him, "Too bad, I have the right to not have sex with you."

f. A.H. said that Plaintiff continued to grab her breasts with an excessive amount of force and that she told him to stop.

g. A.H. said that at one point, Plaintiff was on top of her on the bed and said to her, "you know I want to have sex with you."

h. A.H. said that while Plaintiff was on top of her, he grabbed her thong and ripped it off, despite her trying to hold onto it to keep it on. She said he threw the thong across the room.

i. A.H. said that while Plaintiff was on top of her he tried to push open her legs. She said that she fought him. A.H. said that she had her hand barricading her crotch so that he could not penetrate her. A.H. reported that at this moment she was "terrified."

j. A.H. said that Plaintiff then grabbed the front of her neck with his hand and held her down so that she couldn't breathe.

k. A.H. said that she was able to get out from underneath Plaintiff and start looking for her clothes. At this point she started to have a panic attack and hyperventilate. She said she was crying hysterically. A.H. said that Plaintiff tried to calm her down and get her to regulate her breathing. She

23

Copy

told Plaintiff that she wanted to leave, but he said she was "not allowed" to go until she calmed down.

l.  A.H. said that she put her clothes back on and then headed out of the suite. She recalled looking back and seeing Plaintiff leaning against the doorframe with his eyes partially closing; she believed this occurred because he was so intoxicated. A.H. said that Plaintiff blew her a kiss.

m.  A.H. recalled saying multiple times during the encounter, "I should leave" and Plaintiff saying "no no no, stay.

73.  Student 1 provided more information to the EAD. Some statements are as follows:[54]

a.  According to Student 1, A.H. told her that she and Plaintiff were making out, he wanted to have sex but she did not, and he choked her. Student 1 said that at one point A.H. told her that she felt bad because maybe she had been "teasing" Plaintiff. Later that day A.H. told Student 1 that Plaintiff beat her.

b.  A.H. also told Student 1 that there was a bump on the back of her head but she did not know how it got there.

74.  A.H. also commented on some of the statements made during the investigative reports. They are as follows:[55]

a.  In response to the *Preliminary Investigation Report*, A.H. stated that she did not remember Plaintiff biting her or specifying that Plaintiff threw her to the ground.

b.  A.H. confirmed to EAD that she did tell Plaintiff that [she had a previous interaction in which someone had put their hands around her throat.]

75.  In contrast with A.H., Plaintiff's story stayed the same throughout each interview process. Plaintiff's story was aforementioned in the facts, up until the points that discussed A.H. leaving his dorm room and returning to her dorm room.

---

[54] Except for names, these statements are copied verbatim from the Final Investigative Report.
[55] Except for names, these statements are copied verbatim from the Final Investigative Report.

### 3. The Complaint against Plaintiff

76. Plaintiff was investigated for violating the Sexual Misconduct Policy through these offenses:

      a. Non-consensual sexual contact

      b. Dating violence

      c. Attempted non-consensual sexual intercourse.

### G. The Investigative Reports and the Decision

77. The Preliminary Investigative report was issued on April 27, 2016.

78. The Final Investigative report was issued on May 9, 2016 and issued by D. Michael Carter, EAD Compliance Manager.

79. The EAD found that Plaintiff engaged in contact of a sexual nature without effective consent, used physical force against A.H. during the encounter and attempted to engage in non-consensual sexual intercourse with A.H.

80. The Final Report conducts and analysis of credibility considering the inconsistency or consistency of statements, witness's demeanor, witness's incentive to lie, existence or absence of corroborating evidence, and where the witness's statements included specific details that were or were not plausible.

81. The Final Report included the EAD's determination that A.H. was more credible because:

      a. Her statements were consistent verses Plaintiff's when the EAD determined were inconsistent. The Final Report states that A.H. was consistent in reporting that the initial kissing and petting were consensual and that Plaintiff became upset when A.H. expressed she did not want to have sex, and that A.H. was consistent in reporting that Plaintiff grabbed her neck. (Note: not as to specific details of choking). Whereas, Plaintiff

25

Copy

was uncertain as to whether A.H.'s clothing was removed or not and where and when he put his hands on her neck.

b. The report found that A.H. had the ability to recall detail where as Plaintiff gave non-committal answers.

c. The EAD reported it found corroborating evidence for the Statements made to police, mainly that the video evidence verifying A.H.'s timeline, and that the bruising was consistent with A.H.'s report. (NOTE: bruise on thighs that EAD says is confirmation was reported by the charge nurse in the VUPD report as non-supporting the allegations.).

d. EAD also relied on fact that Plaintiff did not want to call A.H. a liar. Despite the fact in both of statements made by the Plaintiff, he denied the allegations.

e. However, A.H.'s statements are not consistent:

- She did not tell her roommate that she has been sexually assaulted. It is unclear when the allegation that Plaintiff forcibly tried to penetrate her became part of the narrative, because it is not included in the initial police report or roommate's statement.

82. The Final Investigative Report made the following findings of fact despite some evidence to the contrary:

a. Plaintiff groped A.H. in an aggressive manner.

b. Plaintiff got upset when A.H. indicated she did not want to have sex.

c. Plaintiff got on top of A.H. and stated he wanted to have sex with her.

d. Plaintiff removed A.H.'s underwear.

e. Plaintiff attempted to push A.H.'s legs apart in order to penetrate her vagina because of the medical reports of substantial bruising. (In Officer

26

Meyer's report, Charge Nurse Katie Moore, indicated there were tiny

pinpoint bruises on A.H.'s thighs but they were not related to incident.)

    f.   Plaintiff grabbed A.H.'s neck and held her down for a few seconds.

    g.   A.H. had a panic attack and spent 30 minutes in restroom.

83.    The Final Report included the police reports generated by the Vanderbilt

Police Department as an exhibit.

## H. The Appeal

84.    Plaintiff was allowed to appeal the decision of the EAD and Director of Student Accountability. Student appeals are decided by a panel of three Appellate Officers for Sexual Misconduct and Power-based Personal violence. The Officers are faculty or academic administrators appointed by the Chancellor. They are supposed to receive annual training on issues involved in sexual misconduct cases.

85.    The appeals officer can only consider a written petition for appeal, the supporting explanation and copies of all information previously provided to the EAD. No other documents or other evidence is allowed.

86.    There are four grounds for appeal: procedural irregularities sufficient to affect the determination by EAD and/or the sanction imposed by the Director of Student Accountability, insufficient information to support the determination by EAD, new information that was not reasonably available for presentation to EAD, the introduction of which could reasonably be expected to affect EAD's determination, and the harshness of the sanction imposed by the director of student accountability sufficient to show an abuse of discretion.

87.    Plaintiff appealed Vanderbilt's decision to the appellate board in writing on May 18, 2016. He stated that the decision had been based on unfounded assumptions from second hand sources, incomplete information, and lack of consideration for his narrative, including

27

**Copy**

pointing out that Nurse Katie Moore with Vanderbilt Medical Center said that A.H.'s thighs had tiny pinpoint bruises, but that they were not related to the incident.[56]

88.    On June 2, 2016, the EAD Compliance Manager, D. Michael Carter, filed a response to the appeal. Mr. Carter's response set forth that they examined the totality of evidence, and does not know what incomplete information Plaintiff referred to in his appeal. His response then stated that the EAD is an impartial fact finder but found A.H. more credible. The EAD's response did not in any way address the evidence or inconsistencies that Plaintiff referenced in his appeal.

89.    On June 3, 2016, Mary Solomon, the Director of Student Accountability sent a letter to the Appellate Board about Plaintiff's case. She relied upon the report of the EAD and based on what she said was physical violence used felt that expulsion was the most appropriate.

90.    The Appellate Board affirmed the decision to expel Plaintiff despite acknowledging his cooperation with the EAD and disciplinary record.

**I. The Aftermath of Complaint and Investigation**

91.    Because of his expulsion three days before his graduation, Plaintiff was prohibited from graduating and deprived of receiving his degree, which he had earned.

92.    As a result of the expulsion, Plaintiff was not commissioned as an Army Officer.

93.    As a result of not being commissioned as an Army Officer to the United States Army, the Plaintiff retroactively lost his scholarship from ROTC and is required to pay an estimated Two Hundred Eighteen Thousand Dollars ($218,000.00) in tuition to Vanderbilt University.

94.    Because of Vanderbilt's policy regarding expulsion, a permanent mark was placed on his transcript so that any subsequent university or employment applied to by the Plaintiff would be aware of the situation and his expulsion.[57]

---

[56] See VUPD Incident Report.
[57] Found in Vanderbilt Student Handbook under the heading "Sanctions" in Chapter 3: Student Accountability.

28



95.     As a result, the Plaintiff's future career prospects and economic stability are ruined and compromised.

<h2 style="text-align:center">COUNT I<br>(Breach of Contract)</h2>

96.     The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

97.     Plaintiff applied to and enrolled in Defendant Vanderbilt's program and paid tuition in addition to other fees and expenses. Plaintiff did so in reliance on the understanding and expectation that Defendant Vanderbilt would implement and enforce the promises and policies made in its official publications, including their Mission Statement, the Student Handbook, the Sexual Misconduct and Other Forms of Power-Based Personal Violence policies and procedures, as well as, other relevant documents, including those not mentioned in this complaint.

98.     A contract implied in law or in fact, was formed between Defendant Vanderbilt and the Plaintiff once the Plaintiff applied to and enrolled in the program. Specifically, Defendant Vanderbilt offered Plaintiff the ability to enroll in the university upon the condition that the Plaintiff paid for the necessary tuition and fees.

99.     Once Plaintiff paid for his tuition and fees, Plaintiff accepted Defendant Vanderbilt's offer. In this contract, Defendant Vanderbilt expects Plaintiff to adhere to all of the policies set forth in the Student Handbook while attending the University. In return, Defendant Vanderbilt receives the benefit of their policies being met, as well as, Plaintiff's financial contribution to the university. Likewise, Plaintiff expects Vanderbilt to follow the policies and procedures set out in its mission statement, Student Handbook, and other relevant documents.

100.    Moreover, the contract contained an implied covenant of good faith and fair dealing. Defendant Vanderbilt's Student Handbook for the year Plaintiff enrolled in the

29

Copy

university (2012-2013) states: "What students may expect of Vanderbilt is articulated in the University's mission statement, in the catalogues of the colleges and schools, in Equal Opportunity Statement, and in the Statement of Principles found in the Faculty Manual." Moreover, the Student Handbook contains the following provision relating to Vanderbilt's "Fair Procedures":

> The University is committed to providing students with the opportunity to present complaints about the action of any member of the University community. It will provide fair and appropriate procedures, including the opportunity for appeal, for addressing and resolving complaints. These procedures will be administered in a nonadversarial spirit of openness, fairness, cooperation, and mutual respect among the participants.

101. As set forth below, Vanderbilt repeatedly and materially breached their promise regarding fundamental fairness, as well as the implied covenant of good faith and fair dealing and other contractual provisions. These breaches include, but are not limited to, the following:

### A. Breach of Obligation to Conduct an Appropriate Investigation Pursuant to Title IX Obligations and Vanderbilt's Policies and Procedures

102. Vanderbilt's breach of its obligations under the Sexual Misconduct Policy to conduct an appropriate investigation began with the Equal Opportunity, Affirmative Action, and Disability Services office's ("EAD") disregard for the statements set out in the police reports and medical reports that came directly from licensed and trained individuals. These statements include those made by the Detective who "ruled out any non-consensual sexual contact," and the statements made by the Nurse who stated that the bruises to on A.H.'s thigh area were "tiny, pinpoint" and "not related to the incident." The EAD violated the promise of fundamental fairness and the implied covenant of good faith and fair dealing by refusing to observe the totality of the circumstances.

103. Additionally, the Appellate Board breached its obligation to conduct an appropriate investigation by construing the language of the interview documents in a manner that fit their predetermined decision to uphold the EAD and the Office of Student Accountability's

30

Copy

determination. The Appellate Board knew that those documents were not restated verbatim or based off of recorded conversations, and thus, were able to position them in a manner that fit their reasoning. The Appellate Board ruled Plaintiff's statements inconsistent based off certain language provided by the EAD in their interview reports, rather than the Plaintiff's recorded statements from Vanderbilt Police Officers. Further, the Appellate Board refused to appreciate Plaintiff's repetitive assertion that he refused to disrespect A.H. by calling her a liar, but ultimately disagreed with her recollection of events.

### B. Breach of Obligation to Refrain from Proceeding if Charge Lacks Sufficient Evidence

104. Vanderbilt's promise of fundamental fairness and the implied covenant of good faith and fair dealing obligated the EAD, the Title IX Coordinator, and the Office of Student Accountability to refrain from proceeding with A.H.'s charge if the investigation demonstrated that there was insufficient evidence to convince an unbiased tribunal of Plaintiff's guilt.

105. Regardless of any other evidence yielded by the investigation, A.H.'s initial statements to the police show that there was not sufficient evidence to convince an unbiased tribunal of Plaintiff's guilt. As aforementioned, the Metro Nashville Sex Crimes Detective responded to the Hospital when the allegation of sexual assault initially occurred. The Detective spoke with A.H. directly and subsequently ruled out any non-consensual sexual contact. As this Court knows, the Metro Nashville Sex Crimes Unit deals specifically with sex crimes, including those types of sexual misconduct that Vanderbilt sets out in their Sexual Misconduct Policy.

106. Even with A.H.'s additional information regarding the incident, the initial reports of the Vanderbilt Police and the medical reports from Vanderbilt show that there was not sufficient evidence to convince an unbiased tribunal of Plaintiff's guilt. Specifically, A.H. provided the EAD with new information over a month after the incident that consisted of "the Plaintiff forcibly removing A.H.'s thong underwear and trying to spread her legs." However, when evaluated initially by a Vanderbilt nurse, the Nurse stated that "she observed the victim's

31

thighs and stated there were tiny pinpoint bruises, but did not feel that they were related to the incident." Again, as this Court knows, the nurses that work with victims of sexual assault are specifically trained and have a significant amount of experience backing their observations.

107.     Moreover, A.H.'s statements vary significantly between each initial report made after A.H. arrived at the hospital. Further, A.H. admitted in her written statement that she was "drunk at the time" and that her "memory was spotty."

108.     When looking at these admissions and findings, the Title IX Coordinator, the Office of Student Accountability, and the EAD's decision to proceed with the investigation and charge Plaintiff with acts of sexual misconduct was a breach of Vanderbilt's promise of fundamental fairness and the implied covenant of good faith and fair dealing.

### C. Breach of Obligation to Provide Written Statements of All Witnesses

109.     The Sexual Misconduct Policy promises that "[t]he final investigative report will contain a summary of the information and documents on which the final determination is based and will address, to the extent EAD considers appropriate, *any comments received from the complainant or respondent. The comments from the complainant and respondent will also be attached as an exhibit.*"[58] Thus, Plaintiff should have had access to any questions asked to A. H. and statements provided by A.H.  However, the Final Investigative Report did not contain the aforementioned. The only statement of A.H.'s that was provided was the written statement that was a part of the Vanderbilt Police report.

110.     The EAD stated that A.H. was asked questions on April 13, 2016 and that A.H. returned her answers to the EAD the next day. The EAD also stated that A.H. provided them with a written narrative summary of the events. Further, A.H. provided comments in response to the Preliminary Investigation Report and those comments were not made available to Plaintiff at any time.

---

[58] *Id.* (emphasis supplied).

32

Copy

111. Therefore, Vanderbilt breached their obligation set forth in the Sexual Misconduct Policy, as well as the promise of fundamental fairness and the implied covenant of good faith and fair dealing. These breaches prevented Plaintiff from presenting an adequate defense, which resulted in severe prejudice against the Plaintiff.

### D. Breach of Promise that All Persons with Relevant Information Will Be Permitted to Provide Testimony

112. The Sexual Misconduct Policy promises that the EAD "will provide the student alleged to have engaged in misconduct with an opportunity to respond to the allegations, ask questions, provide information, and offer names of *witnesses or other people with relevant information.* . . . Supporting documentation and information may be collected from the complainant, respondent, and witnesses."[59] Thus, Plaintiff had the right to provide witnesses that interacted with Plaintiff after the alleged incident, as well as any witnesses that could comment on Plaintiff's character and capability of committing such acts.

113. Vanderbilt breached this promise when the EAD informed Plaintiff that his witnesses were irrelevant because these witnesses were not present at the time of the incident and thus, Plaintiff was not allowed to provide such witness. However, Vanderbilt allowed A.H.'s roommate's statements to be entered in the report as evidence of Plaintiff's conduct, even though Student 1 was not present at the time of the incident, and was only present afterwards, when A.H. returned to her dorm room. This is the same situation that Plaintiff was in, due to the fact that his roommates were present once A.H. left Plaintiff's suite. Student 1 was able to testify as to A.H.'s demeanor and statements made after the incident, while Plaintiff's roommates were denied the right to potentially testify as to Plaintiff's level of intoxication, his demeanor, and any statements made about his time with A.H.

---

[59] All quotations concerning the Vanderbilt Student Handbook are from Vanderbilt's website: http://www.vanderbilt.edu/student_handbook/ (emphasis supplied).

33

Copy

114.    Moreover, the EAD provided in the Final Investigative Report that "Plaintiff did not provide any names of people that he wanted the EAD to interview." The EAD completely misinterpreted the conversation about witnesses that they had with the Plaintiff, which shows that they were aware of their breach of the contract by denying his right to provide witnesses.

115.    Thus, from the start of EAD's investigation, the EAD determined that no other witnesses would influence their decision on Plaintiff's guilt of the incident, and did not allow Plaintiff to present an effective defense. Overall, the EAD's investigation tactics severely prejudiced Plaintiff and prevented him from having a fair and appropriate investigation. This represents another breach by Vanderbilt of their promise of fundamental fairness and the implied covenant of good faith and fair dealing.

### E.  Breach of Obligation to Disclose Exculpatory Evidence

116.    As the EAD states in their Final Investigative Report and their Sexual Misconduct Policy, the questions, answers, and comments involved in the EAD's interviews with A.H. significantly impacted their decision to expel Plaintiff from Vanderbilt and find him guilty of the charges against him. However, as aforementioned, Plaintiff was denied of his right to view such documents, and therefore, could not adequately provide a defense against the exculpatory evidence. Thus, Vanderbilt's failure to provide the aforementioned information was a breach of their obligation to disclose exculpatory evidence, as well as, the promise of fundamental fairness and of the implied covenant of good faith and fair dealing.

117.    Moreover, once the EAD was informed by the Plaintiff and A.H. that A.H. experienced panic attacks when triggered by certain actions, the EAD had a duty to investigate further to determine whether A.H. used any prescription medications or other treatments for her panic attacks, or possible anxiety or depression. As the EAD knows, alcohol and prescription drugs can severely affect one's state of mind and their level of intoxication. In many instances,

34

prescription drugs that treat anxiety, depression, and/or panic attacks can increase the effects of alcohol and increase symptoms related to the aforementioned mental illnesses.

### F. Breach of Obligation to Provide an Unbiased and Independent Disciplinary Panel and Investigation

118. Moreover, the EAD and the Appellate Board specifically criticized Plaintiff during the initial decision and the appeal processes for not being able to recall certain information, but took statements made by A.H. for the first time over a month after the incident, as facts and evidence. Further, A.H. did not inform the EAD of her new information until after a month had passed from the incident, which neither the EAD nor Appellate Board described as "inconsistent." Thus, the EAD and the Appellate Board breached its obligation to conduct an unbiased investigation. The EAD and Appellate Board both found A.H. to be more credible than the Plaintiff based on Plaintiff's inability to recall specific details, even though A.H. could not recall dramatic, significant portions of the night of the incident until one month after. Thus, the EAD and Appellate Board conducted their investigation and review with a bias, and discriminated against the Plaintiff's statements based on his gender.

119. As this Court is aware, Vanderbilt University has been under the spotlight for quite some time regarding sexual misconduct occurring on their campus by other members of Vanderbilt's community. It would be difficult to ignore the role that these types of situations play on Vanderbilt's campus at this time. Further, the Appellate Board members are appointed by the Chancellor of Vanderbilt, or through another person whom the Chancellor has selected to appoint members on his behalf. Thus, given the Chancellor's role at Vanderbilt and the pressure that comes along with maintaining the University's image, the Chancellor's appointment of Appellate Board members at this time violated the promise of an unbiased and independent panel and investigation.

35

### G. Breach of Obligation that There Be Sufficient Evidence to Support the Board's Finding

120.    The only evidence that a sexual assault occurred is A.H.'s statements. Those statements were inconsistent and unreliable given A.H.'s admitted level of intoxication.

121.    Defendant Vanderbilt's promise of fundamental fairness and implied covenant of good faith and fair dealing placed a requirement on the EAD team, Title IX Coordinator, and Director of Student Accountability to investigate an allegation only if there is sufficient evidence.

122.    On the basis of A.H.'s inconsistent reported statements, Defendant Vanderbilt's decision to hold a hearing and expel Plaintiff from the school was a breach of Defendant Vanderbilt's promise to be fundamentally fair and the implied covenant of good faith and fair dealing.

### H. Breach of Obligation to Afford Opportunity for Confrontation and Cross-Examination

123.    When the allegations of sexual misconduct rely solely on one student verses another, the hearing panel must weigh the credibility of both parties. Typically, as is the case here, there are no third-party witnesses, alcohol or other mind altering substances are involved, and consensual sexual contact often precedes the alleged sexual assault. Not requiring that both the compliant and the respondent testify at the hearing cannot be squared with fundamental fairness.

124.    Vanderbilt did not require A.H. to testify during the hearing against Plaintiff.

125.    The lack of A.H.'s presence at the hearing also prevented the plaintiff from an opportunity to cross-examine A.H. This caused the Plaintiff to be denied the opportunity to directly confront the evidence against him and was a breach of fundamental fairness and the implied covenant of good faith and fair dealing.



126. The Plaintiff was denied his right to due process by not being allowed to confront his accuser.

### I. Summary

127. All of the foregoing breaches of contract were wrongful. As a direct and foreseeable result of these breaches of contract, the Plaintiff sustained, and will continue to sustain substantial injury, damages, and loss, including but not limited to: past and future economic loss, loss of wages, deprivations of due process, loss of future career prospects, severe emotional distress, defamation to his character, and mental anguish.

### COUNT II
### (Promissory Estoppel)

128. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

129. As described above, the Sexual Misconduct policies detailed in the Vanderbilt University Student publication constitutes a promise that Defendant Vanderbilt will act in a manner described in the publications. Defendant Vanderbilt should have expected Plaintiff to rely on the policies stated in the handbook when he enrolled in Vanderbilt and had his scholarship money from ROTC applied there. Plaintiff reasonable expected Defendant Vanderbilt would honor its express and implied promises, including that of fundamental fairness and the implied covenant of good faith and fair dealing.

130. Plaintiff relied to his detriment on these express and implied promises and representations made by the Defendant Vanderbilt.

131. Injustice can only be avoided by enforcement of Defendant Vanderbilt's representations.

132. As a direct and foreseeable result of Defendant Vanderbilt's failure to honor its promises, the Plaintiff has suffered severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

37



**COUNT III**
**(Declaratory Judgment – Title IX and Clery Act)**

133.   The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

134.   Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

135.   Upon information and belief, Defendant Vanderbilt receives substantial monies in federal funding for research and development.

136.   Both the Department of Education has expressed that Title IX requires schools to "adopt and publish grievance procedures providing for prompt and equitable resolution of student...complaints alleging any action when would be prohibited" by Title IX or regulations thereunder. 34 C.F.R. § 106.8(b). The procedures created for Title IX must "accord due process to both parties involved...".[60]

137.   "The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding." [61]

138.   There are four different standards that claims arising under Title IX must fall within when they involve disciplinary hearings; they are the "erroneous outcome" standard, the "selective enforcement" standard, the "deliberate indifference" standard, and the "archaic assumptions" standard.[62]

> a.   The "erroneous outcome" standard means that a University's disciplinary proceeding was erroneous because of a motivation governed by a sexual bias.[63]

---

[60] U.S. Dept. of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties—Title IX* (2001) at 19-20, 21.
[61] Id. at 20
[62] *Malloy v. Ohio Univ.*, 76 Fed.Appx. 634, 638 (6th Cir. 2003) (internal citations omitted).
[63] *Id.*

38

Copy

139.    In the case at hand, Defendant Vanderbilt made the decision to charge and expel the Plaintiff based off of a sexual bias. Defendant Vanderbilt's sexual misconduct investigation was unfair and unequal in several regards, including their decision to provide unequal treatment as to Plaintiff's opportunity to present witnesses, the credibility given to A.H.'s inconsistent and manipulated statements, the EAD's inability to take Plaintiff's statements at face value, and the lack of protection of Plaintiff and his rights.

140.    Based on the foregoing, Defendant Vanderbilt has deprived Plaintiff, on the basis of his sex, of his rights to due process and equal protection through the improper administration of Defendant Vanderbilt's sexual misconduct policies.

141.    Defendant Vanderbilt has violated Title IX of the Education Amendment of 1972 in that it has created a hostile environment for male students accused of sexual assaulting a female. Defendant Vanderbilt conducted its investigation of A.H.'s allegations in a manner that was biased against the male being accused. Plaintiff was guilty until proven innocent, effectively denying him due process by having to prove his innocence when the female's statement is accepted at face value.

142.    Based on the aforementioned, Defendant Vanderbilt imposed a disciplinary sanction of expulsion against the Plaintiff due to his gender, which was disproportionate and excessive compared to the severity of charges leveled against him and without any consideration of his clean disciplinary record.

143.    As a result of the foregoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, that this Honorable Court orders the following: (1) Defendant reverses its outcome and findings; (2) Plaintiff's disciplinary record be expunged; (3) the record of Plaintiff's expulsion from Defendant Vanderbilt be removed; and (4) and record of Plaintiff's EAD hearing and appeal be permanently destroyed.



## COUNT IV
## (Defamation)

144. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

145. Defendant Vanderbilt published to third parties that Plaintiff was guilty of a sexual assault on campus, even though they knew the allegation was false and/or unsubstantiated, or acted with reckless indifference to the truth or falsity of said allegation.

146. The defamatory statements harmed Plaintiff's reputation by conveying to third persons the Plaintiff's guilt of sexual assault.

147. Defendant Vanderbilt, with its defamatory accusations, intended to and did ruin the Plaintiff's good name in the community, brought scandal to his peer group, and limits the Plaintiff's future educational and career prospects.

148. The defamatory statements were not statements of mere opinion but where conveyed as facts.

149. The defamatory statements were malicious, reckless, and intentionally or negligently made.

150. All persons receiving the communication understood the defamatory nature and meaning of the communications.

151. The defamatory statements were published to multiple third parties via the Vanderbilt warning system and to the Director of Student Accountability.

152. As a result of the defamatory statements, the plaintiff suffered actual loss to his reputation and personal humiliation.

153. Vanderbilt's actions were wanton, reckless, willful, and malicious and showed a reckless indifference to the affects to the plaintiff so as to warrant an award of punitive damages.

40



## COUNT V
### (Damages under Title IX)

154.     The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

155.     Title IX includes an implied private right of action, without any requirement that administrative remedies, if any, be exhausted. An injured plaintiff may seek money damages and other relief.

156.     As set forth above, Defendant Vanderbilt's action in the investigation and ultimate expulsion of Plaintiff were wrongful, intentional, reckless, and in clear violation of Title IX's requirements. Their actions were biased against Plaintiff on the basis of his gender.

157.     Defendant Vanderbilt was deliberately indifferent to the effects of its actions on Plaintiff and his future.

158.     Because of Vanderbilt's violation of Title IX, the Plaintiff has suffered severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

## COUNT VI
### (Negligence *Per Se*)

159.     The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

160.     When Defendant Vanderbilt accepted Plaintiff's enrollment as a student, they entered into a duty of care towards Plaintiff to conduct themselves in a manner consistent with the Student Handbook and in a non-negligent manner.

161.     Defendant Vanderbilt breached its duty of care towards Plaintiff when it conducted the investigation in a way that was indifferent to the truth of the allegations made against Plaintiff.

41

**Copy**

162. Because of Defendant Vanderbilt's negligent conduct the Plaintiff has suffered severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

**COUNT VII**
**(The Clery Act)**

163. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

164. Title IX and the Clery Act created a statutory duty of care that the University was obligated to perform. Plaintiff is a person within the protection of Title IX and the Clery Act.

165. Vanderbilt's violations of Title IX and the Clery Act constitute negligence per se and are the proximate cause of Plaintiff suffering severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

**COUNT VIII**
**(Gross Negligence)**

166. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

167. As stated above, Defendant Vanderbilt was negligent and negligent per se.

168. Defendant Vanderbilt recklessly disregarded the rights of Plaintiff, and was callously indifferent to the effects of their conduct would have on Plaintiff's reputation, mental health, and future. Defendant Vanderbilt's bias against Plaintiff amounts to grossly negligent conduct and deviation from the standard of care.

169. Vanderbilt's grossly negligent conduct has caused the Plaintiff to suffer severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.



## COUNT IX
### (Intentional Infliction of Emotional Distress)

170. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

171. Defendant Vanderbilt's conduct towards Plaintiff during the investigation, appeal, and expulsion was intentional and reckless and so outrageous that it is not tolerated by a civilized society.

172. Vanderbilt's conduct has caused serious mental injury to the Plaintiff, and has significantly impaired Plaintiff's daily life.

## COUNT X
### (Unjust Enrichment)

173. The Plaintiff incorporates and reasserts all previous allegations as if copied verbatim herein.

174. Due to the Plaintiff's excessive wrongful expulsion from Defendant Vanderbilt, the Plaintiff is now required to pay back an estimated One Hundred Thirty-six Thousand Dollars ($136,000.00). Additionally, the Plaintiff already paid the Defendant Vanderbilt the sum of Eighty-two Thousand Dollars ($82,000.00), for a total estimated cost of Two Hundred Eighteen Thousand Dollars ($218,000.00). Despite conferring a benefit to Defendant Vanderbilt in the form of tuition payments, Plaintiff was denied his degree. It would be unjust for Defendant Vanderbilt to be allowed to keep said Eighty-Two Thousand Dollars ($82,000.00) previously paid to Defendant Vanderbilt, and to require Plaintiff to pay back One Hundred Thirty-six Thousand Dollars ($136,000.00) received from the ROTC program.

175. In order to avoid Defendant Vanderbilt's unjust enrichment at the Plaintiff's expense, Plaintiff is entitled to damages in the amount that Defendant Vanderbilt has been unjustly enriched or Plaintiff should be awarded his degree to avoid said injustice.



## RELIEF REQUESTED

WHEREFORE, the Plaintiff respectfully requests and prays for a judgment against the Defendant Vanderbilt and further respectfully requests this Honorable Court to:

1. Issue a Judgment declaring the following:

   a. Defendant Vanderbilt's investigation, prosecution, and ultimate expulsion of the Plaintiff were contrary to Title IX, Defendant Vanderbilt's own rules and regulations, and the law.

   b. The decision that Plaintiff did commit the offense of sexual misconduct and the Director of Student Accountability's decision to expel the Plaintiff was not supported by substantial evidence beyond the preponderance of evidence standard applied by Defendant Vanderbilt.

   c. Defendant Vanderbilt is required to expunge the incident from its records and the Plaintiff's transcript and/or school record.

   d. Defendant Vanderbilt is required to confer the degree, which the Plaintiff so justly earned, upon the Plaintiff.

2. Award Plaintiff compensatory damages in an amount to be proven at trial, in addition to prejudgment interest on Plaintiff's loss of wages, loss of income potential, loss of his military career, lost tuition, damages to his reputation, emotional distress, punitive damages, attorney's fees expenses and costs, and all other damages set out in the pleadings in an amount not less than Ten Million Dollars ($10,000,000.00);

3. For an award of costs pursuant to T.C.A. § 29-14-111, *et seq.*; and

4. For such other relief to which the Plaintiff may be entitled and that the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims so triable.

44

Respectfully submitted:

ROB MCKINNEY      #16807
One Washington Square, Suite 400
214 Second Avenue North
Nashville, TN 37201
(615) 256-7337 telephone
(615) 254-4228 facsimile
rob@maymckinneylaw.com


## Certificate of Service

I do hereby certify on the 12th day of May, 2017 that true and correct copy of the foregoing document was sent via United States Postal Service, first class, postage prepaid, and/or Hand Delivery, Facsimile, Electronic Transmittal to the following:

Ms. Sheree Wright, Esquire
Office of General Counsel
2100 West End Avenue, Suite 750
Nashville, TN 37203

Rob McKinney

45

Copy

IN THE CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE
AT NASHVILLE

FILED

2017 MAY -9 AM 11: 33

RICHARD R. ROOKER, CLERK

Schatman D.C.

Z. J.,

     Plaintiff,

v.

(THE) VANDERBILT UNIVERSITY,

     Defendant.

)
)
)
)
)
)
)
)
)

No. 17C1122

JURY DEMAND

## ORDER TO PROCEED UNDER A PSEUDONYM

It appears to the Court, for good cause shown, that the Motion to Proceed under a Pseudonym is well taken and should be granted. It is, therefore,

**ORDERED, ADJUDGED AND DECREED** that the Plaintiff shall be allowed to proceed with this action under the pseudonym of "Z. J." in the above referenced cause. It is, further,

**ORDERED, ADJUDGED AND DECREED** that the Affidavit submitted with the Motion to Proceed under a Pseudonym shall be placed under seal to protect the identity of the Plaintiff.

ENTERED this the _____ day of _____, 2017.

JUDGE _____
JOE P. BINKLEY, SR.
PRESIDING JUDGE OF THE
20TH JUDICIAL DISTRICT
AT NASHVILLE, TENNESSEE

Approved for Entry:

_____
ROB MCKINNEY          #16807
One Washington Square, Suite 400
214 Second Avenue North
Nashville, TN 37201
(615) 256-7337 telephone
(615) 254-4228 facsimile
rob@maymckinneylaw.com

1


Copy

## Certificate of Service

I do hereby certify on the 9th day of May, 2017 that true and correct copy of the foregoing document was sent via United States Postal Service, first class, postage prepaid, and/or Hand Delivery, Facsimile, Electronic Transmittal to the following:

Vanderbilt University (The)
Office of General Counsel
305 Kirkland Hall
Nashville, TN 37240

Rob McKinney

2

Copy

IN THE CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE
AT NASHVILLE

FILED
2017 MAY 12 PM 12: 20
RICHARD R. ROOKER, CLERK
D.C.

Z. J.,                          )
                                )
        Plaintiff,              )
                                )
v.                              )    No. 2017-C-1122
                                )    JURY DEMAND
(THE) VANDERBILT UNIVERSITY,    )
                                )
        Defendant.              )

## ORDER TO SUBSTITUTE ORIGINAL COMPLAINT
## WITH AMENDED COMPLAINT AND PLACE
## ORIGINAL COMPLAINT UNDER SEAL

For good cause shown, it appears to the Court that the Motion to Substitute Original

Complaint with Amended Complaint and Place Original Complaint under Seal filed by the

Plaintiff, and the Defendant having no objection, is well taken and should be granted. It is,

therefore,

**ORDERED, ADJUDGED AND DECREED** that the original Complaint filed in the

above referenced cause shall be substituted with the Amended Complaint filed by the Plaintiff. It

is, further,

**ORDERED, ADJUDGED AND DECREED** that the original Complaint shall be placed

under seal of the Court to protect the privacy of the parties and witnesses.

ENTERED this the _____ day of _____, 2017.

_____
JUDGE

1

Copy

Approved for Entry:

_____

ROB MCKINNEY          #16807
One Washington Square, Suite 400
214 Second Avenue North
Nashville, TN 37201
(615) 256-7337 telephone
(615) 254-4228 facsimile
rob@robmckinneylaw.com

## **Certificate of Service**

I do hereby certify on the 12th day of May, 2017 that true and correct copy of the foregoing document was sent via United States Postal Service, first class, postage prepaid, and/or Hand Delivery, Facsimile, Electronic Transmittal to the following:

Ms. Sheree Wright, Esquire
Office of General Counsel
2100 West End Avenue, Suite 750
Nashville, TN 37203

_____

Rob McKinney

2

# Copy

## RETURN ON PERSONAL SERVICE OF SUMMONS

I hereby certify and return that on the ____/17___ day of ___May_____, 20_17_, I:

[ ✓ ] served this summons and complaint/petition on _Asst. Nancy_ _Shore_____ in the following manner:

_____

[ ] failed to serve this summons within 90 days after its issuance because

_____

_____
Sheriff/Process Server

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return, that on the _____ day of _____, 20____ I sent, postage prepaid by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in Docket No.

_____ to the defendant, _____. On the _____ day of

_____, 20____, I received the return receipt for said registered or certified mail, which had been signed

by _____ on the _____ day of _____, 20_____. Said return

receipt is attached to this original summons and both documents are being sent herewith to the Circuit Court Clerk for filing.

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS

_____ DAY OF _____, 20_____.

_____
PLAINTIFF, PLAINTIFF'S ATTORNEY OR OTHER PERSON
AUTHORIZED BY STATUTE TO SERVE PROCESS

_____NOTARY PUBLIC or _____DEPUTY CLERK

MY COMMISSION EXPIRES: _____

2017 MAY 22  PM 4: 15
D.C.
ATTACH
RETURN
RECEIPT
HERE
(IF APPLICABLE)

## NOTICE

**TO THE DEFENDANT(S):**
Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

STATE OF TENNESSEE
COUNTY OF DAVIDSON

(To be completed only if
copy certification required.)

I, Richard R. Rooker, Clerk of the Circuit Court in the State and County aforesaid, do hereby certify this to be a true and correct copy of the original summons issued in this case.

RICHARD R. ROOKER, CLERK

By: _____D.C.