# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **Z.J.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:17-cv-00936** |
| | ) | **CHIEF JUDGE CRENSHAW** |
| **THE VANDERBILT UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Z.J., a former Vanderbilt University ("Vanderbilt") student, brings this action arising out of Vanderbilt's investigation of an accusation of sexual misconduct made against him by a female student ("A.H.") following an alleged physical incident that occurred after a St. Patrick's Day tailgate party.[1] After the investigation, Vanderbilt concluded that Z.J. had engaged in non-consensual sexual contact, dating violence, and attempted non-consensual sexual intercourse with A.H., and it expelled Z.J. as a sanction. Z.J. brings this action asserting over twenty claims under Title IX of the Educational Amendments Act of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"); the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f) ("Clery Act"); the Declaratory Judgment Act, 28 U.S.C. § 2201; and multiple Tennessee laws of contract and tort. Before the Court is Vanderbilt's Motion to Dismiss pursuant to Federal Rule of Procedure 12(b)(6). (Doc. No. 26.) Z.J. has responded in opposition (Doc. No. 36) and Vanderbilt has replied (Doc. No. 38). For the following reasons, Vanderbilt's Motion will be granted and this case will be dismissed.

---

[1] Due to confidentiality concerns and the sensitive issues involved in this case, pseudonyms are utilized to protect anonymity.

I.    Legal Standard

To survive a Rule 12(b)(6) motion, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 557). "If the plaintiffs do not nudge their claims across the line from conceivable to plausible, their complaint must be dismissed." Lutz v. Chesapeake Appalachia, L.L.C., 717 F.3d 459, 464 (6th Cir. 2013) (citation and brackets omitted). Dismissal is likewise appropriate where the complaint, however factually detailed, fails to state a claim as a matter of law. Mitchell v. McNeil, 487 F.3d 374, 379 (6th Cir. 2007). The Court of Appeals for the Sixth Circuit recently confirmed, after a challenge, that this is indeed the governing standard for Title IX claims as well as other claims. See Doe v. Miami Univ., 882 F.3d 579, 588-589 (6th Cir. 2018) (rejecting the reduced pleading standard in Title IX cases enunciated by the Court of Appeals for the Second Circuit).

In deciding a motion to dismiss, the court is not required to accept summary allegations, legal conclusions, or unwarranted factual inferences. Mixon v. Ohio, 193 F.3d 389, 400 (6th Cir. 1999); Lillard v. Shelby Cty. Bd. of Educ., 76 F.3d 716, 726 (6th Cir. 1996). Nor is the court required to accept as true allegations that are contradicted by documents that have been incorporated by reference in the complaint. Williams v. CitiMortgage, Inc., 498 F. App'x 532, 536 (6th Cir. 2012).

As a general rule, "matters outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss unless the motion is converted to one for summary judgment under [Federal Rule of Civil Procedure] 56." Weiner v. Klais & Co., 108 F.3d 86, 88 (6th Cir. 1997).

The term "pleadings" encompasses both the complaint and the answer, Fed. R. Civ. P. 7(a), and a copy of any exhibit thereto. Fed. R. Civ. P. 10(c). However, the Court of Appeals has held that "[d]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim." Jackson v. City of Columbus, 194 F.3d 737, 745 (6th Cir. 1999), abrogated on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002); see also Commercial Money Ctr., Inc. v. Illinois Union Ins. Co., 508 F.3d 327, 335 (6th Cir. 2007) (holding that a district court may consider documents referenced in the pleadings that are "integral to the claims" in deciding motion to dismiss); Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp., 413 F.3d 553, 560 (6th Cir. 2005) (noting that in deciding a motion to dismiss "the court may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice"). In short, "if both parties reference and quote extensively from particular documents, and neither party contests the appropriateness of considering the documents on review of a motion to dismiss, the Court may consider the documents." Doe v. Ohio St. Univ., 219 F. Supp. 3d 645, 653 (S.D. Ohio 2016) (hereinafter "Ohio St. Univ. I") (citing In re Fair Fin. Co., 834 F.3d 651, 656 n.1 (6th Cir. 2016)).

II.  Factual Allegations and Procedural Background

Vanderbilt is a private university located in Nashville, Tennessee, that accepts federal funding. (Doc. No. 23 at ¶¶ 6, 32.) Z.J., a resident of Tennessee, matriculated at Vanderbilt in the fall of 2012 and intended to graduate. (Id. at ¶ 8, 11-12, 96.) Upon enrolling at Vanderbilt, Z.J. – like every other student – became (1) generally bound by Vanderbilt's honor code, which is embodied in the "Community Creed," and (2) specifically governed by the policies and regulations

3

set forth in the Vanderbilt Student Handbook ("Handbook").[2] (Doc. Nos. 27-1 at 1-2.) Vanderbilt

specifies that it reserves the right to "add to, modify, or revoke any of its regulations and policies,

including those in the [H]andbook, without notice," and students are cautioned that "the

information provided, and the regulations and policies articulated in the [Handbook] are not

intended to be all-inclusive and do not constitute a contract."[3] (Id. at 2) The Handbook includes a

general provision regarding "Fair Procedures" in which Vanderbilt states that it is "committed to

providing students with the opportunity to present complaints about the action of any member of

the University community." (Doc. No. 23 at ¶ 105.) Vanderbilt generally commits to providing

"fair and appropriate procedures, including the opportunity for appeal, for addressing and

resolving complaints," that will be administered openly, fairly, cooperatively, and with a mutual

respect among the participants. (Id.)

---

[2] Vanderbilt attached the 2015-2016 Handbook to the Motion. (See Doc. No. 27-1.) This is the version relevant to this case. Z.J. does not contest the authenticity of the Handbook (see Doc. No. 36), the Handbook has been expressly and extensively referenced in the Complaint, and the Handbook is integral to Plaintiff's claims (see, e.g., Doc. No. 23 at ¶¶ 43-50, 52-53, 55-65, 79, 89-91, 102-107, 110, 114, 117, 121.) Also expressly referenced in the Complaint and integral to Z.J.'s claims is Vanderbilt's Final Investigation Report, discussed below. (See id., e.g., at ¶ 81-88). While Vanderbilt did not initially attach this document to its Motion to Dismiss, it withheld it strictly out of concern for A.H.'s privacy rights (see Doc. No. 27 at 5 n.2). The Court ordered a copy of the report to be filed under seal. (See Doc. No. 42.) These types of documents are often considered on motions to dismiss claims concerning university disciplinary matters, see, e.g., Ohio St. Univ., 219 F. Supp. 3d at 653 (consulting underlying record of proceeding at university), and the parts not necessarily quoted by Z.J. are still integral to Z.J.'s claims, see Doe v. Baum, 227 F. Supp.3d 784, 794 (E.D. Mich. 2017), reversed and remanded on other grounds by Doe v. Baum, 903 F.3d 575 (6th Cir. 2018). Under controlling law, the Court considers these two documents in their entirety in ruling on the motion to dismiss.

[3] The Handbook references several other publications that provide sources of information as to "what students may expect of Vanderbilt," including school catalogues, the school Equal Opportunity Statement, and the Faculty Manual Statement of Principles. (Doc. No. 27-1 at 2.) The parties have not made any claim that these publications contain any information, policies or promises relevant to the Sexual Misconduct Policy, and these publications are neither referenced by Z.J. nor attached to the Motion to Dismiss. The Court therefore does not discuss them further.

A. <u>Vanderbilt's Sexual Misconduct Policy</u>

The Handbook includes a dedicated disciplinary policy concerning "Sexual Misconduct and other Forms of Power-Based Personal Violence" ("Sexual Misconduct Policy"). (<u>Id</u>. at 99-121.) According to the Sexual Misconduct Policy, "Vanderbilt takes reports of sexual misconduct and power-based personal violence seriously." (<u>Id</u>. at 108.) Vanderbilt (1) explains that it "prohibits and seeks to eliminate all forms of sexual misconduct, including sexual harassment and sexual assault, and other forms of power-based personal violence, which includes dating violence, domestic violence, and stalking"; (2) declares that it "has a duty to take steps to prevent and redress sexual misconduct and power-based personal violence"; and (3) affirms that "[s]uch conduct is contrary to Vanderbilt's values, represents socially irresponsible behavior, and is not tolerated." (<u>Id</u>. at 99.)

The Sexual Misconduct Policy lists and defines a variety of prohibited offenses, several of which are relevant here. (<u>Id</u>. at 104.) "Non-Consensual Sexual Contact" includes "any contact of a sexual nature – however slight – with the breasts, buttocks, groin, genitals, mouth, or other body part of another, by any person upon another without effective consent." (<u>Id</u>. at 104; Doc. No. 23 at ¶ 50.) "Dating Violence" is defined as "sexual or physical abuse or the threat of such abuse committed by a person who is or has been in a social relationship of a romantic or intimate nature with the person against whom the violence is perpetrated." (Doc. No. 27-1 at 104; Doc. No. 23 at ¶ 50.) Finally, "Non-Consensual Sexual Intercourse" is "any vaginal and/or anal penetration – however slight – by a penis, object, tongue, or finger, and/or oral copulation (mouth to genital contact), by any person upon another without effective consent." (Doc. No. 27-1 at 104; Doc. No. 23 at ¶ 50.) The Sexual Misconduct Policy clarifies that "[d]eterminations regarding whether a person's level of intoxication affects their ability to give effective consent will be made on a case-

by-case basis." (Doc. No. 27-1 at 106.) It also notes that intoxication does not "provide a valid explanation or excuse for engaging in any form of sexual misconduct or power-based personal violence." (Id.) Finally, the Sexual Misconduct Policy defines effective consent as "consent that is informed and freely and actively given."[4] (Id. at 107.)

---

[4] The Sexual Misconduct Policy further expounds on "effective consent":

> Effective consent requires mutually understandable words or actions indicating a willingness to engage in mutually agreed-upon sexual activity.
> - The person who wishes to engage in sexual activity with another bears the burden of specifically obtaining effective consent. If effective consent is in question or ambiguous, then the person who wishes to engage in sexual activity must clarify or explicitly ask for permission.
> - Effective consent must be maintained by both parties throughout the sexual interaction.
> - Effective consent to sexual activity may be revoked at any time, at which point sexual activity must cease immediately.
> - A person who is the object of sexual misconduct is not required to resist physically or otherwise in order to convey or demonstrate a lack of effective consent.
> - Effective consent means communicating "yes" by word or action; the absence of saying or indicating "no" does not equate to effective consent.
> - Previous sexual relationships of the complainant and the respondent with others are generally irrelevant to the existence of effective consent, but a previous and/or current sexual relationship between the complainant and the respondent may or may not be relevant to demonstrating or establishing, depending on the facts and circumstances, whether effective consent was sought or obtained.
> - Effective consent expires. Effective consent lasts for a reasonable time, depending on the circumstances. Thus, effective consent on one occasion, whether on the same day or another day, may not carry over to another sexual interaction.
> - Effective consent is never implied by attire, nor can it be inferred from the buying of dinner, the spending of money on a date, being invited or accepting an invitation to a person's residence, or engaging in kissing or other foreplay.
> - Because effective consent must be informed, an individual may not engage in sexual activity with another person if the individual knows the person is incapacitated, or if a reasonable person would know the person is incapacitated.

6

How Vanderbilt responds to complaints under the Sexual Misconduct Policy "depends upon a variety of factors, including the wishes of the victim, the facts and circumstances of the specific incident, to whom it was reported, and [Vanderbilt's] obligations under applicable federal and state laws." (Id. at 108.) Vanderbilt recommends that students make complaints of sexual misconduct directly to its Equal Opportunity, Affirmative Action, and Disabilities Services Department ("EAD"), which is led by the University's Title IX Coordinator (at the time Anita Jenious), and has responsibility for administrative investigation of reports of Sexual Misconduct Policy violations. (Id. at 110.) "The EAD staff is trained annually and on an ongoing basis on issues related to sexual harassment, sexual misconduct, and power-based personal violence, and in conducting investigations in a manner that protects the well-being and safety of the complainant, the respondent, and the [Vanderbilt] community." (Id.) Students may also make an initial complaint to another Vanderbilt employee, and that person will refer the matter to EAD. (Id.) "Everyone is encouraged to report sexual misconduct or power-based personal violence even if some or all information is unavailable or cannot be provided." (Id. at 111.)

---

- Because effective consent can never be provided by an incapacitated person, effective consent is deemed withdrawn when an individual becomes incapacitated at any point during sexual activity.
- Agreement or acquiescence obtained through the use of fraud or force (actual or implied), whether that force be physical force, threats, intimidation, or other forms of coercion, is not effective consent.
- A person's age may be a factor in determining the ability to give effective consent.
- The existence of a cognitive disability or other condition that significantly limits a person's ability to understand the nature of an action for which effective consent is requested may be a factor in determining the ability to give effective consent.

(Doc. No. 27-1 at 107.)

7

B.     The Sexual Misconduct Policy Complaint and Investigation Process

After a complaint of a violation of the Sexual Misconduct Policy is brought to the attention of EAD, the first step is for the Title IX Coordinator and EAD to determine whether to proceed with an investigation.[5] (Id. at 111.) The Title IX Coordinator and EAD consider a variety of factors, including "the interests of the complainant and [Vanderbilt's] commitment to a safe and nondiscriminatory environment for all members of the [Vanderbilt] community."[6] (Id.; Doc. No. 23 at ¶ 57.) On the other hand, in weighing a request that no investigation be conducted, "the Title IX Coordinator will consider a variety of factors, including, but not limited to, the complainant's desire for confidentiality, information concerning any previous allegations involving the respondent, the likelihood of repeated offenses, evidence that the alleged misconduct is part of a pattern of misconduct, and [Vanderbilt's] ability to ensure that the alleged misconduct does not contribute to the creation of a hostile environment for any students." (Doc. No. 27-1 at 111.) EAD will gather evidence from the complainant, including the names of potential witnesses and supporting documentation such as emails, text messages and social media posts. (Id. at 112.) If EAD determines a complaint involves an alleged violation of the Sexual Misconduct Policy, it "will normally commence an investigation." (Id.)

Upon a determination by the Title IX Coordinator that an investigation involving a student respondent will be conducted, "the EAD investigator will normally provide a summary of the

---

[5] While this process unfolds, Vanderbilt may implement "appropriate interim measures" on its own initiative or in response to a request from a complainant, including "directives to desist," which are more commonly known as no-contact orders, between the complainant and potential respondent. (Doc. No. 27-1 at 103, 116.)

[6] Vanderbilt generally extends immunity for possession or use of alcohol or drugs and any resulting intoxication to victims and potential witnesses in order to facilitate reporting and resolution of Sexual Misconduct Policy complaints. (Doc. No. 27-1 at 115.)

8

allegations to the Director of Student Accountability," who will then "determine the charge(s) to be brought, if any, and present the charge(s) and possible sanctions to the respondent."[7] (Id. at 112.) "After the presentation of any charge(s), "the respondent will have the opportunity to agree or disagree with the charge(s)." (Id.) The completed charge sheet is then sent to EAD for further investigation and a determination. (Id.) But whether or not the Director of Student Accountability has already presented charges, the Sexual Misconduct Policy directs that "the EAD investigator will inform the respondent of the allegations, the status and/or initiation of an investigation, and the possibility of sanctions, and will provide the student alleged to have engaged in misconduct with an opportunity to respond to the allegations, ask questions, provide information, and offer names of witnesses or other people with relevant information." (Id. at 113; Doc. No. 23 at ¶ 59.)

The Sexual Misconduct Policy provides that EAD investigators will interview the respondent and other individuals that it determines "may have pertinent knowledge." (Doc. No. 27-1 at 113.) "[S]upporting documentation and information may be collected from the complainant, respondent, and witnesses," and "EAD may request access to premises, records, documents, and other forms of evidence it deems relevant to the complaint." (Id.; Doc. No. 23 at ¶ 59.) As the investigation progresses, EAD investigators may seek clarification from any person participating in the investigation regarding the incident or their statement. (Doc. No. 27-1 at 113.) The complainant and respondent are allowed to notify EAD investigators of "any additional information during the course of the investigation." (Id.) The Sexual Misconduct Policy states that the complainant and the respondent will be given the opportunity "to review and revise the summar[ies] of their interview[s] prepared by the EAD investigator." (Id.)

---

[7] A charge may be brought or revised at any point during an investigation based on the information obtained by EAD. (Doc. No. 27-1 at 112.)

9

Student are expected "to cooperate with the investigation[ ] conducted by EAD." (Id.) During an investigation, both a complainant and respondent are permitted to have an "adviser" of their choosing to accompany them to meetings related to disposition of the complaint. (Id.) The adviser for either party may confer privately with that party, but may not speak on the party's behalf or otherwise participate in any meeting. (Id.)

At the conclusion of an investigation, and prior to making a determination, EAD prepares a preliminary investigation report that contains a summary of the information and documents that EAD considers to be relevant to whether the respondent violated the Sexual Misconduct Policy. (Id. at 114; Doc. No. 23 at ¶ 59.) The complainant and respondent are each given an opportunity to review a copy of the preliminary report. (Doc. No. 27-1 at 114.) Both the complainant and respondent are then allowed to submit, within five days, up to five pages of written comments. (Id.) After considering those comments on the preliminary report, EAD issues a final investigation report that sets forth EAD's final determinations, based on a preponderance of the evidence (i.e., more likely than not) standard, regarding whether the respondent violated the Sexual Misconduct Policy by engaging in any prohibited offenses. (Id.; Doc. No. 23 at ¶ 63.) The final investigation report contains a summary of the information and documents on which it is based and addresses, "to the extent EAD considers appropriate," any comments received from the complainant or respondent on the preliminary report. (Doc. No. 27-1 at 114.) The parties' comments to the preliminary investigation report are also appended to the final investigation report. (Id.) When the respondent is determined to have engaged in the conduct for which he or she was charged, the final

10

investigation report will also be forwarded to the appropriate person for sanctioning, referral, or follow-up – in the case of a student respondent, the Director of Student Accountability.[8] (Id.)

If the EAD has determined that a respondent violated the Sexual Misconduct Policy, the Director of the Office of Student Accountability, Community Standards, & Academic Integrity (or designee) ("Director of Student Accountability") reviews the EAD's final investigation report, seeks any necessary clarifications, and renders an appropriate sanction. (Id. at 116.) "The sanctioning determination is made "based on the information contained in the EAD investigative report, with particular regard for the nature of the incident and the respondent's reported cooperation and candor, and the respondent's disciplinary history (if any)." (Id.) Available sanctions for non-consensual sexual contact and dating violence range from disciplinary probation to expulsion; for non-consensual sexual intercourse the sanctions range from suspension to expulsion. (Id.)

C.      The Sexual Misconduct Policy Appeal Process

Either party has the right to appeal a determination by EAD or any sanction rendered by the Director of Student Accountability. (Id. at 117; Doc. No. 23 at ¶¶ 65, 89.) Student appeals are decided by a panel of three Appellate Officers for Sexual Misconduct and Power-Based Personal Violence ("Appellate Officers"). (Id.) Appellate Officers are faculty or academic administrators,

---

[8] The University endeavors to complete the investigative process within 60 calendar days from the time that EAD determines that an investigation will proceed. If additional time is required, "the complainant and the respondent will be notified simultaneously, in writing, if the investigation process cannot be completed within 60 days, and they will be provided with a revised timeline." (Doc. No. 27-1 at 115.) Where appropriate, complaints also may be filed with either the Vanderbilt University Police Department or Metro-Nashville Police Department. The filing of a police report or the pendency of civil or criminal proceedings does not preclude EAD from proceeding with its investigation and determination. The investigation and determination may be delayed until the police have finished gathering evidence, but EAD generally will not wait for the conclusion of any criminal proceeding. (Id.)

11

appointed by the Chancellor (or the Chancellor's designee) for two or three-year terms, who receive annual training on issues involved in sexual misconduct and other forms of power-based personal violence.[9] (Id.) Within ten days of the determination, a respondent assessed a sanction may submit a written appeal petition of no more than ten pages in length. (Doc. No. 27-1 at 117; Doc. No. 23 at ¶ 65.) The petition must include the following: a statement of the grounds for appeal, a supporting explanation, and copies of, or reference to, all information not previously submitted to the EAD that the petitioner wishes the Appellate Officers to consider.

There are only four limited grounds for appeal, however, and "new" information will only be consideration in the limited context of those contentions. The possible grounds for appeal are:

    a.  Procedural irregularities sufficient to affect the determination or sanction;[10]
    b.  Insufficient information to support the determination;[11]
    c.  New information that was not reasonably available for presentation to EAD, the introduction of which could reasonably be expected to affect EAD's determination;[12] or
    d.  Harshness of the sanction imposed by the Director of Student Accountability sufficient to show an abuse of discretion.

---

[9] Assignment to disciplinary cases is made on a rotating basis. (Doc. Nos. 27-1 at 117; Doc. No. 23 at ¶ 65.)

[10] "In the judgment of the Appellate Officers," harmless procedural irregularities are not a basis for modifying a determination or sanction. (Doc. No. 27-1 at 118.)

[11] Appellate Officers may not alter EAD's determination unless it is "clearly erroneous and cannot be reasonably supported by the information considered." (Doc. No. 27-1 at 118.) "It is not the role of Appellate Officers to substitute their judgment for the judgment of EAD if there is a reasonable basis for EAD's determination. Deference must be given to EAD's determination since EAD had the opportunity to hear the witnesses and to assess their credibility and demeanor." (Id.)

[12] A student who seeks to introduce new information has the burden of demonstrating that the information was not reasonably available for presentation to EAD, and that the introduction of such new information can be reasonably expected to affect EAD's determination. If the Appellate Officers determine that the student has satisfied this burden, the Appellate Officers remand the case to EAD with instructions to reconsider it in light of the new information. (Doc. No. 27-1 at 118.)

12

(Doc. Nos. 27-1 at 117-18; Doc. No. 23 at ¶ 91.) As part of the appeal process, the petition is sent to EAD, the Director of Student Accountability, and the non-appealing student, and those parties are given an opportunity to submit a written response. (Doc. Nos. 27-1 at 118; Doc. No. 23 at ¶ 65.) The petitioning student may then reply. (Id.)

The Appellate Officers then proceed to consideration of the appeal. "The Appellate Officers' consideration of the appeal must be based only on the original records created by or provided to EAD and/or the Director of Student Accountability and the petition, any new information in the petition that was not reasonably available for presentation to EAD and the introduction of which could reasonably be expected to affect EAD's determination that the Appellate Officers determine should be considered, any written comments/response, and the reply." (Doc. Nos. 27-1 at 119; Doc. No. 23 at ¶ 90.) The Appellate Officers decide by majority vote whether to affirm, modify, or reverse the determination or sanction or to remand the case to EAD or the Director of Student Accountability with instructions. (Doc. No. 27-1 at 118.) "At no time may Appellate Officers substitute their opinions or values for Vanderbilt policy." (Id.)

D.       The Complaint Against Z.J. by A.H.

        1.       The Events of March 19, 2016

On March 19, 2016, Z.J. and A.H., who "did not really know each other," separately attended a St. Patrick's Day tailgate party at a fraternity house on Vanderbilt's campus. (Doc. No. 23 at ¶ 13; Doc. No. 45 at 4.) Both Z.J. and A.H. reported having consumed a significant amount of alcohol that afternoon. (Doc. No. 45 at 4.) A.H. reported that she was "very inebriated." (Id.) Z.J. reported that he was "not sure" how drunk A.H. was, "but would assume somewhat as she was drinking during the duration of the day." (Id.) Z.J. described himself as having imbibed a "fair amount" and being "drunk but not out of control," including consuming multiple beers and other

liquor-based drinks. (Id. at 4-5.) Around mid-afternoon, Z.J. and A.H. "crossed paths" and subsequently agreed to go to Z.J.'s dormitory suite. (Doc. No. 23 at ¶ 14; Doc. No. 45 at 4.) A surveillance video captured them entering Z.J.'s dormitory elevator at 4:13 p.m. (Doc. No. 23 at ¶ 14; Doc. No. 45 at 5 n.7.)

According to the Complaint: (a) the two students began clothed "consensual kissing and petting";[13] (2) Z.J. asked A.H. if she wanted to have sexual intercourse, and she declined because she was too intoxicated and the two students did not know each other well enough; (3) A.H. asked Z.J. if he knew her name, and he responded with an incorrect but "close version," to which A.H. became visibly upset; (4) "in an effort to console" A.H., Z.J. "reached to the back of A.H.'s neck to gently sit A.H. back down on the bed"; (5) Z.J. understood why A.H. would be upset about the name mix-up and was not angry about her refusal to have sexual intercourse; (6) Z.J. "inadvertently and non-maliciously placed his thumb and/or fingers on the side, possibly close to the front, of A.H.'s neck." (Id. at ¶¶ 15-17.) Z.J. alleges that A.H. then had a panic attack and told Z.J. that he has triggered unpleasant memories of a past experience of having hands around her throat. (Id. at ¶ 18.) Z.J. alleges that he then "ceased physical contact" with A.H., except for holding her shoulders to "console and calm her down." (Id. at ¶ 19.) Z.J. gave A.H. some water and felt "helpless and unsure" how to act. (Id. at ¶ 20.) He "suggested she wait to leave until she had calmed down." (Id.)

According to surveillance tape, A.H. left Z.J.'s dorm room at approximately 6:06 p.m. (Id. at ¶ 21; Doc. No. 45 at 9.) A.H. took the elevator to the lobby of the dorm building and entered the

---

[13] This allegedly involved Z.J. touching A.H.'s buttocks, breasts, and neck, while A.H. remained in a "neutral position." (Doc. No. 23 at ¶ 15 n.4.)

bathroom, where she stayed for 24 minutes before leaving while on her cell phone.[14] (Id.) Upon returning to her own dorm room, A.H. went to the bathroom and immediately began to shower. (Id. at ¶ 22; Doc. No. 45 at 9.) While in the shower, A.H. began calling out for her roommate ("Student 1"). (Doc. No. 23 at ¶ 22.) Student 1 found A.H. in a panicked state, "crying and hyperventilating." (Id.) A.H. said to Student 1, "he choked me." (Id.)

2.      The Events of March 20-21, 2016

On March 20, 2016, A.H. explained to Student 1 what had happened to her and the symptoms she was having.[15] (Doc. No. 23 at ¶¶ 23, 66; Doc. No. 45 at 9.) According to A.H., she woke up with bruising on her breasts, thighs and buttocks, a very stiff neck, trouble swallowing, and difficulty moving her neck. (Doc. No. 45 at 9.) Student 1 encouraged A.H. to get examined at Vanderbilt University Medical Center ("VUMC"). (Doc. No. 23 at ¶ 23.) A.H. and Student 1 "fought about what she should do before finally deciding to go" to VUMC. (Doc. No. 45 at 9.)

A.H. and Student 1 went to VUMC and A.H. asked to be examined in relation to being physically assaulted by another student. (Doc. No. 23 at ¶ 67.) A triage nurse referred A.H. to a social worker, Esther Alcorn, after hearing she had allegedly been physically assaulted; the social worker, in turn, spoke with Vanderbilt University Police Department ("VUPD") about the reported assault. (Id.) VUPD dispatched an officer to the Emergency Department to speak with A.H. and others. (Id.) A.H. reported to the officer that she and Z.J. engaged in "consensual petting" but no "sexual penetration." (Id.) According to A.H., she then declined to have sexual intercourse with Z.J., which made Z.J. so angry he "placed his hand at [A.H.'s] neck and shoved her to the ground."

---

[14] A.H. reported to EAD that she spent that time crying in one of the stalls. (Doc. No. 45 at 9.)

[15] There was also a bump on the back of A.H.'s head, but she did not know how it got there. (Doc. No. 45 at 9.)

(Id.) A.H. said that she was able to break free of Z.J.'s grasp, but began to have a panic attack. (Id.; Doc. No. 45 at 12.) A.H. reported that she later had tightness and soreness in her throat and it was difficult to swallow. She also reported that there was soreness in her breast area from where Z.J. had groped her.[16] (Doc. No. 45 at 12.)

A.H. also gave a written statement to VUPD. (Id. at ¶ 67; Doc. No. 45 at 12.) A.H. reported that, after she told Z.J. that she did not want to have sexual intercourse, Z.J. (1) became "angry and frustrated"; (2) "proceeded to try to convince [her] to hook up"; (3) "forcibly groped" her; and (4) when A.H. got mad, "tried to choke [her] by grabbing [her] neck and cutting off [her] air." (Doc. No. 23 at ¶ 67; Doc. No. 45 at 12.) A.H. stated that, at that point, she "threw [Z.J.] off and got dressed to leave" but that, because she was "hysterical," Z.J. "wouldn't let [her] leave until [she] calmed down."[17] (Doc. No. 23 at ¶ 67; Doc. No. 45 at 12.) A.H. mentioned that her memory at that moment was still "spotty," but noted that she "was drunk at the time" and that "when [she] woke up [her] neck was stiff and sore and [she] had bruises all over [her] breasts." (Doc. No. 23 at ¶ 67; Doc. No. 45 at 12.)

Student 1 and social worker Alcorn were interviewed by VUPD. Alcorn reported to VUPD that, after A.H. told Z.J. "no" to sex, he became violent, bit her breast, choked her, and slammed her down. (Doc. No. 23 at ¶ 67; Doc. No. 45 at 13.) The social worker told a second VUPD officer that A.H. had reported Z.J. became upset when she did not want to have sex, and that this "sparked the assault" whereby Z.J. "grabbed her neck and it was sore to the touch." (Id. at ¶ 67.) The social worker also explained that Z.J. had been "attempting to have [A.H.] calm down before leaving the

---

[16] A.H. informed VUPD that she did not want to prosecute and that she wanted the incident handled administratively by Vanderbilt. (Doc. No. 45 at 12.)

[17] In her initial statement to VUMC, A.H. volunteered that both she and Z.J. had been "drunk" at the time, and noted that her memory was "spotty." (Doc. No. 23 at ¶ 67.)

16

room due to her outburst that was loud."[18] (Id.) Student 1 reported to VUPD that A.H. had said she angered Z.J. by telling him "no" to sex, Z.J. then got violent with A.H., Z.J. had "choked [A.H.]," after which Z.J. "started to apologize and said he didn't mean it." (Doc. No. 45 at 13; Doc. No. 23 at ¶ 67.)

Both Alcorn and Student 1 also gave written statements to VUPD. (Doc. No. 23 at ¶ 67.) The social worker's written statement reiterated that A.H. told Z.J. "no," Z.J. became angry and assaulted her by "grabb[ing] her around the throat and chok[ing] her." (Id.) Student 1's written statement related that "A.H. told me the guy choked her . . . they were both drunk, and she told him she didn't want to have sex. She said he tried to calm her down before she left the room because this had spurred a panic attack. . . . She was not respected and harmed instead." (Id.)

Z.J. provided a statement to VUPD. (Id. at ¶ 69; Doc. No. 45 at 12.) Z.J. stated that A.H. had been upset by his inability to remember her name and by an anxiety attack she had that was unrelated to him and due to A.H.'s "previous misfortunes." (Doc. No. 23 at ¶ 69.) After being advised by VUPD of "the bruising seen in the neck and breast area," Z.J. "said that he did not intentionally choke her but was holding her shoulders while trying to calm her down." (Id.) Z.J. took responsibility for "heavy-handed petting," being "disrespectful," "not knowing her name," and being an "asshole." (Id.; Doc. No. 45 at 12.) Z.J. also stated that no vaginal penetration occurred. (Doc. No. 23 at ¶ 69.)

Z.J. also provided a written statement to VUPD (directed toward A.H.), in which he stated: "I cannot say enough times how sorry I am. At no point did I intend to hurt you or to force you to do anything against your will." (Id. at ¶ 70; Doc. No. 45 at 12.) Z.J. continued: "Nothing I did was

---

[18] According to VUPD reports, much of the information Alcorn attributed to A.H. was actually provided by Student 1. (Doc. No. 45 at 13 n.20.)

meant to be hostile or malicious, and if you could forgive me for even putting that possibility in the air, I would appreciate it." (Doc. No. 23 at ¶ 70.) Z.J. noted that he was sorry if "[his] hands on [A.H.'s] neck caused [her] to feel unsafe at any time" or A.H. "felt taken advantage of" at any point. (<u>Id</u>.; Doc. No. 45 at 12.)

Medical and photographic evidence was taken at VUMC. (Doc. No. 45 at 13.) Among other things, the records reflected that A.H. had (1) a contusion on her lower lip, (2) tenderness to the hyoid and cricoid cartilage regions,[19] (3) "significant, extensive bruising to the breast bilaterally," and (4) extensive bruising to the inner thighs bilaterally. (Doc. No. 45 at 14.) The first reporting VUPD officer's incident report also documented A.H.'s injuries, including "obvious bilateral bruising to the breast tissue," a "1-1½ inch hickey around A.H.'s sternum," "very light bruising on either side" of her neck, and a "stiff" neck with "apparent pain to the anterior neck region." (Doc. No. 23 at ¶ 68.)

E.      Vanderbilt's Investigation of A.H.'s Complaint

A.H.'s allegations were brought to the attention of EAD. On March 29, 2016, after reviewing the narratives and photographs, EAD's Title IX Compliance Manager D. Michael Carter recommended to EAD's Title IX Coordinator, Anita Jenious, that EAD investigate the matter. (Doc. No. 45 at 1.) Jenious accepted the recommendation and EAD presented a summary of the allegations to Mary Helen Solomon, the Director of Student Accountability. (<u>Id</u>.) On April 4, 2016, Solomon met with Z.J. and formally charged him with attempting to commit sexual misconduct,

---

[19] The hyoid bone is situated at the base of the tongue in the front of the neck and between the lower jaw and the largest cartilage of the larynx, or voice box. <u>See</u> https://www.merriam-webster.com/dictionary/hyoid%20bone (last accessed December 18, 2018). The cricoid cartilage, located near the middle and center of the neck, is a ring of cartilage that surrounds the lower larynx. <u>See</u> https://medical-dictionary.thefreedictionary.com/cricoid (last accessed December 18, 2018).

non-consensual sexual contact, and dating violence. (Id. at 1, 3.) The specific allegations were as follows: "Attempted to engage in sexual intercourse with a female student without her consent on March 19, 2016 in Carmichael Towers. It is further alleged that you groped the female student without her consent and put your hands around her neck in an attempt to choke her when she tried to stop the sexual contact." (Id. at 1-2.) Z.J. denied violating the Sexual Misconduct Policy as described in the charge and indicated so on the charge sheet. (Id. at 2-3.)

The investigation included two interviews of Z.J., written information and answers provided by A.H.,[20] the interview of one non-party witness, as well as a review of VUPD reports, VUMC medical information, photographs and surveillance video. (Id.) More specifically, EAD first interviewed Z.J. on April 11, 2016. (Doc. No. 23 at ¶ 71.) Also present at that interview was Z.J.'s personal adviser, a senior Vanderbilt student. (Doc. No. 45 at 3.) At this time, Z.J. was shown photographs of the bruising on A.H. He acknowledged that there were bruises on the upper part of both of A.H.'s breasts. (Doc. No. 45 at 10.) Z.J. suggested that the bruises could have been caused "[p]ossibly from my hands being on them, grabbing them harder than I anticipated. I was heavy-handed." (Id.) Z.J. also acknowledged that he saw bruises on A.H.'s throat. (Id.) When asked how they arose, he replied, "I guess from where I put my hands on her neck too hard." (Id.)

Z.J. was provided with a summary of EAD's interview notes to review and return, and Z.J. did so later that same day. (Id.) Two days later, EAD provided A.H. with a list of questions. (Doc. No. 23 at ¶ 72.) A.H. responded in writing the next day. (Id.) On April 15, 2016, A.H. also submitted a narrative summary of the events in question. (Id. at ¶ 73.) Z.J. participated in a second

---

[20] A.H. did not wish to have in-person interviews with EAD, but she agreed to answer EAD's questions in writing and gave permission for EAD to use her statements, medical records, and photo evidence. (Doc. No. 45 at 3.)

19

interview with EAD on April 20. (Id. at ¶ 74; Doc. No. 45 at 4.) Z.J. did not have an advisor present at this interview. (Doc. No. 45 at 4 n.4.) Once again, Z.J. was given EAD's notes of the interview with him to review and return, and he did so the same day. (Id. at 4.)

EAD also interviewed Student 1.[21] (Doc. No. 23 at ¶ 76.) Student 1 reported that A.H. eventually told her that she and Z.J. were making out, he wanted to have sex but she did not, and he choked her. (Id. at ¶ 76a; Doc. No. 45 at 11.) Student 1 stated that A.H. had said she "felt bad" because maybe she had been "teasing" Z.J., but that A.H. had also confided that Z.J. had "beat her." (Doc. No. 23 at ¶ 76b; Doc. No. 45 at 11.) Student 1 saw red marks on A.H.'s neck, heard A.H. say it hurt to swallow, and heard A.H. say her breasts were in pain. (Doc. No. 45 at 11.)

A.H. also provided additional information over the course of the EAD investigation. (Id. at ¶ 75.) A.H. recalled that when she was in Z.J.'s room engaged in consensual petting, suddenly her clothes were off. (Id. at ¶ 75a.) In his first EAD interview, Z.J. had denied that A.H.'s clothes were off. (Doc. No. 45 at 5.) In his second EAD interview, Z.J. said that the idea that all of A.H.'s clothes were ever off "was not familiar to him," but that he could not remember because it was "a month and a half ago." (Id.) Z.J. further stated that, if anything was off, it was A.H.'s shirt. (Id. at 5-6.).

Other substantive issues arose and were considered by EAD as A.H. supplied additional information, including (1) events surrounding Z.J.'s alleged aggressive groping of A.H.'s breasts, including the extent to which A.H. verbalized that Z.J. was hurting her, whether Z.J. could remember any manifestations of pain by A.H., and how A.H. told Z.J. to stop (see Doc. No. 23 at ¶¶ 75c, 75f; Doc. No. 45 at 6-7); (2) the parties' memories of whether A.H. said she did not want to have sex because she was "too drunk" (see Doc. No. 23 at ¶ 75d; Doc. No. 45 at 6.); (3) whether

---

[21] Z.J. did not provide any witnesses for EAD to interview. (Doc. No. 45 at 10.)

and why Z.J. allegedly grew mad at A.H. when she declined sex  (see Doc. No. 23 at ¶ 75e; Doc. No. 45 at 6-7); (4) whether at one point Z.J. was on top of A.H. on the bed, continuing to pressure her for sex (see Doc. No. 23 at ¶ 75g; Doc. No. 45 at 7); (5) whether Z.J. removed A.H.'s underpants against her wishes (see Doc. No. 23 at ¶ 75h; Doc. No. 45 at 7); (6) whether Z.J. tried to push open A.H.'s legs (see Doc. No. 23 at ¶ 75i.; Doc. No. 45 at 7.); (7) how exactly Z.J. handled A.H.'s neck (see Doc. No. 23 at ¶ 75j; Doc. No. 45 at 8); (8) whether Z.J., in an overly intoxicated state, "blew [A.H.] a kiss" when she left his room (see Doc. No. 23 at ¶ 75l; Doc. No. 45 at 9); and (9) how long the parties each estimated that they were in Z.J.'s room (see Doc. No. 45 at 9 and n.2.).[22]

F.     The Investigation Reports

EAD issued a preliminary investigation report on April 27, 2016 ("Preliminary Report"). (Doc. No. 23 at ¶ 80.) EAD sent it to Z.J. and A.H. the same day via email. (Doc. No. 45 at 4.) A.H. submitted comments in response – namely, that she did not remember Z.J. biting her or specifying that Z.J. threw her to the ground. (Doc. No. 23 at ¶ 77a.) A.H. also confirmed to EAD that she told Z.J. that she had a previous negative interaction with someone who had put his hands around her throat. (Id. at ¶ 77b.) Z.J. did not respond to the preliminary investigation report. (Doc. No. 45 at 2.)

EAD issued the final investigative report ("Final Report") on May 9, 2016. (Doc. No. 23 at ¶¶ 80-81; Doc. No. 45.) The Final Report explained EAD's analysis of the credibility of A.H. and Z.J., including its evaluation of consideration of the consistency of their statements, demeanor,

---

[22] The parties gave EAD estimates as to their perceptions of the time they were together in Z.J.'s suite. A.H. estimated that she and Z.J. were together for "about an hour and a half." (Doc. No. 45 at 9.) Z.J. estimated the time was "45 minutes to an hour." (Id.) The actual time the parties spent together in the suite was just over one hour and fifty minutes. (Id. at 9 n. 2.)

21

their incentives to lie, the existence or absence of corroborating evidence, and the presence and/or plausibility of specific details in witnesses' statements. (Doc. No. 23 at ¶ 83; Doc. No. 45 at 14.) EAD concluded that A.H.'s account of the events of March 19, 2016 was more credible. (Doc. No. 23 at ¶ 84; Doc. No. 45 at 14.) This was based on A.H.'s more consistent reporting of the events to several different people, including VUPD, Alcorn, Student 1, and EAD (i.e., initial consensual petting, refusing sexual intercourse, Z.J. becoming upset, and Z.J. grabbing her neck) versus Z.J.'s less consistent reporting of events (including uncertainty as to whether A.H.'s clothing was removed and regarding where and how he placed his hands on A.H.'s neck). (Doc. No. 23 at ¶ 84a; Doc. No. 45 at 14-15.)

Next, the Final Report reviewed the evidence and concluded that A.H. had the ability to recall details whereas Z.J. gave noncommittal answers. (Doc. No. 23 at ¶ 84b; Doc. No. 45 at 15.) In short, EAD found that A.H. could recall "many more" details than Z.J., some of which Z.J. confirmed, others of which Z.J. simply could not recall. (Doc. No. 45 at 15-16.) EAD also found corroborating evidence for A.H.'s reports to EAD or VUPD. (Id. at 16; Doc. No. 23 at ¶ 84c.) Specifically, the Final Report listed corroboration in the form of medical evidence, photographic evidence, surveillance video, A.H.'s more accurate time estimate, and Student 1's testimony. (Doc. No. 45 at 16.) EAD also noted that, although Z.J. later indicated that he thought A.H. was not being truthful, in his first EAD interview, Z.J. said that he was "not calling A.H. a liar." (Id. at 17.)

Informed by EAD's conclusions that A.H. was more credible and had better recall of details, EAD made several findings in the Final Report – namely, that: (1) Z.J. groped A.H. in an aggressive manner, (2) A.H. "communicated clearly" to Z.J. that she did not want to have sex because they were intoxicated and/or Z.J. did not know A.H.'s name; (3) the aggressive groping continued and is "apparent" in the medical and photographic evidence of significant bruising to

the A.H.'s breasts; (4) Z.J. got upset when A.H. indicated that she did not want to have sex; (5) Z.J. got on top of A.H. and stated he wanted to have sex with her; (6) Z.J. removed A.H.'s underwear; (7) Z.J. attempted to push A.H.'s legs apart for the purpose of penetration; (8) as A.H. struggled to leave, Z.J. grabbed A.H.'s neck from the front and held her down for a few seconds; (9) it is not plausible that the tenderness to A.H.'s hyoid bone situated in the front of the neck and cricoid cartilage region near the middle and center of the neck was caused by Z.J. holding A.H. by the back of her neck; (10) A.H. was able to get out from under Z.J., had a panic attack, and spent nearly 30 minutes in Z.J.'s dorm restroom – behavior consistent with someone who has just experienced a traumatic event; (11) A.H. returned to her room, immediately took a shower and experienced another panic attack – further behavior consistent with someone who has just experienced a traumatic event. (Doc. No. 23 at ¶ 86; Doc. No. 45 at 17-19.)

In the end, EAD found that Z.J. engaged in contact of a sexual nature without effective consent, used physical force against A.H. during the encounter, and attempted to engage in non-consensual sexual intercourse with A.H. (Doc. No. 23 at ¶ 82; Doc. No. 45 at 2.) Accordingly, the Final Report explained that "there is sufficient evidence to conclude that the respondent engaged in Non-Consensual Sexual Contact, Dating Violence, and Attempted Non-Consensual Sexual Intercourse in violation of the [Sexual Misconduct Policy] based on a preponderance of evidence standard."[23] (Doc. No. 45 at 2, 20-21.)

---

[23] The dating violence violation pertained to the use of Z.J.'s hands on A.H.'s throat, while the non-consensual sexual contact and attempted non-consensual sexual intercourse violations pertained to Z.J. continued physical attempts to have sex with A.H. in the absence of effective consent. (Id. at 20-21.)

G.      Sanction, Appeal, and Impact

On May 18, 2016, Z.J. appealed the Final Report. (Doc. No. 23 at ¶¶ 89, 92.) Z.J. stated that EAD's decision had been based on unfounded assumptions from second-hand sources, incomplete information, and "lack of consideration for his own narrative." (Id. at ¶ 92.) Z.J. noted in his appeal that a VUMC nurse had expressed the view that the bruises on A.H.'s thighs were not related to the incident. (Id.) On June 2, 2016, EAD Compliance Manager Carter filed a response to the appeal. (Id. at ¶ 93.) Carter stated that EAD examined the totality of the evidence, did not know what incomplete evidence Z.J. referred to, and still found A.H. more credible. (Id.) On June 3, 2016, Director of Student Accountability Solomon sent a letter to the Appellate Officers about Z.J.'s case. (Id. at ¶ 94.) She relied on the Final Report and stated that expulsion was the appropriate sanction because physical violence was involved. (Id.) Thereafter, the Appeals Officers affirmed the Final Report and decision to expel Z.J. (Id. at ¶ 95.)

Z.J. was expelled from Vanderbilt three days before his 2016 graduation. (Id. at ¶ 96.) He was not allowed to receive his degree, and his transcript was marked with the disciplinary action. (Id. at ¶¶ 96, 99.) Despite having been in the U.S. Army Reserve Officer Training Corps Program, Z.J. was not commissioned as an officer. (Id. at ¶ 97.) Z.J. is now required to repay a significant sum of tuition and scholarship money to Vanderbilt.[24] (Id. at ¶ 98.)

H.      Procedural History

On May 5, 2017, Z.J. filed a complaint against Vanderbilt in the Circuit Court of Davidson County, Tennessee. (Doc. No. 1. at 1.) Z.J. filed an amended complaint one week later. (Id.) On

---

[24] Paragraph 10 of the Complaint suggests that this amount is $136,000, while Paragraph 98 states that it is $218,000. (Compare Doc. No. 23 at ¶ 10 with id. at ¶ 98.) Later in the Complaint, Z.J. appears to explain that he has paid $82,000 in tuition and must repay "an estimated" additional $136,000 "received from the ROTC program, for a total liability of $218,000. (Id. at ¶ 179.)

24

June 12, 2017, Vanderbilt removed this action to federal court pursuant to 28 U.S.C. §§ 1441(a), 1331, and 1367. (Id.) In June 2017, Vanderbilt filed a Motion to Dismiss. (Doc. No. 7.) However, before the Court could rule on that motion, the Court of Appeals for the Sixth Circuit issued the decision in Doe v. Miami University, which contained a relevant and important discussion of Title IX claims in the context of university sexual misconduct disciplinary proceedings. Miami Univ., 882 F.3d at 579. To give the parties the opportunity to address that precedent, the Court denied the motion to dismiss without prejudice, granted Z.J. an opportunity to file a second amended complaint, and allowed Vanderbilt to file a new motion to dismiss. (Doc. No. 21 at 1-2.) Z.J. filed the Second Amended Complaint ("Complaint") on March 9, 2018 (Doc. No. 23), and Vanderbilt thereafter filed a second Motion to Dismiss (Doc. No. 27).

The Complaint generally purports to bring numerous causes of action, specifically (1) Title IX; (2) Clery Act; (3) Declaratory Judgment Act; (4) breach of contract; (5) promissory estoppel; (6) defamation; (7) negligence *per se*; (8) negligence; (9) gross negligence; (10) intentional infliction of emotional distress; and (11) unjust enrichment claims, including sub-claims based on different theories of liability. (See Doc. No. 23.) Each of Z.J.'s claims is broadly premised on the allegation that Vanderbilt mishandled A.H.'s complaint against Z.J. under Vanderbilt's Sexual Misconduct Policy. (Id.) Z.J. seeks damages over $25,000,000; certain declaratory relief; and certain injunctive relief, including a ruling that Vanderbilt's findings were "not supported by substantial evidence beyond the preponderance of evidence standard" and to command Vanderbilt to expunge the incident from Z.J.'s records and confer a degree on him. (Id. at 49.)

III.   Discussion

Vanderbilt has moved to dismiss all of Z.J.'s claims. Z.J. generally resists the motion by relying on the sufficiency of his factual allegations.

25

"There has been much debate in recent times about the most effective method for addressing the formidable problem of sexual assault on college campuses. College administrators, politicians, academics and students alike have clashed on how best to balance the interests and rights of complainants with those of the accused." Yu v. Vassar College, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015). The Court, however, has a limited role to play. Particularly at the motion to dismiss stage, "this case comes before the Court in limited posture." Doe v. Univ. of the South, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009) (hereinafter "Univ. of the South I"). Because Z.J.'s claims against Vanderbilt are grounded upon the manner in which the university conducted the process leading to its conclusion that he had violated the Sexual Misconduct Policy and the resulting imposition of sanctions, the Court's review is "substantially circumscribed" – namely, "the law does not allow th[e] Court to retry the University's disciplinary proceeding." Id. (quoting Gomes v. Univ. of Maine Sys., 365 F. Supp. 2d 6, 14 (D. Maine 2005)); Doe v. Belmont Univ., --- F. Supp. 3d ---, No. 3:17-cv-01245, 2018 WL 4627033, at *10 (M.D. Tenn. Sept. 27, 2018) (same); see also Plummer v. Univ. of Houston, 860 F.3d 767, 772 (5th Cir. 2017) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion."); Saravanan v. Drexel Univ., 2017 WL 5659821, at *4 (E.D. Pa. Nov. 24, 2017) ("In reviewing [the university's] proceedings, we may not "advocate for best practices nor [. . . ] retry disciplinary proceedings.") (quoting Yu, 97 F. Supp. 3d at 461).

Furthermore, this is not a lawsuit between Z.J. and A.H. Accordingly, the Court is not asked to make an independent determination as to what happened between the Z.J. and A.H. on March 19, 2016. "The Court therefore expresses no opinion as to whether [a violation of the Sexual Misconduct Policy] occurred, whether any such acts were consensual, or who, as between [Z.J.] and [A.H.] is credible." Univ. of the South I, 687 F. Supp. 2d at 755; see also Pierre v. Univ. of

Dayton, 143 F. Supp. 3d 703, 713 (S.D. Ohio 2015) (noting that "the issue before this Court is not whether the [university] should have believed a certain party's version of events") (hereinafter "Pierre"); Yu, 97 F. Supp. 3d at 461 (explaining that the Court's role is only to determine if the school discriminated against the plaintiff under federal law or otherwise violated a provision of state law when it expelled him for sexually assaulting a fellow student). The Court only evaluates factual discrepancies to the extent they go to questions regarding the nature of the investigation, rather than the quality of the outcome. Doe v. Univ. of the South, No. 4:09-cv-62, 2011 WL 1258104, at *14 (E.D. Tenn. Mar. 31, 2011) (hereinafter "Univ. of the South II").

Bearing this in mind, the Court addresses each of Z.J.'s claims in turn.[25]

A.    Title IX Claims

Title IX was enacted to supplement the ban on discrimination in the Civil Rights Act of 1964, and it is designed to prevent sexual discrimination and harassment in educational institutions receiving federal funding. Bonnell v. Lorenzo, 241 F.3d 800, 810 n.6 (6th Cir. 2001); Schaumleffel v. Muskingum Univ., Case No. 2:17-cv-463, 2018 WL 1173043, at *12 (S.D. Ohio Mar. 6, 2018). Title IX states that: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any education program receiving Federal financial assistance. . . ." 20 U.S.C. § 1681(a). It is beyond cavil that "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994). While the Court of Appeals has noted that "[e]ducation is a university's first priority [and] adjudication of student

---

[25] The Complaint is over 50 pages long, including over 60 footnotes. The 14 Counts of the Complaint, which sometimes overlap or are mislabeled, encompass over 20 actual claims. For ease of organization, the Court's discussion is organized by substantive claim, not necessarily to track the order of the Counts in the Complaint.

disputes is, at best, a distant second," Doe v. Univ. of Cincinnati, 872 F.3d 393, 400 (6th Cir. 2017) (citing Bd. of Curators of the Univ. of Missouri v. Horowitz, 435 U.S. 78, 88 (1978)), regulations require educational institutions to implement "grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by [Title IX]." 34 C.F.R. § 106.8(b). Title IX is enforceable through a judicially implied private right of action, through which monetary damages are available.[26] Klemencic v. Ohio St. Univ., 263 F.3d 504, 510 (6th Cir. 2001).

In Miami University, the Court of Appeals explicitly adopted for the first time in a published opinion the analytical framework set forth by the Second Circuit in Yusuf for determining whether a plaintiff is able to demonstrate that intentional gender discrimination occurred in connection with a university disciplinary proceeding. As a result, the Court of Appeals recognizes at least four theories of liability that a student who is attacking a university disciplinary proceeding on grounds of gender bias can potentially assert under Title IX. Miami Univ., 882 F.3d at 589 (citing Yusuf, 35 F.3d at 715). These theories are: (1) "erroneous outcome"; (2) "selective enforcement"; (3) "deliberate indifference"; and (4) "archaic assumptions." Miami Univ., 882 F.3d at 589 (citing Yusuf, 35 F.3d at 715; Doe v. Cummins, 662 F. Appx. 437, 451-52 & n.9 (6th Cir. 2016); Mallory v. Ohio Univ., 76 F. App'x 634, 638-39 (6th Cir. 2003)). In addition, a "hostile-environment" theory of liability has also been recognized in some Title IX cases, although it has a less obvious application in sexual misconduct disciplinary action cases. See Miami Univ., 882 F.3d at 589 (citing Doe v. Claiborne Cty., 103 F.3d 495, 515 (6th Cir. 1996)). Z.J. attempts to bring claims on all five bases; Vanderbilt contends Z.J. does not plausibly allege any theory.

---

[26] There is no dispute that Vanderbilt is an educational institutional voluntarily participating in federal programs and, thus, under the ambit of Title IX.

28

Case 3:17-cv-00936   Document 48   Filed 12/19/18   Page 28 of 86 PageID #: 1002

disputes is, at best, a distant second," Doe v. Univ. of Cincinnati, 872 F.3d 393, 400 (6th Cir. 2017) (citing Bd. of Curators of the Univ. of Missouri v. Horowitz, 435 U.S. 78, 88 (1978)), regulations require educational institutions to implement "grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by [Title IX]." 34 C.F.R. § 106.8(b). Title IX is enforceable through a judicially implied private right of action, through which monetary damages are available.[26] Klemencic v. Ohio St. Univ., 263 F.3d 504, 510 (6th Cir. 2001).

In Miami University, the Court of Appeals explicitly adopted for the first time in a published opinion the analytical framework set forth by the Second Circuit in Yusuf for determining whether a plaintiff is able to demonstrate that intentional gender discrimination occurred in connection with a university disciplinary proceeding. As a result, the Court of Appeals recognizes at least four theories of liability that a student who is attacking a university disciplinary proceeding on grounds of gender bias can potentially assert under Title IX. Miami Univ., 882 F.3d at 589 (citing Yusuf, 35 F.3d at 715). These theories are: (1) "erroneous outcome"; (2) "selective enforcement"; (3) "deliberate indifference"; and (4) "archaic assumptions." Miami Univ., 882 F.3d at 589 (citing Yusuf, 35 F.3d at 715; Doe v. Cummins, 662 F. Appx. 437, 451-52 & n.9 (6th Cir. 2016); Mallory v. Ohio Univ., 76 F. App'x 634, 638-39 (6th Cir. 2003)). In addition, a "hostile-environment" theory of liability has also been recognized in some Title IX cases, although it has a less obvious application in sexual misconduct disciplinary action cases. See Miami Univ., 882 F.3d at 589 (citing Doe v. Claiborne Cty., 103 F.3d 495, 515 (6th Cir. 1996)). Z.J. attempts to bring claims on all five bases; Vanderbilt contends Z.J. does not plausibly allege any theory.

---

[26] There is no dispute that Vanderbilt is an educational institutional voluntarily participating in federal programs and, thus, under the ambit of Title IX.

1. <u>Hostile Environment and Deliberate Indifference</u>

Under the combined heading of hostile environment and deliberate indifference, Z.J. alleges that: (1) Vanderbilt displayed deliberate indifference "motivated by [Z.J.'s] gender in all aspects of the investigation, hearing, and appeal; (2) Z.J.'s expulsion "was motivated by a deliberate indifference based on his gender and the gender of the complaining witness"; (3) Vanderbilt was "subjected to a prior, nationally publicized incident of sexual misconduct by [the all-male] members of its football team, which . . . caused [Vanderbilt] to be overzealous in the prosecution of [Z.J.] due to his gender and the allegations filed against him"; and (4) Vanderbilt's "failure to consider alternatively less drastic measures created a severe, pervasive, and objectively offensive environment that barred [Z.J.] from receiving the educational benefit of a college degree from [Vanderbilt's] facility." (Doc. No. 23 at ¶¶ 195-198.) Z.J.'s allegations in this respect are peculiar because the Court of Appeals has expressly warned litigants *not* to conflate the theories of deliberate indifference and hostile-environment because "a hostile-environment claim and deliberate-indifference claim require the plaintiff to allege different elements." <u>Miami Univ.</u>, 882 F.3d at 589.

a. <u>Hostile-Environment Claim</u>

A Title IX hostile-environment claim "is analogous to a Title VII hostile-environment claim." <u>Id</u>. at 590 (citing <u>Claiborne Cty.</u>, 103 F.3d at 515); <u>Tumminello v. Father Ryan High Sch., Inc.</u>, 678 F. App'x 281, 284 (6th Cir. 2017). To sustain this claim, a plaintiff must allege, among other things, that his educational experience was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's educational environment." <u>Miami Univ.</u>, 882 F.3d at 590 (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (internal citations and quotation marks omitted); <u>Doe v. Univ. of Dayton</u>,

29

Case No. 3:17-cv-134, 2018 WL 1393894, at *8 (S.D. Ohio Mar. 20, 2018) (hereinafter "Univ. of Dayton"). In Miami University, the plaintiff, who was suspended for violation of the university's sexual assault policy, made allegations of gender bias in the university's disciplinary process. Miami Univ., 882 F.3d at 586-88. The plaintiff argued that these allegations were sufficient to constitute a viable hostile-environment claim. Id. The Court of Appeals, however, held that those allegations did *not* support a reasonable inference that the plaintiff's educational experience was "permeated with discriminatory intimidation, ridicule, and insult." Id. (quoting Harris, 510 U.S. at 21) (citation and internal quotation marks omitted). In Schaumleffel, a sister district court in this circuit followed the lead of Miami University to reach the same legal conclusion in similar circumstances. See Schaumleffel, 2018 WL 1173043, at *14.

Z.J. avers anti-male bias and overzealousness in the sexual misconduct disciplinary process. These allegations, as in Miami University, are not relevant to whether Z.J. was forced to endure an educational experience permeated with gender-based discriminatory intimidation and ridicule so severe and pervasive that it altered the very conditions of his educational environment. Indeed, Z.J. makes no complaint whatsoever about the "educational environment" at Vanderbilt, no complaint about nearly four years of his time on campus, and, most importantly, complains of nothing outside of his objections to the disciplinary process and its outcome. The Court therefore concludes that Z.J.'s allegations do not support the reasonable inferences necessary to allow a hostile-environment claim to proceed. See, e.g., Univ. of Dayton, 2018 WL 1393894, at *8 (concluding that allegations of flawed and biased investigation and resolution of a sexual assault allegation failed to state hostile-environment claim because they did not implicate the plaintiff's

educational experience being so permeated with discriminatory intimidation and insult so as to alter the conditions of his educational environment).[27]

b.    <u>Deliberate Indifference Claim</u>

In contrast to a hostile-environment theory, to bring a claim under the deliberate indifference theory, the misconduct alleged by a plaintiff must be sexual harassment.[28] <u>Miami Univ.</u>, 882 F.3d at 591 (citing <u>Mallory</u>, 76 F. App'x at 638-39; <u>Horner v. Ky. High Sch. Athletic Ass'n</u>, 206 F.3d 685, 691-93 (6th Cir. 2000); <u>Univ. of the South I</u>, 687 F. Supp. 2d at 758; <u>see also Baum</u>, 903 F.3d at 588 ("The deliberate-indifference theory was designed for plaintiffs alleging sexual harassment."); <u>Schaumleffel</u>, 2018 WL 1173043, at *14 ("The deliberate indifference standard applies when a plaintiff seeks to hold a university responsible for sexual harassment."). Furthermore, a deliberate indifference claim premised on student-on-student misconduct must allege "harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." <u>Miami Univ.</u>, 882 F.3d at 590 (quoting <u>Davis v. Monroe Cty. Bd. of Educ.</u>, 526 U.S. 629, 633 (1999) and citing <u>Patterson v. Hudson Area Schs.</u>, 551 F.3d 438, 444-45 (6th Cir. 2009)); <u>K.T. v. Culver-Stockton Coll.</u>, 865 F.3d 1054, 1057 (8th Cir. 2017) (same); <u>Doe v. Tr. of Boston Coll.</u>, 892 F.3d 67, 93 (1st Cir. 2018)

---

[27] To any extent Z.J. attempts to base any hostile-environment claim on "sexual harassment," it still fails. <u>See Schaumleffel</u>, 2018 WL 1173043, at *14 (citing <u>Doe v. Salisbury Univ.</u>, 123 F.Supp.3d 748, 758 (D. Md. 2015) (finding that allegations that the university improperly investigated and disciplined the plaintiff's alleged sexual assault and the university's policies were biased against men in violation of Title IX were insufficient to state a claim for "harassment" for purposes of bringing a hostile environment sexual harassment claim)).

[28] In addition, a plaintiff must plead that "an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to," the alleged misconduct. <u>Miami Univ.</u>, 882 F.3d at 590 (quoting <u>Mallory</u>, 76 F. App'x at 638). Finally, a plaintiff must meet the high bar of alleging that a university's response to the alleged harassment was "clearly unreasonable in light of the known circumstances." <u>Univ. of the South I</u>, 687 F. Supp. 2d at 757 (quoting <u>Patterson v. Hudson Area Schs.</u>, 551 F.3d 438, 446 (6th Cir. 2009)); <u>Adams v. Ohio Univ.</u>, 300 F. Supp. 3d 983, 995-1000 (S.D. Ohio 2018) (same).

(same) (hereinafter "Tr. of Boston Coll. I"). Only claims involving pervasive and widespread harassment are actionable; a single incident is not enough. See Miami Univ., 882 F.3d at 591; Carmichael v. Galbraith, 574 F. App'x 286, 289-90 (5th Cir. 2014); Haidak v. Univ. of Mass. at Amherst, 299 F. Supp. 3d 242, 270 (D. Mass. 2018). Alleged sexual harassment in the form of a failure to follow Title IX regulations is not a sufficiently severe form of discrimination to give rise to a deliberate indifference claim. Roe v. St. Louis Univ., 746 F.3d 874, 883-84 (8th Cir. 2014); Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist., 647 F.3d 156, 169 (5th Cir. 2011).

Accordingly, to plead a Title IX deliberate indifference claim, the misconduct Z.J. alleges "must be sexual harassment, not just a biased disciplinary process." Baum, 903 F.3d at 588 (quoting Miami Univ., 882 F.3d at 591); Univ. of Dayton, 2018 WL 1393894, at *8 (rejecting argument that plaintiff alleged a deliberate indifference claim based solely on the gender discrimination he asserted occurred throughout the disciplinary process). Z.J., however, alleges only bias in application of the Sexual Misconduct Policy and Vanderbilt's treatment of him during the disciplinary process. Z.J. has not alleged that he was sexually harassed, by A.H., Vanderbilt employees, or anyone else, before or during Vanderbilt's disciplinary proceedings. Z.J.'s deliberate indifference claim therefore "fails because the alleged gender discrimination is not tethered to a claim of sexual harassment."[29] Miami Univ., 882 F.3d at 591; see also Baum, 903 F.3d at 588 (concluding the same because the plaintiff "did not allege that actionable sexual harassment occurred during his disciplinary proceedings"); Doe v. Ohio St. Univ., 323 F. Supp.

---

[29] The Court notes that in a separate section of the Complaint (under the "archaic assumptions" heading), Z.J. includes an isolated statement that he "was subjected to harassment due to [Vanderbilt's] actions in expelling" him. (See Doc. No. 23 at ¶ 203.) This is insufficient for numerous reasons, including that it is vague; it does not allege *sexual* harassment – i.e., a "pattern of sexually offensive behavior, Miami Univ., 882 F.3d at 591; and it does not allege a pervasive pattern as opposed to one incident, id.

32

3d 962, 968 (S.D. Ohio 2018) (dismissing deliberate indifference claim because "[p]laintiff ha[d] not alleged that he complained to [the university] that he was being sexually harassed, nor is there any allegation that [the university] ignored his complaints of sexual harassment") (hereinafter "Ohio St. Univ. II"); Schaumleffel, 2018 WL 1173043 at *15 (reaching same conclusion because the plaintiff's claims were based not on sexual harassment but on "the alleged gender discrimination that occurred throughout his disciplinary process"); Univ. of Dayton, 2018 WL 1393894, at *8 (dismissing deliberate indifference claim because the plaintiff only asserted that he suffered discrimination, not sexual harassment, "throughout the disciplinary process").

### 2. Archaic Assumptions Claim

Z.J. also brings a Title IX claim under the theory of "archaic assumptions." (Doc. No. 23 at ¶ 200.) Z.J. avers that Vanderbilt made a credibility finding in favor of A.H. "based on gender" and that the disciplinary process findings "clearly favored one gender over another." (Id. at ¶¶ 201-202.) Z.J., however, fundamentally misunderstands this theory of liability. The Court of Appeals "has never applied the archaic assumptions theory outside of the athletic context, and, indeed, [has] repeatedly refused litigants' requests to do so." Baum, 903 F.3d at 588. Specifically, "Title IX plaintiffs use the archaic assumptions theory to show that a school denied a student an equal opportunity to participate in an athletic program because of historical assumptions about boys' and girls' physical capabilities." Id. (citing Mallory, 76 F. App'x at 638-39 (explaining that the archaic assumptions theory applies "where plaintiffs seek equal athletic opportunities"); Cummins, 662 F. App'x at 451 n.9 ("The 'archaic assumptions' standard appears limited to unequal athletic opportunities.")); see also Marshall v. Ohio Univ., Case No. 2:15-cv-775, 2015 WL 725 4213, at *8 (S.D. Ohio Nov. 17, 2015) ("The archaic assumptions standard applies when a plaintiff seeking equal athletic opportunities demonstrates discriminatory intent in actions taken because of

33

classifications based upon archaic beliefs and stereotypes about gender."). As recently as September of 2018, the Court of Appeals confirmed this understanding and affirmed the dismissal of an archaic assumptions claim concerning university disciplinary proceedings. See Baum, 903 F.3d at 588 (finding "no reason to change course"). Because Z.J.'s archaic assumptions claim clearly arises from disciplinary proceedings and outside the context of university athletics, it will be dismissed.

### 3. Selective Enforcement Claim

Z.J. also brings a Title IX claim under the theory of "selective enforcement." (Doc. No. 23 at ¶ 190.) In a selective enforcement claim, "a plaintiff essentially asserts that even if he or she did violate a university policy, the decision to initiate disciplinary proceedings or the severity of the penalty imposed was motivated by gender bias." Marshall, 2015 WL 725 4213, at *6 (citing Yusuf, 35 F.3d at 715). "To prevail on a 'selective enforcement' claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." Cummins, 662 F. App'x at 452; see also Mallory, 76 F. App'x at 641 ("To support a claim of selective enforcement, [a male plaintiff] must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the [u]niversity."); Marshall, 2015 WL 725 4213, at *6 (under the selective enforcement theory, a plaintiff must allege "that a female was in circumstances sufficiently similar to his own and was treated more favorably" by the university and that the difference in treatment was due to gender); Rossley v. Drake Univ., --- F. Supp. 3d ---, 2018 WL 5307625, at *20 (S.D. Iowa Oct. 12, 2018) (explaining that, to support a claim of selective enforcement, a plaintiff "must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the [u]niversity"). In particular, the Court of Appeals has specified that, to make this showing, a plaintiff must "identif[y] . . . a

34

comparator of the opposite sex who was treated more favorably by the educational institution when facing similar disciplinary charges."[30] Cummins, 662 F. App'x at 452 (citing Yusuf, 35 F.3d at 716); Schaumleffel, 2018 WL 1173043, at *17 (same); Univ. of the South I, 687 F. Supp. 2d at 757 (same).

Under the heading of this claim, Z.J. alleges that he (1) "was singled out for enforcement of Title IX proceedings based on his gender"; (2) "did not have sexual control over A.H. or subject her to dating violence"; and (3) "intends to prove . . . he was expelled with no other less drastic options being made available to him based on his gender." (Id. at ¶¶ 191-193.) In addition, although located elsewhere in the Complaint, Z.J. also alleges that Vanderbilt "failed to investigate [A.H.'s] conduct after obtaining information indicating she, too, may have violated the policy." (Id. at ¶ 185.)

The Court finds that Z.J. "has failed to allege that any female student was not disciplined by [Vanderbilt] after a complaint was filed similar to the allegations made [by A.H.] against [Z.J.] in this case." Schaumleffel, 2018 WL 1173043, at *17; see also Univ. of the South I, 687 F. Supp. 2d at 757 (finding plaintiff had failed to plead that a similarly situated woman would not have been subjected to the same disciplinary proceedings). Indeed, Z.J. has neither alleged that he has been treated less fairly than a female student charged with similar violations of the Sexual Misconduct Policy (i.e., non-consensual sexual contact, dating violence, or attempted non-consensual sexual intercourse), nor compared the penalty imposed upon him for violating the Sexual Misconduct Policy (or any Vanderbilt policy, for that matter) to the punishment imposed upon any female

---

[30] To be clear, in Miami University, the Court of Appeals held that, for the purposes of a deliberate-indifference claim, a complaint need not necessarily have been made against a female accuser. Miami Univ., 882 F.3d at 591. That Court did not address selective enforcement claims, for which the similarly-situated comparator requirement remains in place. Ohio State Univ II., 323 F. Supp. 3d at 967-68.

student for violating any Vanderbilt policy. See Marshall, 2015 WL 7254213, at *7 (explaining that the plaintiff should have compared the penalty imposed upon him for violating the policy to the punishment imposed upon a female student for violating the policy).

The Court further finds that Z.J.'s vague allegation that A.H. should somehow have been investigated – i.e., that she was similarly-situated to Z.J. merely by virtue of having been intoxicated – is wholly insufficient.[31] (See Doc. No. 23 at ¶¶ 184-185.) Z.J. does not allege that he made any charge against A.H. that would have required an investigation of A.H., and the Complaint contains no allegation as to how A.H. might seriously have been similarly-situated to a student facing the charges that Z.J. faced under the Sexual Misconduct Policy. Thus, there is no basis for the Court to draw an inference of gender bias. Beyond that, the Complaint and Final Report suggest the contrary – that is, that Z.J. and A.H. were not similarly-situated. At the very least, both Z.J. and A.H. seem to agree that it was Z.J. who sought to initiate sexual intercourse, not A.H., and it was A.H. who resisted Z.J. Put simply, there are obvious reasons why Vanderbilt could have chosen to investigate Z.J. and not A.H. A.H. is simply not a valid comparator for purposes of this claim. See, e.g., Rossley, 2018 WL 5307625, at *22 ("[I]f the accused student did not similarly initiate or attempt to initiate a complaint against his or her accuser, the two cannot be compared."); Doe v. Univ. of Colo., Boulder, 255 F. Supp. 3d 1064, 1079 (D. Colo. 2017) (noting that "the inference of pro-victim bias is an obvious alternative explanation that overwhelms any potential inference of gender bias") (internal citation omitted); Stenzel v. Peterson, 2017 WL 4081897, at *4-6 (D. Minn. Sept. 13, 2017) (noting that the mere fact that plaintiff is male and the alleged victim is female "does not suggest that the disparate treatment was because of [the]

---

[31] Z.J.'s Response brief asserts that he and A.H. were "similarly situated, intoxicated students." (Doc. No. 36 at 4.)

plaintiff's sex" and finding the male plaintiff's selective enforcement claim failed because plaintiff could not show he and the female complainant were similarly situated); <u>Doe v. Univ. of St. Thomas</u>, 240 F. Supp. 3d 984, 991 (D. Minn. 2017) ("[N]umerous courts have held that even if a university treated a female student more favorably than the plaintiff during the disciplinary process, the mere fact that plaintiff is male and the alleged victim is female does not suggest that the disparate treatment was because of plaintiff's sex.") (internal quotation marks and modifications omitted).

In short, Z.J. has not alleged that he was unfairly investigated or disciplined where similarly-situated females facing disciplinary charges were not. As a result, Z.J.'s selective enforcement claim may not proceed. <u>Cummins</u>, 662 F. App'x at 452; <u>see also</u> <u>Schaumleffel</u>, 2018 WL 1173043, at *17 (selective enforcement claim dismissed because it did not assert that any other female student was not appropriately disciplined after being subject to a similar complaint); <u>Univ. of Dayton</u>, 2018 WL 1393894, at * 10 (finding selective enforcement claim "inapplicable" because the plaintiff failed to allege that similarly-situated females were treated more favorably than him); <u>Marshall</u>, 2015 WL 7254213, at *6 (dismissing selective enforcement claim on grounds that plaintiff (1) "never allege[d] facts about a single instance when [the university] declined to investigate allegations that a similarly situated female violated the policy" and (2) did not allege that the university decided to investigate the victim's allegations about the plaintiff because the plaintiff was male *and* that the university would not have investigated the university's allegations if the plaintiff was female); <u>Curto v. Smith</u>, 248 F. Supp. 2d 132, 146-47 (N.D.N.Y. 2003) (stating that the relevant question for a selective enforcement claim was whether others received less punishment for the same violations).

37

4. Erroneous Outcome

Finally, Z.J. pleads the erroneous outcome theory of Title IX liability, based broadly on allegations that Vanderbilt's "flawed investigation into the alleged sexual assault of A.H." was "unfair and unequal" because it was "based off of a sexual bias." (Doc. No. 23 at ¶¶ 143-44, 182.) "In a typical erroneous outcome case, the plaintiff 'attack[s the] university disciplinary proceeding on grounds of gender bias' by arguing that the plaintiff 'was innocent and wrongly found to have committed an offense.'" Sahm v. Miami Univ., 110 F.Supp.3d 774, 777-78 (S.D. Ohio 2015) (quoting Yusuf 35 F.3d at 715); see also Saravanan, 2017 WL 5659821, at *4 (same). To plead an erroneous outcome claim, a plaintiff must allege two things: "(1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding, and (2) a particularized . . . causal connection between the flawed outcome and gender bias." Miami Univ., 882 F.3d at 592 (quoting Cummins, 662 F. App'x at 452 (internal quotation marks and citation omitted)); Yusuf, 35 F.3d at 715; Tr. of Boston Coll. I, 892 F.3d at 93 (same); see also Doe v. Marymount Univ., 297 F. Supp. 3d 573, 585 (E.D. Va. 2018) (noting a plaintiff must allege "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding"); Univ. of Cincinnati, 2018 WL 1521631, at *4; Doe v. Purdue Univ., 281 F. Supp. 3d 754, 774 (N.D. Ind. 2017).

The pleading burden as to the first element – articulable doubt – is "not heavy" and can normally be met by alleging "particular procedural flaws affecting the proof." See Yusuf, 35 F.3d at 715. The second element, however, requires significantly more. A plaintiff may satisfactorily plead a causal connection between a flawed outcome and gender bias by alleging "inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." Miami Univ., 882

38

F.3d at 593 (quoting Yusuf, 35 F.3d at 715); Univ. of Cincinnati, 2018 WL 1521631, at *4; Saravanan, 2017 WL 5659821, at *4. Stated differently, a Title IX plaintiff successfully alleges gender bias for purposes of this claim "if he or she points to statistical evidence of gender bias in [a u]niversity's decision making, policies and procedures that are designed to reach gender-specific outcomes, and/or statements by university officials evidencing gender bias." Marymount Univ., 297 F. Supp. 3d at 585 (citing Cummins 662 F. App'x at 452).

Review of several recent decisions of the Court of Appeals for the Sixth Circuit is useful. In Miami University, the Court of Appeals reversed a district court that concluded a student had not sufficiently pleaded the second part of an erroneous outcome claim. Miami Univ., 882 F.3d at 593-95. The plaintiff had alleged that (1) every male student accused of sexual misconduct in the Fall 2013 and Spring 2014 semesters was found responsible by the university for the alleged violation, and (2) nearly ninety percent of students found responsible by the university for sexual misconduct between 2011 and 2014 had male first-names. Id. at 593. In addition, the plaintiff incorporated an affidavit from an attorney who represents many students in the university's disciplinary proceedings, which described a pattern of the university pursuing investigations concerning male students, but not female students. Id. Next, the plaintiff pointed to his own situation, in which he asserted that the university improperly initiated an investigation into him but not the female student. Id. The plaintiff also asserted that the university faced external pressure from the federal government and certain lawsuits brought by private parties that caused it to discriminate against men. Id. at 594. Specifically, he argued that pressure from the federal government to vigorously combat sexual assault on college campuses (e.g., by means of the 2011

Department of Education "Dear Colleague Letter"[32]), and the potential punishment of the loss of federal funds if it failed to comply, led the university to discriminate against men in its sexual-assault adjudication process. Id. Finally, the plaintiff alleged that the university faced pressure to increase the zealousness of its "prosecution" of sexual assault and the harshness of the sanctions it imposed because it was a defendant in a lawsuit brought by a student who alleged that she would not have been assaulted if the university had expelled her attacker for prior offenses. Id. After considering these allegations, the Court of Appeals concluded that "*[t]aken together*, the statistical evidence that ostensibly shows a pattern of gender-based decision-making *and* the external pressure on [the university] supports at the motion-to-dismiss stage a reasonable inference of gender discrimination." Id. at 593 (emphasis added).

Even more recently, the Sixth Circuit Court of Appeals mirrored these principles in Baum. In that case, the plaintiff alleged that (1) the federal government had launched an investigation to determine whether the university's process for responding to allegations of sexual misconduct discriminated against women; (2) when news of the investigation broke, student groups and local media outlets sharply criticized the administration; (3) the federal government's investigation and the negative media reports continued for years, including during the university's consideration of the plaintiff's case; (4) public attention and the ongoing investigation put pressure on the university to prove that it took complaints of sexual misconduct seriously; (5) the university stood to lose millions in federal aid if it was found to be non-compliant with Title IX; and (6) a female student had triggered the federal investigation and the news media consistently highlighted the university's poor response to female complainants. Baum, 903 F.3d at 586. The Court of Appeals concluded

---

[32] This letter, from Russlynn Ali, Assistant Secretary for Civil Rights, Office for Civil Rights, U.S. Department of Education (Apr. 4, 2011), became commonly known as *the* "Dear Colleague Letter" in Title IX litigation.

that "*all of this external pressure* . . . provides a backdrop that, when combined with other circumstantial evidence of bias in [the plaintiff's] specific proceeding, gives rise to a plausible claim" of gender bias. Id. (emphasis added).

Other recent cases in which Title IX erroneous outcome claims survived have involved allegations of statistical evidence of gender bias in a university's decision making, policies and procedures designed to reach gender-specific outcomes, statements by university officials evidencing gender bias, identifiable outside pressures on a university's disciplinary process, or some combination of these circumstances. See, e.g., Doe v. Columbia Univ., 831 F.3d 46, 57 (2d Cir. 2016) (plaintiff contended that (1) during the period preceding the disciplinary hearing, there was substantial criticism of the university both in the student body and in the public media that accused the university of not taking seriously complaints of female students alleging sexual assault by male students; (2) the investigator had been subjected to "personal criticism" by the student body and in news articles "for her role in prior cases in which the [u]niversity was seen as not taking seriously the complaints of female students"; and (3) the investigator was "aware that the university had been criticized for conducting investigations in a manner that favored male athletes and was insufficiently protective of sexually assaulted females"); Marymount, 297 F. Supp. 3d at 586-87 (plaintiff alleged his adjudicator had "certain engendered beliefs" and senior university officials publicly admitted that Title IX process had become "politicized"); Saravanan, 2017 WL 5659821, at *4-6 (plaintiff alleged numerous explicitly-biased anti-male statements made by university investigative personnel and anti-male/pro-female university documents); Doe v. Tr. of the Univ. of Pa., 270 F. Supp. 3d 799, 823 (E.D. Pa. Sept. 13, 2017) (plaintiff alleged that (1) university was influenced by media criticism for not taking the complaints of female students seriously, including accusations of "victim blaming" and imposing short sentences," and (2)

41

university leaders stated they were "redoubling [their] efforts" to "tackle [the] problem" identified in the "deeply troubling" results of a study showing that a third of female students had reported being sexually assaulted); Doe v. Amherst Coll., 238 F. Supp. 3d 195, 223 (D. Mass. 2017) (plaintiff alleged that university was trying to "appease" a biased, student-led movement of which the alleged victim was a part); Doe v. Lynn Univ., Inc., 235 F. Supp. 3d 1336, 1340-42 (S.D. Fla. 2017) (plaintiff alleged that the university was reacting to news reports that it had been delinquent in pressing charges against male perpetrators and "pressure from the public and the parents of female students" to punish the next male accused of sexual misconduct, who happened to be the plaintiff); Doe v. Brown Univ., 166 F. Supp. 3d 177, 189 (D.R.I. 2016) (plaintiff alleged that (1) university employee stated the university treats male students "guilty, until proven innocent" and assumed "it's always the 'boy's fault,'" (2) a professor stated "there is gender bias that is overwhelming at Brown" concerning sexual misconduct cases, and (3) a professor agreed that the "culture of thinking" on the campus is that "males are 'bad'" and "females are victims"); Wells v. Xavier Univ., 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014) (plaintiff alleged that university was "reacting against him[ ] as a male," in response to a Department of Education investigation, to demonstrate that the university "would take action, as [it] had failed to in the past, against males accused of sexual assault").

Accordingly, courts must look with a critical eye to determine whether a plaintiff plausibly alleges the required causal connection – i.e., particular circumstances suggesting that gender bias was a motivating factor behind a university's allegedly erroneous outcome – as opposed to merely making untethered, vague, or conclusory allegations of discrimination. Stated differently, conclusory allegations of gender bias, unsupported by even minimal data, credible anecdotal references, or the purported presence of specific external pressures, are insufficient to support a

plausible erroneous outcome claim. Further, when courts consider allegations of external pressure, they look to see if a plaintiff has alleged facts demonstrating that it was pressure not only to "aggressively pursue sexual assault cases, but to do so in a manner biased against males." Ruff v. Bd. of Regents of Univ. of New Mexico, 272 F. Supp. 3d 1289, 1302 (D.N.M. 2017). This takes into account that "a disciplinary system that is biased in favor of alleged victims and against those accused of misconduct . . . does not equate to gender bias because sexual assault victims can be both male and female." Sahm, 110 F. Supp. 3d at 778.

Here, Z.J. alleges that Vanderbilt's sexual misconduct investigation was "unfair and unequal in several regards, including their [sic] decision to provide unequal treatment as to [Z.J.'s] opportunity to present witnesses, the credibility given to A.H.'s inconsistent and manipulated statements, [ ] EAD's inability to take [Z.J.'s] statements at face value, and the lack of protection of [Z.J.]." (Doc. No. 23 at ¶ 144.) Z.J. further alleges that (1) the facts are sufficient to "cast some articulable doubt" on the outcome of the disciplinary process; (2) Z.J. was discriminated against during that process despite the fact that A.H. was also intoxicated, (3) A.H. should have been investigated for violating Vanderbilt policies; (4) Vanderbilt inappropriately "took the word of" A.H. over his; and (5) Z.J.'s expulsion was an "erroneous outcome" when "less drastic measures were applicable" and because Z.J. was not arrested by law enforcement. (Id. at ¶¶ 183-189.) Z.J. also, arguably, makes several other allegations scattered throughout the Complaint in support of this claim, including that (1) EAD's findings of fact were made "despite some evidence to the contrary"; (2) EAD's decision was the result of "insufficient training and a cognitive bias towards male students"; (3) EAD and the Appeals Board did not sufficiently address evidence put forward by Z.J.; and (4) the Appeals Board affirmed the decision to expel Z.J. "despite acknowledging his cooperation with [ ] EAD and disciplinary record." (Id. at ¶¶ 86, 88, 93, 95.) Finally, Z.J. alleges,

albeit elsewhere in the Complaint,[33] that (1) Vanderbilt "has been under the spotlight for quite some time regarding sexual misconduct occurring on their [sic] campus, (id. at ¶ 124), and (2) "[Vanderbilt] was subjected to a prior, nationally publicized incident of sexual misconduct by members of its football team, said members being all male, which [Z.J.] asserts caused [Vanderbilt] to be overzealous in the prosecution of [Z.J.] due to his gender and the allegations filed against him," (id. at ¶ 197).

The Court need not delve into the first element – i.e., allegations that cast "some articulable doubt" on the outcome of the disciplinary proceeding – because it concludes that Z.J.'s failure to sufficiently plead the second element of the erroneous outcome claim is outcome determinative. Z.J. has neither alleged any statistics, patterns, or anecdotal evidence showing gender bias in reporting, investigation, or punishment under Vanderbilt's Sexual Misconduct Policy, nor alleged *any* policy or practice designed to produce gender-specific outcomes. Absent any allegation to the contrary, "[t]he gender of [ ] students accused of sexual assault is the result of what is reported to [Vanderbilt], and not the other way around." Tr. of Boston Coll. I, 892 F.3d at 92. In a similar vein, Z.J. has not alleged a single statement by any university official evidencing gender bias before or during the disciplinary process. Z.J. has also not alleged any language in the Handbook that would suggest that gender bias played a role in the outcome of EAD's investigation, the Director of Student Accountability's sanction, or Z.J.'s appeal. Indeed, throughout the Sexual Misconduct Policy, complainants and respondents are carefully referred to as "he or she or they," indicating that Vanderbilt believes that men *and* women can both be victims and perpetrators. (See Doc. No. 27-1.) Most of Z.J.'s general allegations simply reflect dissatisfaction with the outcome

---

[33] This allegation is located under the heading of a different Title IX claim that appears after the erroneous outcome claim, but the Court assumes Z.J. intended for it to be considered here.

of his particular case. A single case of an individual who is subjectively displeased with the result of a disciplinary proceeding, however, cannot constitute a "pattern of decision-making" that makes plausible an erroneous outcome claim. Mallory, 76 F. App'x at 640; Yusuf, 35 F.3d at 715; Schaumleffel, 2018 WL 1173043, at *15. Without more, Z.J.'s erroneous outcome claim may not proceed. See Univ. of Cincinnati, 2018 WL 1521631, at *4 (citing Cummins, 662 F. App'x at 452) ("Alleged procedural deficiencies, without alleging additional facts linking the procedural defects to gender bias, do not create a plausible inference of gender discrimination."); Yusuf, 35 F.3d at 715 ("Allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss.").

Z.J.'s vague allegation regarding the occurrence of a "prior, nationally publicized incident of sexual misconduct by members of its football team, said members being all male" (Doc. No. 23 at ¶ 197) do not salvage his erroneous outcome claim. Z.J. does not allege *how* Vanderbilt was impacted by the prior incident or *what* the university did in response to the prior incident. It is not for the Court to imagine how Vanderbilt *may* have changed its policies or practices in the wake of the prior incident from a Complaint that contains no such allegation. See Iqbal, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"). Z.J. does not make any supporting allegations about specific news articles, editorials, television coverage or appearances, meetings, marches, public statements, campaigns, or rallies by outside individuals concerning Vanderbilt's handling of the prior incident, subsequent events, or sexual assault investigations on campus. Nor does Z.J. make any allegations about public or private statements of senior Vanderbilt officials or EAD employees at any time during or in the wake of

the prior incident or during his own investigation. Finally, Z.J. makes no allegations about any lawsuits, outside investigations, or government pressure on Vanderbilt to modify its treatment of male versus female students in the Sexual Misconduct Policy disciplinary process. The related allegation about Vanderbilt being "under the spotlight" (Doc. No. 23 at ¶ 124) is too vague and suffers from all these same infirmities.

Without additional detail or context, Z.J. alleges only that the "publicity" and "spotlight" related to the prior incident *in some unknown way* led to *his* overzealous prosecution, not to the overzealous prosecution of *male students* in *some identifiable way*. Compare with Miami Univ., 882 F.3d at 594 (plaintiff alleged direct connection between public scrutiny and gender-biased conduct by quoting from training and educational materials adopted in wake of federal government pressure); Baum, 903 F.3d at 586 (complaint plausibly alleged gender bias where it combined external pressure with empirical evidence of alleged gender-biased conduct by adjudicator). Indeed, Z.J. does not even allege that, in the wake of the prior incident, Vanderbilt treated alleged male perpetrators any different than alleged female perpetrators. All of these failures are critical, because, (1) as discussed above, one case does not allow an inference about a university's pattern of decision-making, and (2) "cracking down on perpetrators is not the same as cracking down on men." Marshall, 2015 WL 7254213, at *8; see also Rossley, 2018 WL 5307625, at *23 ("Victim-centric disciplinary proceedings do not equate to gender-biased, female-centric disciplinary proceedings."); Doe v. Coll. of Wooster, 243 F. Supp. 3d 875, 886 (N.D. Ohio 2017) (explaining that "[d]emonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against alleged perpetrators, is not equivalent of demonstrating bias against male students"); Sahm, 110 F. Supp. 3d at 778 ("Demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not

46

the equivalent of demonstrating bias against male students."); King v. DePauw Univ., No. 2:14-cv-70, 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014) (demonstrating a bias against students accused of sexual assault is not the equivalent of demonstrating a bias against males); Haley v. Va. Commonwealth Univ., 948 F. Supp. 573, 579 (E.D. Va. 1996) (stating that "a bias against people accused of sexual harassment and in favor of victims . . . indicate[s] nothing about gender discrimination").

The Court therefore concludes that Z.J. has failed to sufficiently plead an erroneous outcome claim under Title IX. See, e.g., Univ. of Cincinnati, 2018 WL 1521631, at *4-6 (dismissing erroneous outcome claim lacking statistical evidence and relying solely on indeterminate public pressures); Doe v. Columbia Coll. Chicago, 299 F. Supp. 3d 939, 953 (N.D. Ill. 2017) (dismissing erroneous outcome claim because "general allegations about public pressure to resolve sexual assault complaints are insufficient to show that gender bias was the motivating factor in the erroneous result"); Coll. of Wooster, 243 F. Supp. 3d at 886 (dismissing erroneous outcome claim because allegations of gender-neutral public pressure focusing only on the college's need to confront problems of campus sexual assault did not suggest basis for discrimination); Yu, 97 F. Supp. 3d at 475 ("[Plaintiff] has not provided, for instance, any statements made by [disciplinary board] members, nor any statements made by any other [college] official, that would evidence any sort of discriminatory intent. [Plaintiff] has similarly failed to provide any statistical evidence that 'males invariably lose' when charged with sexual misconduct at [the college]."); Univ. of the South I, 687 F. Supp. 2d at 756 (dismissing erroneous outcome claim because plaintiff failed to plead that the university's disciplinary hearing process constituted a "pattern of decision-making" whereby the disciplinary procedures governing sexual assault claims were "discriminatorily applied or motivated by a chauvinistic view of the sexes").

47

5.    Summary

Accordingly, Z.J.'s five substantive Title IX claims will be dismissed. Because his substantive claims will be dismissed, Z.J.'s Title IX causes of action for damages and injunctive relief will also be dismissed.

B.    Intentional Infliction of Emotional Distress Claim

Z.J. also brings a state law claim for intentional infliction of emotional distress. (Doc. No. 23 at ¶¶ 176-177.) In Tennessee, the tort of intentional infliction of emotional distress ("IIED") is synonymous with the tort of outrageous conduct. Belmont Univ., 2018 WL 4627033, at *13 (citing Lyons v. Farmers Ins. Exch., 26 S.W.3d 888, 893 (Tenn. Ct. App. 2000)). A Tennessee plaintiff must plead the following elements of an IIED claim: (1) intentional or reckless conduct; (2) conduct so outrageous that it is not tolerated by civilized society; and (3) conduct resulting in serious mental injury. Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997). "To say that Tennessee courts narrowly define 'outrageous conduct' would be something of an understatement." Belmont Univ., 2018 WL 4627033, at *13. The conduct must be "atrocious," "utterly intolerable," and "beyond all bounds of decency." Goldfarb v. Baker, 547 S.W.2d 568, 569 (Tenn. 1977). As the Tennessee Supreme Court has explained:

> In describing these elements, we have emphasized that it is not sufficient that a defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress. A plaintiff must in addition show that the defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 51 (Tenn. 2004) (internal citations and quotation marks omitted) (emphasis added).

48

Thus, first, the standard is not whether an aggrieved person (such as Z.J.) considers a party's actions to have been outrageous, but whether a civilized society would find them so. And, second, a plaintiff must prove that the conduct is outrageous and utterly intolerable in character, not just in motive. Belmont Univ., 2018 WL 4627033, at *14. In this way, a plaintiff seeking damages for IIED must meet an "exacting standard." Miller v. Willbanks, 8 S.W.3d 607, 614 (Tenn. 1999). Furthermore, Tennessee courts have limited recovery for IIED to mental injury that "is so severe that no reasonable person would be expected to endure it."[34] Arnett v. Domino's Pizza I, L.L.C., 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003).

Z.J. alleges that "Vanderbilt's conduct towards [him] during the investigation, appeal, and expulsion was intentional and reckless and so outrageous that it is not tolerated by a civil society. (Id. at ¶ 176.) He claims that Vanderbilt's conduct "has caused serious mental injury" and "significantly impaired [his] daily life." (Id. at ¶ 177.) According to the allegations of the Complaint, Vanderbilt investigated Z.J. in response to a report of potential violations of the Sexual Misconduct Policy made by another student. Vanderbilt conducted an investigation that included interviewing Z.J. and reviewing several statements he gave to VUPD. Z.J. participated in the investigation. Vanderbilt allowed Z.J. to comment on notes of his own interviews. Vanderbilt engaged in extensive analyses and credibility determinations, and explained its findings and conclusions in a notably detailed, 21-page Final Report, which was supported by photographic evidence, surveillance video evidence, VUMC records, and VUPD records. Z.J. was allowed to appeal the Final Report, and EAD was asked to respond to his appeal. Even if Vanderbilt's investigation was imperfect, misguided, or unfair, its alleged conduct is not "so extreme in degree,"

---

[34] Trial courts have been empowered to "reasonably dismiss this legal theory as a matter of law." Lane v. Becker, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010).

"so beyond all possible bounds of decency," or "so atrocious and utterly intolerable to society," such that it meets the highly demanding Tennessee standard for an IIED claim.

Furthermore, as this Court recently explained in Belmont University, Tennessee courts have consistently held that removal from academic programs and frustration of earning academic degrees, even if humiliating, depressing, or distressful, are not sufficiently egregious to support a claim of IIED. See Belmont Univ., 2018 WL 4627033, at *14 (citing Kindred v. Nat'l Coll. of Bus. And Tech., Inc., No. W2014-00413-COA-R3-CV, 2015 WL 1296076, at *9-10 (Tenn. Ct. App. Mar. 19, 2015) (dismissing IIED claim where plaintiff's enrollment was cancelled by school and plaintiff alleged the actions of administrator caused her "continuing great emotional pain and mental distress," and that she "felt that she could no longer pursue her educational goals because she could not continue at [school] and she could not start all over somewhere else," because reasonable minds could not find that school's conduct was "utterly intolerable" or "beyond all bounds of decency"); Runions v. Tenn. St. Univ., No. M2008-01574-COA-R3-CV, 2009 WL 1939816, at *6 (Tenn. Ct. App. July 6, 2009) (holding that a student's physical removal from classroom and expulsion from nursing program, despite prior promises of fair treatment and reinstatement from provost, did not meet exacting standard for recovery on claim of IIED); Goldfarb v. Baker, 547 S.W.2d 567, 568 (Tenn. 1977) (fact that student was publicly accused of assault and blackmail by teacher and removed from class, although a "misfortune," was not sufficient to establish IIED claim).

In short, Z.J. has not sufficiently pleaded an IIED claim. Nor "has he alleged discomfort that a student in a modern university sexual misconduct investigation cannot be expected by society to face." Belmont Univ., 2018 WL 4627033, at *14; see also, e.g., Doe v. Rider Univ., Civil Action No. 3:16-cv-4882-BRM-DEA, 2018 WL 466225, at * 18 (D.N.J. (Jan. 17, 2018)

("Courts have found that when a university takes action in response to a claim of sexual assault made by another student, such conduct fails to meet the standard of 'outrageous.'"); Tr. of Univ. of Pa., 270 F. Supp. 3d at 827 (under similar legal standard, dismissing IIED claim where plaintiff alleged that university distorted facts in investigation, improperly attacked plaintiff's credibility, unjustifiably branded plaintiff a rapist, threatened plaintiff with expulsion when not justified, and imposed unfair sanction); Austin v. Univ. of Oregon, 205 F. Supp. 3d 1214, 1230 (D. Ore. 2016) (under similar legal standard, dismissing IIED claim where plaintiff alleged inadequate investigation, hearing and appeal process, unfair publicity, and being unfairly stamped with a "badge of infamy" by university officials). Accordingly, the Court will dismiss Z.J.'s IIED claim.

C.    Defamation Claim

Z.J. also brings a state law claim for defamation.[35] To plead a prima facie case of defamation in Tennessee, the plaintiff must establish that: 1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. Seaton v. TripAdvisor, LLC, 728 F.3d 592, 596-97 (6th Cir. 2013) (quoting Sullivan v. Baptist Mem'l Hosp., 995 S.W.2d 569, 571 (Tenn. 1999)); Chase v. Funk, Case No. 3:16-cv-01579, 2016 WL 7180150, at *6 (M.D. Tenn. Dec. 9, 2016) (same); RESTATEMENT (SECOND) OF TORTS § 580B (1997). "Publication is a term of art meaning the communication of defamatory matter to a third person." Brown v. Christian Bros. Univ., 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013) (citing Quality Auto Parts Co. v. Bluff City Buick Co., 876 S.W.2d 818, 821 (Tenn. 1994)). It is an "elementary

---

[35] The law of defamation includes both slander and libel. A libel action involves written communication and a slander action involves spoken communication. The basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person's character and reputation. Little Stores v. Isenberg, 172 S.W.2d 13, 16 (Tenn. Ct. App. 1943).

rule" in Tennessee that "publication" is "an essential element of a [defamation] action without which a complaint must be dismissed." Woods v. Helmi, M.D.A., 758 S.W.2d 219, 222-23 (Tenn. Ct. App. 1988) (citing Applewhite v. Memphis State Univ., 495 S.W.2d 190 (Tenn. 1973)). "Without publication, the court will not address the issues of malice, privilege, falsity, or other related questions." Siegfried v. Grand Krewe of Sphinx, No. W2002-02246-COA-R3-CV, 2003 WL 22888908, at *2 (Tenn. Ct. App. Dec. 2, 2003) (citing Applewhite, 495 S.W.2d at 223).

Tennessee courts have held that certain "intra-corporate communications" do not constitute publication. Woods, 758 S.W.2d at 223. Specifically, "where [a] communication is made to a servant or business associate in the ordinary and natural course of business, there is no actionable [defamation]." Clark v. Hoops, LP, 709 F. Supp. 2d 657, 671 (W.D. Tenn. 2010) (quoting Freeman v. Dayton Scale Co., 19 S.W.2d 255, 256 (Tenn. 1929)); see also Sullivan, 995 S.W.2d at 572 (noting that "communication among agents of the same corporation . . . are not to be considered as statements communicated or publicized to third persons") (citing Quality Auto Parts Co., 876 S.W.2d at 821). This exception for "intra-corporate communications" even extends to non-profit corporations, unincorporated groups, and associations. Siegfried, 2003 WL 22888908, at *3; Trotter v. Grand Lodge F. & A.M. of Tenn., No. E2005-00416-COA-R3-CV, 2006 WL 538946, at *4-6 (Tenn. Ct. App. Mar. 6, 2006). Put simply, when the person in receipt of a communication is within the structure of a defined organization and has a responsibility to the organization to receive that communication, there is no publication to a third party. See, e.g., Siegfried, 2003 WL 22888908, at *3 (rejecting defamation claim where only recipients of communications at issue were representatives of defendant non-profit social organization who had responsibility to receive and review charges of malfeasance pursuant to the by-laws of the organization); Trotter, 2006 WL

538946, at *6 (distinguishing between situations in which private information is disseminated to members of an organization and to the general public).

Z.J. alleges that "Vanderbilt published to third parties that [he] was guilty of a sexual assault on campus, even though they [sic] knew the allegation was false and/or unsubstantiated, or acted with reckless indifference to the truth or falsity of said allegation." (Doc. No. 23 at ¶ 150.) Z.J. alleges that the defamatory statements were "published to multiple third parties via the Vanderbilt warning system and to the Director of Student Accountability." (Id. at ¶ 156.) He further alleges that the defamatory statements harmed his reputation, caused personal humiliation, harmed his "good name in the community," "brought scandal to his peer group," and limit[ed] [his] future educational and career prospects." (Id. at ¶¶ 151-152, 157.)

Z.J.'s allegations regarding "publication to a third party" include publication to (1) the Director of Student Accountability, (2) "third parties," and (3) "multiple third parties via the Vanderbilt warning system." However, under the intra-corporate communications doctrine, communications by Vanderbilt (or any Vanderbilt official) with Vanderbilt's own Director of Student Accountability, cannot constitute "publication" under Tennessee law, because that would merely be the sharing of information among Vanderbilt employees involved in the disciplinary process.

The remaining alleged communications – to unknown "third parties" – are insufficiently vague. Critically missing from Z.J.'s allegations is exactly what specific information about him was communicated to third parties. Z.J.'s isolated reference to use of a "Vanderbilt warning system" offers no allegation regarding what that system is; who it allegedly broadcast information to; how or when it supposedly publicized information about Z.J.; or what, even generally speaking, information it allegedly conveyed. Factual allegations must be enough to raise a right to relief

above the speculative level. Twombly, 550 U.S. at 555. While this standard does not require overly detailed factual allegations, it demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678; see also ConocoPhillips Co. v. Shaffer, No. 3:05-cv-7131, 2005 WL 2280393, at *1 (N.D. Ohio Sept. 19, 2005) (noting that, to properly plead a defamation claim, a plaintiff must both adhere to the notice and pleading requirements of the Federal Rules of Civil Procedure and allege all elements of the cause of action). Lacking substance, Z.J.'s vague allegations regarding Vanderbilt's publication to unknown "third parties" fall "short of the line between possibility and plausibility of 'entitle[ment] to relief.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557); see also Handley v. May, 588 S.W.2d 772, 775 (Tenn. Ct. App. 1979) (explaining that a defamation claim must set forth the substance of the alleged statement and, "if the complaint is so vague that a court cannot ascertain the nature of the alleged slander, it is insufficient"); compare with Univ. of Dayton, 2018 WL 1393894, at *5 (under similar Ohio law, allowing defamation claim to proceed because the plaintiff alleged the specific third parties to whom information was purportedly published as well as "when, how, and what was allegedly said"). Z.J.'s insufficient defamation claim will therefore be dismissed.

D.     Breach of Contract Claims

Z.J. alleges that he had an implied contractual relationship with Vanderbilt by virtue of his paying tuition. (Doc. No. 23 at ¶¶ 103-104.) Z.J. claims that the relevant terms of the parties' contract are set forth in the Handbook and Sexual Misconduct Policy (id. at ¶¶ 102, 104), and that Vanderbilt breached these terms when it failed to provide Z.J. with a fair adjudicatory process in a number of ways (id. at ¶ 106). Vanderbilt contends that there is no actionable binding contract, but assumes for purposes of the Motion that the Handbook creates an implied contract. (Doc. No.

27 at 14-15.) Vanderbilt argues, however, that Z.J. has not sufficiently alleged a breach of the contractual relationship. (Id. at 15-22.)

In Tennessee, to allege a breach of contract a plaintiff must plead (1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breach. Thomas v. Meharry Med. Coll., 1 F. Supp. 3d 816, 828 (M.D. Tenn. 2014). There is also "implied in every contract a duty of good faith and fair dealing in its performance and enforcement." Shah v. Racetrac Petroleum Co., 338 F.3d 557, 572 (6th Cir. 2003); Univ. of the South II, 2011 WL 1258104, at * 18. The nature of the duty "depends upon the individual contract in each case." Id.

The Tennessee Supreme Court "has not . . . enunciated the standard which should be applied in a dispute arising out of the university-student relationship." Doherty v. S. Coll. of Optometry, 862 F.2d 570, 577 (6th Cir. 1988). However, noting that courts "have rejected a rigid application of contract law in this area," the Court of Appeals for the Sixth Circuit, applying Tennessee law, has recently reaffirmed that "the student-university relationship is contractual in nature." Sifuna v. S. Coll. of Tenn., Inc., No. 17-5660, 2018 WL 3005814, at *2 (6th Cir. Apr. 5, 2018); see also Atria v. Vanderbilt Univ., 142 F. App'x 246, 255 (6th Cir. 2005) (explaining that provisions of university's student handbook may be enforced in Tennessee as an implied contract); Doherty, 862 F.2d at 577 (describing student-university relationship as "contractual in nature"); accord Papelino v. Albany Coll. of Pharmacy of Union Univ., 633 F.3d 81, 93 (2d Cir. 2011) (under parallel contract law, finding implied contract exists between student and university). Catalogs, manuals, student handbooks, bulletins, circulars and regulations of a university help define the implied contractual relationship. Atria, 142 F. App'x at 255. And, indeed, the Court of Appeals has in the past specifically held that Vanderbilt's own Handbook creates implied

55

contractual obligations. See id. (concluding that Vanderbilt's Handbook, "which states that its policies 'are not intended to be all-inclusive and do not constitute a contract,' is not an express written contract," but the Handbook's provisions may be enforced as an implied contract).

Accordingly, "a student may raise breach of contract claims arising from a university's alleged failure to comply with its rules governing disciplinary proceedings." Anderson v. Vanderbilt Univ., 450 F. App'x 500, 502 (6th Cir. 2011). Here, the Court utilizes the Handbook and Sexual Misconduct Policy to define the relevant terms of the implied contractual relationship between Z.J. and Vanderbilt. Atria, 142 F. App'x at 255; Anderson, 450 F. App'x at 502; see also Univ. of South II, 2011 WL 1258104, at *18 (explaining that university's sexual assault policies and procedures could be enforced as implied contract); Doe v. Colgate Univ., No. 5:15-CV-1069 (LEK/DEP), 2017 WL 4990629, at *19 (N.D.N.Y. Oct. 31, 2017) (under similar contract law, treating student handbook and university grievance policy as containing terms of the agreement between student plaintiff and university). However, the provisions therein "have unique qualities and must be construed to allow the [university's] governing body to meet its educational and doctrinal responsibilities," Valente v. Univ. of Dayton, 438 F. App'x 381, 384 (6th Cir. 2011), and, as mentioned, it is not the role of the Court to "advocate for best practices," Yu, 97 F. Supp. 3d at 461.

Z.J. alleges numerous grounds for breach of his contractual relationship with Vanderbilt arising from the university's investigation and disciplinary action under the Sexual Misconduct Policy.

### 1. Claim Based on Decision to Proceed with Investigation

Z.J. alleges that Vanderbilt breached an obligation to "refrain from proceeding with A.H.'s charge if the investigation demonstrated that there was insufficient evidence to convince an

unbiased tribunal of guilt." (Doc. No. 23 at ¶ 109.) Z.J. further alleges that Vanderbilt proceeded with its investigation even though (1) VUPD and VUMC records did not contain sufficient evidence of his guilt, and (2) A.H.'s statements varied too much over time. (Id. at ¶¶ 110-113.) However, the Sexual Misconduct Policy does not require that any particular evidentiary threshold be met to for EAD to proceed with an investigation or terminate an investigation before completion. The Sexual Misconduct Policy sets forth various factors that EAD should take into consideration in determining whether to conduct an investigation,[36] but none of these dictate a specific determination regarding the sufficiency of the evidence. (Doc. No. 23 at ¶ 57; Doc. No. 27-1 at 111.) This makes sense because, initially, EAD is not in possession of all the evidence, let alone in a position to evaluate it; EAD is only in a position to make a threshold finding regarding whether a student's complaint arguably falls within the Sexual Misconduct Policy. To that end, there is a process whereby EAD will gather some evidence from the complainant, including the names of potential witnesses and supporting documentation such as emails, text messages and social media posts, for the purpose of determining if a complaint actually involves a potential violation of the Sexual Misconduct Policy. (Doc. No. 27-1 at 112.) If such a determination is made, the Sexual Misconduct Policy states that EAD "will normally commence an investigation." (Id.) Once an investigation is commenced, the Sexual Misconduct Policy provides the procedural steps that EAD shall follow, proceeding through to preliminary and final investigative reports. (Doc. No. 27-1 at 113-14.) There is no requirement for EAD to reach *any* determinations regarding the

---

[36] These include the "interests of the complainant and the University's commitment to a safe and nondiscriminatory environment for all members of the University community," the "complainant's desire for confidentiality," "information concerning any previous allegations involving the respondent," the "likelihood of repeated offenses," "evidence that the alleged misconduct is part of a pattern of misconduct," and Vanderbilt's "ability to ensure that the alleged misconduct does not contribute to the creation of a hostile environment for any students." (Doc. No. 23 at ¶ 57; Doc. No. 27-1 at 111.)

sufficiency of the evidence *before* producing the investigative reports containing final conclusions based on the totality of the evidence and EAD's credibility determinations. (Id.) Stated differently, there is no evidence-based yardstick in the Sexual Misconduct Policy for EAD to abandon an investigation prior to delivering its investigative reports.[37]

Accordingly, to proceed with an investigation pursuant to the Sexual Misconduct Policy, EAD need only follow basic steps to determine if the concerns raised in a student's complaint fall under the purview of the Sexual Misconduct Policy, and, once an investigation is commenced, EAD must follow its procedures and complete the investigation to reach a conclusion, by a preponderance of the evidence, regarding whether the respondent violated the Sexual Misconduct Policy. As long as the Sexual Misconduct Policy is relevant to the complaint, there is neither a requirement of a particular evidentiary threshold for a complainant to be eligible for an EAD investigation, nor any metric for a respondent to assert that he is entitled to have EAD discontinue an ongoing investigation based on evidence that a respondent believes undercuts the complaint. Indeed, weighing evidence is the heart and soul of an investigation.

Here, the Complaint itself alleges that facts existed (including A.H.'s first-hand report to VUMC and VUPD of the events of March 19, 2016 and medical observations and photographs of "obvious bilateral bruising to the breast tissue") to support the conclusion that A.H.'s complaint indeed fell under the Sexual Misconduct Policy to justify the next step – EAD's investigation of the complaint. Accordingly, Z.J. cannot plausibly allege that Vanderbilt's decision to proceed with that investigation is a breach of contract simply by pointing to certain evidence that he believes weakened A.H.'s complaint or Vanderbilt's ultimate conclusions. Belmont Univ., 2018 WL

---

[37] Of course, if EAD finds the evidence against a respondent to be insufficient, it concludes that he or she is not responsible for charges in in preliminary and final investigative reports.

4627033, at *9; see also, e.g., Doe v. Tr. of Boston Coll., Civil Action No. 15-cv-10790, 2016 WL 5799297, at *18 (D. Mass. Oct. 4, 2016) (hereinafter "Tr. of Boston Coll. II") (noting the existence of conflicting evidence does not defeat a student's complaint), affirmed in part and reversed in part on other grounds, Tr. of Boston Coll. I, 892 F.3d at 67; Doe v. Univ. of Denver, Civil Action No. 16-cv-00152-PAB-KMT, 2018 WL 1304530, at *11 (D. Colo. Mar. 13, 2018) (stating that the presence of conflicting evidence in the record does not mean that university failed to consider that evidence). Z.J.'s disagreement with Vanderbilt's decision to conduct an investigation, or to complete that investigation, is therefore an insufficient basis for a claim that Vanderbilt breached its contractual obligations.

2.     Claim Based on Obligation to Conduct an Appropriate Investigation

Z.J. alleges that Vanderbilt breached its obligations under the Sexual Misconduct Policy to conduct an appropriate investigation by improperly "disregarding" isolated statements in the VUPD reports and VUMC records concerning whether Z.J.'s behavior was non-consensual and the relationship of the bruises on A.H.'s thighs to the alleged incident. (Doc. No. 23 at ¶107.) Z.J. alleges that EAD violated the "promise of fundamental fairness" by "refusing to observe the totality of the circumstances." (Id.) Z.J. also alleges that the Appeals Officers also failed to conduct an appropriate review by basing their "predetermined" decision on EAD interview documents that were "positioned in a manner to fit their reasoning." (Id. at ¶ 108.) Finally, Z.J. alleges that the Appeals Officers "refused to appreciate" Z.J.'s assertion that he "refused to disrespect A.H. by calling her a liar, but ultimately disagreed with her recollection of events." (Id.)

The Sexual Misconduct Policy, however, contains few requirements regarding how EAD must conduct an appropriate substantive investigation, including no specific requirements regarding how EAD must utilize, evaluate, and accept or reject testimony or other evidence.

59

Instead, the Sexual Misconduct Policy only requires that an investigation be conducted in the broadest sense. In most relevant part, the Sexual Misconduct Policy specifically requires that EAD investigators interview the respondent and other individuals that EAD determines may have pertinent knowledge. (Doc. No. 27-1 at 113-14.) All other matters of "appropriateness" are left purely to EAD's discretion: EAD (1) *may* collect supporting documentation and information from the complainant, respondent, and witnesses; (2) *may* request access to premises, records, documents, and other forms of evidence it deems relevant; and (3) *may* seek clarification from any person participating in the investigation regarding the incident or their statement. (<u>Id</u>.) At the end of EAD's investigation, it *shall*: (1) prepare a preliminary investigation report that contains a summary of the information and documents that EAD considers relevant to whether the respondent violated the Sexual Misconduct Policy; and, subsequently, (2) issue a final investigative report that sets forth EAD's final determination, based on a preponderance of the evidence standard, regarding whether the respondent violated the Sexual Misconduct Policy by engaging in any of the prohibited offenses, including "a summary of the information and documents on which it is based" and addressing "to the extent EAD considers appropriate," any comments received from the complainant or respondent. (<u>Id</u>.) The Appeals Officers are given even less guidance; they are merely required to consider the appeal based only on the materials presented to the EAD or new information introduced in certain limited circumstances. (<u>Id</u>. at 118.) In short, EAD and the Appeals Officers are provided with basic guidelines and standards and are given almost unfettered discretion regarding how to conduct their investigations and deliberations.

Accordingly, there are no provisions of the Sexual Misconduct Policy that require EAD investigators or the Appeals Officers to consider evidence in a way that Z.J. alleges they did not, or to refrain from considering evidence in a way that Z.J. alleges they did. Z.J. alleges that

Vanderbilt conducted a timely investigation, interviewed witnesses (including Z.J. in person and A.H. through written question and answer over several weeks, and timely produced a Preliminary Report and Final Report that provided explanations of EAD's consideration of the evidence, witnesses' credibility, and factual conclusions related thereto. (Doc. No. 23 at ¶¶ 71-78, 80-88.) Z.J. further alleges that he was allowed to appeal and submit his arguments in writing. (Id. at ¶¶ 89-95.) Z.J. is understandably dissatisfied with the outcome of Vanderbilt's investigation. His disappointment, however, is an insufficient basis for a breach of contract claim. See, e.g., Schaumleffel, 2018 WL 1173043, at * 11 ("The Student Handbook does not contain specific requirements regarding the investigation following a complaint against a student. [The university] conducted an investigation into the allegations and prepared a report. Those actions are sufficient under the Student Handbook."); Belmont Univ., 2018 WL 4627033, at *7 (dismissing breach of contract claim alleging an inadequate investigation where policy merely stated that investigators will determine whether collected information is relevant); Coll. of Wooster, 243 F. Supp. 3d at 891-92 (dismissing breach of contract claim based on appropriateness of investigation because complaint did not allege that student handbook contained controlling, specific requirements concerning means of investigation); see also, e.g., Powell v. St. Joseph's Univ., Civil Action No. 17-4438, 2018 WL 994478, at *5 (E.D. Pa. Feb. 20, 2018) (holding students are only entitled to those safeguards that a school specifically provides in its procedures); Doe v. Columbia Coll. Chicago, Case No. 17-CV-00748, 2018 WL 497284, at *7 (N.D. Ill. Jan. 22, 2018) (breach of contract claim regarding inadequate investigation failed where school met with and communicated with both complainant and respondent throughout the investigation, gathered facts and witnesses, considered the evidence provided and the credibility of the parties, and created an investigation report); Tr. of Univ. of Pa., 270 F. Supp. 3d. at 813 (concluding that the promise of a "thorough

61

and fair investigation" did not impose any addition requirements other than those specifically set forth in the student disciplinary procedures); Dempsey v. Bucknell Univ., Civil Action No. 4:11-CV-1679, 2012 WL 1569826, at *18 (M.D. Pa. May 3, 2012) (holding that student's breach of contract claim failed where complaint demonstrated that an investigation into the assault complaint was conducted).

### 3. Claim Based on Obligation to Provide Written Statements

Z.J. alleges that Vanderbilt breached an obligation to provide him access to certain written statements made by A.H. (Doc. No. 23 at ¶¶ 114-115.) Specifically, Z.J. alleges that the Final Report contained as exhibits A.H.'s written statement to VUPD, but not A.H.'s (1) written narrative summary, (2) responses to questions asked by EAD; or (3) comments on the Preliminary Report. (Id.) Z.J. bases this claim upon the provision in the Sexual Misconduct Policy that states the final investigation report "will contain a summary of the information and documents on which the final determination is based and will address, to the extent EAD considers appropriate, any comments received from the complainant or respondent. *The comments from the complainant and respondent will also be attached as an exhibit.*" (Doc. No. 27-1 at 114 (emphasis added in Complaint).) However, the Sexual Misconduct Policy does not entitle a respondent to review all evidence or comments a complainant has supplied during the investigation process. The quoted language above is located in the "Determinations" section of the Sexual Misconduct Policy, which consists of a paragraph discussing the preliminary investigation report and a paragraph discussing the final investigation report. (Id.) The "comments" that this section refers to are clearly those provided in response to the preliminary investigation report. See id. ("Both the complainant and respondent will have the opportunity to submit written comments to the preliminary investigation report.")

Accordingly, the Sexual Misconduct Policy provides only for the following: (1) EAD shall summarize information on which its decision is based and need only discuss prior statements or comments of a complainant in its discretion, and (2) EAD shall attach copies of comments on the preliminary investigation report to the final investigation report. The Complaint concedes that Vanderbilt has summarized the information on which its decision was based (see Doc. No. 23 at ¶¶ 66-78), and the comprehensive Final Report reflects that this is so (see Doc. No. 45). Given no additional disclosure requirements exist under the Sexual Misconduct Policy, Z.J.'s claims based on EAD's alleged failures to attach A.H.'s (1) written narrative summary or (2) responses to questions must fail. See e.g., Faparusi v. Case W. Reserve Univ., 2017 WL 759024, at *6 (N.D. Ohio Feb. 28, 2017) (plaintiff cannot state plausible breach of contract action based upon procedural guarantee absent from university disciplinary policy).

That leaves the allegation that Vanderbilt did not attach to the Final Report A.H.'s comments to the Preliminary Report, an omission that the copy of the Final Report filed with the Court confirms. (Doc. No. 45.) However, the Complaint explicitly alleges that EAD summarized those comments in the Final Report (Doc. No. 23 at ¶ 77), and the Final Report reflects that EAD indeed did so (see Doc. No. 45 at 12 n.16; 13 n.21). Thus, the failure to separately attach the comments was, in this instance, a mere technical violation of the policy that did not harm Z.J. See, e.g., Coll. of Wooster, 243 F. Supp. 3d at 891 (technical violation of handbook requirement was not a material breach where the procedure employed was "fundamentally, or essentially, fair"); see also (Doc. No. 27-1 at 118 (Handbook specifying that procedural irregularities that are considered harmless by Appellate Officers are not a basis for upsetting a determination or sanction)). Moreover, Z.J. has not alleged that he made any attempt to bring the omission of this exhibit to EAD's attention (i.e., to ask for the exhibit and be refused by Vanderbilt) after receiving

the Final Report and before preparing his appeal. Thus, beyond the substantive insufficiency of this claim, it has been effectively waived. See, e.g., Tigrett v. Rector and Visitors of Univ. of Va., 97 F. Supp. 2d 752, 762 (W.D. Va. 2000) (finding that where student had an opportunity to question members of disciplinary panel concerning alleged bias but did not challenge their impartiality, he waived subsequent claim of bias). This is therefore an insufficient basis for Z.J.'s breach of contract claim.

### 4. Claim Based on Testimony of Witnesses

Z.J. alleges that he "had the right to provide witnesses that interacted with [him] after the alleged incident, as well as any witnesses that could comment on [his] character and capability of committing such acts," and Vanderbilt breached this promise when EAD "informed him that his witnesses were irrelevant because they were not present at the time of the incident." (Doc. No. 23 at ¶¶ 117-118.) While Z.J. does not include any specific allegations in the factual narrative section of the Complaint, under the cause of action Z.J. alleges that his roommates were no different than Student 1 because Student 1 was "only present afterwards," and his roommates were also present "after A.H. left [Z.J.'s] suite." (Id. at ¶ 118.) Z.J. further alleges that "EAD completely misinterpreted the conversation about witnesses that they had with [him]," and that, as a result, "[his] roommates were denied the right to potentially testify." (Id. at ¶¶ 118-119.)

The Sexual Misconduct Policy provides that the respondent may "offer names of witnesses or other people with relevant information." (Id. at ¶ 117; Doc. No. 45 at 113.) But it does not require that EAD interview every witness proposed by the respondent (or the complainant, for that matter). Rather, as discussed above, the Sexual Misconduct Policy gives EAD discretion to conduct interviews as it sees fit by merely stating that EAD "*may*" collect information from the complainant, respondent, and witnesses that EAD deems to have "pertinent knowledge." (Doc.

No. 23 at ¶ 117; Doc. No. 45 at 113.) In other words, EAD is given the responsibility to determine what witnesses it interviews and what questions it asks them. Compare with Univ. of the South II, 2011 WL 1258104, at *19 (university procedures required investigator to meet with any witness identified by parties). Under the Sexual Misconduct Policy, therefore, a respondent or complainant has no specific contractual right to insist that EAD interview a witness that EAD determines, in its discretion, does not have pertinent knowledge. Furthermore, there is no obligation imposed by the Sexual Misconduct Policy that EAD explain its decisions regarding which witnesses it will interview to any party's satisfaction.

Z.J.'s attempt to equate Student 1 and his roommates is of no moment. The Complaint alleges, and the Final Report reflects, that Student 1 (1) directly witnessed A.H.'s panic attack in the shower and her alleged immediate physical injuries and (2) accompanied A.H. to VUMC. (Doc. No. 23 at ¶¶ 22-23, 67, 76; Doc. No. 45.) Under the "pertinent knowledge" standard," EAD elected to interview Student 1. On the other hand, the Complaint does not allege when Z.J.'s roommates arrived at his suite, aside from conceding that it was at some point after A.H. left. (Doc. No. 23 at ¶ 118.) While the Complaint states that Z.J. would have liked his roommates to "potentially testify," it does not make offer any details regarding the specifics of EAD's alleged denial. This is peculiar, given that Z.J. would have personal knowledge of this issue if he proposed the witnesses.[38] Further, Z.J. does not allege what steps he took to clarify the vague "misinterpretation" that he claims EAD was under about his proposed witnesses. (Id. at ¶ 119.)

In sum, given the discretion afforded to EAD and the lack of specific allegations in the Complaint, Z.J. does not plausibly allege that Vanderbilt breached its contractual obligations by

---

[38] Of note, the Final Report clearly states that Z.J. "did not provide any names of people that he wanted the EAD to interview." (Doc. No. 45 at 10.)

not interviewing his roommates.[39] See Belmont Univ., 2018 WL 4627033, at *7 n.7 (dismissing breach of contract claim where policy allowed university investigators to meet with witnesses as reasonably necessary in its sole judgment); Tsuruta v. Augustana Univ., No. 4:15-CV-04150-KES, 2015 WL 5838602, at *7 (D.S.D. Oct. 7, 2015) (noting that the decision of a school to exercise discretion afforded by policy in student handbook was not a violation of that policy).

5.    Claim Based on Disclosure of Exculpatory Evidence

Z.J. makes two other claims regarding evidence. First, he repeats the claim that Vanderbilt breached the Sexual Misconduct Policy by not releasing A.H.'s statements and answers to EAD's questions – but this time, Z.J. contends that it was a breach of a separate obligation to disclose exculpatory evidence. (Doc. No. 23 at ¶ 121.) Second, Z.J. alleges that Vanderbilt had a duty to investigate A.H.'s potential mental illnesses and medications because she had a self-reported panic attack as a result of the alleged incident. (Id. at ¶ 122.) However, the Complaint identifies no basis for either of these claims in the Handbook or Sexual Misconduct Policy. As discussed above, the Sexual Misconduct Policy procedures specify what must be disclosed to a respondent. If there is no requirement that Vanderbilt disclose a complainant's statements and answers to questions to a complainant, then "failure to do so cannot be deemed an intentional act of hiding information." Univ. of the South II, 2011 WL 1258104, at *17 (explaining that, without procedural mandate, there is "no Brady-like duty to disclose any potentially exculpatory evidence to the [r]espondent in private [university] disciplinary hearing context"); see also Flaim v. Med. Coll. of Ohio, 418 F.3d 629, 635 (6th Cir. 2005) (school disciplinary boards are not bound by formal rules of evidence

---

[39] The Court saves to another day a potentially more concerning allegation by a disappointed respondent that EAD failed to interview a witness with *personal* knowledge of an alleged incident (e.g., someone who was present at the time of an alleged sexual assault). Z.J. simply does not make such an allegation.

or rules of criminal procedure) (citations omitted); (Doc. No. 27-1 at 2, 115 (Handbook differentiates Vanderbilt's disciplinary system from outside civil or criminal proceedings that may have different evidentiary requirements)).

Finally, as discussed above, the Sexual Misconduct Policy leaves decisions regarding the scope of the investigation (e.g., to what extent it was necessary to investigate A.H.'s mental health) to EAD's discretion. See Doe v. Brown Univ., 210 F. Supp. 3d 310, 340 n.17 (D.R.I. 2016) (observing that, absent rules specifying otherwise, "an investigator must retain the discretion to make judgment calls about relevance"). In any event, the Complaint alleges only that some investigation might have revealed that an unknown prescription drug that A.H. might have been taking could have somehow affected her "state of mind" in some unknown way. (Doc. No. 23 at ¶ 122.) Failure to investigate this attenuated possibility does not cross the line of plausibility to demonstrate entitlement to relief. Iqbal, 556 U.S. at 678. In sum, these are insufficient grounds for Z.J.'s breach of contract claim.

### 6. Claim Based on Bias

Z.J. also alleges that the EAD and Appeals Officers were biased. (Doc. No. 23 at ¶¶ 123-124.) This is based on Z.J.'s wholly conclusory allegations that (1) Z.J.'s statements were unfairly discounted because of his gender; and (2) the Appeals Officers are appointed by the Chancellor of Vanderbilt or his designee, and, because Vanderbilt was "in the spotlight" regarding sexual misconduct on campus, those appointments necessarily "violated the premise of an unbiased and independent panel." (Id.)

"In the university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of actual bias." Atria, 142 F. App'x at 256 (emphasis added); McMillan v. Hunt, No. 91-3843, 968 F.2d 1215 (table), 1992 WL 168827, at *2 (6th Cir. Jul. 21,

67

1992) (*per curiam*) (citing <u>Ikpeazu v. Univ. of Neb.</u>, 775 F.2d 250, 254 (8th Cir. 1985)). To overcome that presumption, Z.J. must plausibly allege "personal animosity, illegal prejudice, or a personal or financial stake in the outcome" on the part of the EAD or Appeals Officers. <u>Ikpeazu</u>, 775 F.2d at 254; <u>accord</u> <u>Cummins</u>, 662 F. App'x at 450 (stating that, to survive a motion to dismiss, allegations of bias must be "evident from the record and cannot be based on speculation or inference") (quoting <u>Nash v. Auburn Univ.</u>, 812 F.2d 655, 665 (11th Cir. 1987)); <u>Ohio St. Univ. I</u>, 219 F. Supp. 3d at 658 ("To survive a motion to dismiss, [the plaintiff] needs to allege specific, non-conclusory facts that if taken as true show actual bias.") Stated differently, a "mere belief that [university officials] acted with . . . ulterior motives" during the course of the investigation "is insufficient to state a claim for relief." <u>Univ. of Cincinnati</u>, 173 F. Supp. 3d at 602 (S.D. Ohio 2016); <u>see also</u> <u>Center for Bio–Ethical Reform, Inc. v. Napolitano</u>, 648 F.3d 365, 377 (6th Cir. 2011) (holding "vague and conclusory allegations of nefarious intent and motivation . . . are not well-pleaded, and are therefore insufficient to plausibly suggest an entitlement to relief"); <u>Tr. of Boston Coll. I</u>, 892 F.3d at 84 ("[A]lleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences."); <u>Duke v. N. Tex. State Univ.</u>, 469 F.2d 829, 834 (5th Cir. 1972) (same).

Accordingly, the Court will not "indulge in unreasonable inferences" concerning alleged bias. <u>Cummins</u>, 662 F. App'x at 454. Z.J. has not alleged facts of any specificity to plead "actual bias," and his speculative claim of purported bias due to Vanderbilt being "in the spotlight," without more, fails to clear the required hurdle to sustain a breach of contract claim. <u>See</u> <u>Belmont Univ.</u>, 2018 WL 4627033, at *8 (concluding same where plaintiff alleged biased university officials were determined to punish him); <u>Purdue Univ.</u>, 281 F. Supp. 3d at 777 (holding that alleged procedural deficiencies or a plaintiff's conclusory disagreement with university's

68

substantive determinations are, alone, not a basis to impute bias based on gender) (citing Cummins, 662 F. App'x at 452); Univ. of Denver, 2018 WL 1304530, at *11 ("[E]xperience working with survivors of domestic violence does not establish that [an investigator] harbors pro-female biases."); Coll. of Wooster, 243 F. Supp. 3d at 892 (dismissing breach of contract claim where plaintiff merely alleged that hearing panel was biased against him).

     7.  Claims Based on Credibility Determinations and Weight of the Evidence

  Z.J. alleges that Vanderbilt made improper credibility determinations and reached a final decision based on insufficient evidence. (Doc. No. 23 at ¶¶ 123-127.) Z.J. alleges that the EAD and Appeals Officers both improperly found A.H. to be more credible than him "based on [Z.J.'s] inability to recall certain details, even though A.H. could not recall dramatic, significant portions of the night of the incident until one month later." (Doc. No. 23 at ¶ 123.) He further claims that Vanderbilt improperly credited written statements made by A.H. a month after the incident, while faulting inconsistencies in his own statements. (Id.) Finally, Z.J. alleges that Vanderbilt breached its contractual promise to be fair to him because the evidence against him was insufficient, particularly because A.H. was "inconsistent," "unreliable," and "intoxicated." (Id. at ¶¶ 125-127.)

  The Handbook and Sexual Misconduct Policy, however, do not set forth any specific procedures for making credibility determinations, nor impose any requirement that the university explain those decisions to a party's satisfaction. "Indeed, in every investigation it is necessary to make credibility determinations, and there frequently will be a party displeased by one or more of those decisions." Belmont Univ., 2018 WL 4627033, at *8. In the absence of specific implied contractual provisions, Vanderbilt's discretionary decisions as to the relative merit and credibility of a complainant and respondent (or any other witnesses) cannot, absent something more, equate

to a breach of contract.[40] See, e.g., id.; Univ. of Dayton, 2018 WL 1393894, at *7 ("As for assessing the credibility of hearing witnesses, such a determination is well within the discretion of the disciplinary board, and is not for the courts to second guess."); Coll. of Wooster, 243 F. Supp. 3d at 894 (same); Doe v. W. New England Univ., 228 F. Supp. 3d 154 (D. Mass. 2017) ("[I]t is not the business of lawyers and judges to tell universities what statements they may consider and what statements they must reject."); Univ. of the South I, 687 F. Supp. 2d at 755 (explaining that, in considering a school's disciplinary outcomes, it is not for the courts to review who is credible).

The Sexual Misconduct Policy likewise allows for evaluations of the testimony and evidence to be "well within the discretion of the [EAD and Appeals Officers], and is not for the [C]ourt[ ] to second guess." College of Wooster, 243 F. Supp. 3d at 894. As the Court of Appeals has explained, absent a credible allegation that the university "failed to comply with relevant procedural requirements, [the court should] decline to construe the [ ] Handbook as requiring a particular outcome" based on the evidence.[41] Anderson, 450 F. App'x at 502; see also Pierre, 143 F. Supp. 3d at 713 (stating that "the issue before this Court is not whether the [hearing board] should have believed a certain party's version of events"); Colgate Univ., 2017 WL 4990629, at *23 ("The panelists, having engaged in reasoned decision-making, were free to credit the

---

[40] This case demonstrates exactly why this is so: here, the Complaint acknowledges the existence of potentially corroborating evidence (e.g., evidence of Student 1, surveillance video, photographs, VUPD and VUMC evidence) that may have informed EAD's credibility determinations. (See Doc. No. 23; see also Doc. No. 45 (Final Report relying on those materials).) In other words, Z.J. tacitly acknowledges a basis for Vanderbilt's credibility determinations – he simply disagrees with them. It is not for the Court to insert itself, second-hand, into Vanderbilt's first-hand decision-making as to who among Z.J. and A.H. was more credible. And the foregoing remains true even though this Court questions the ability to make accurate credibility determinations based upon written documents. At the very least, such credibility findings deserve less weight when evaluating the totality of the evidence.

[41] Under the preponderance of the evidence standard, Vanderbilt need only have found enough evidence to conclude it was "more likely than not" that Z.J. committed the violations.

70

complainants' accounts and find that it was more likely than not that [respondent] was responsible for the alleged charges."); Tr. of Boston Coll. II, 2016 WL 5799297, at *18 ("That this Court or a jury may have come to a different outcome than the hearing board is not the determinative test."); Univ. of the South I, 687 F. Supp. 2d at 755 (stating that it is not for the courts to review "whether a sexual assault occurred, whether any such acts were consensual, or who, as between [respondent] and the [c]omplainant is credible"). Accordingly, Z.J.'s breach of contract claim may not proceed on the premise that Vanderbilt simply reached incorrect decisions based on credibility determinations and conflicting evidence.

### 8.    Claim Based on Cross-Examination

Z.J.'s penultimate basis for a breach of contract claim is that Vanderbilt did not require A.H. to testify at a hearing and subject herself to cross-examination by Z.J. (Doc. No. 23 at ¶ 128-131.) Indeed, at no point after EAD commenced its investigation did A.H. answer questions in person. However, the Complaint does not allege that the Sexual Misconduct Policy requires a complainant to appear and be cross-examined by a respondent, and, indeed, there is no such requirement.

Under the Sexual Misconduct Policy, EAD's determination of responsibility is made without a hearing, precluding an opportunity for cross-examination of witnesses. Thus, the implied contractual relationship between Z.J. and Vanderbilt does not provide for the right to confrontation that Z.J. alleges that he was denied. Admittedly, as the Court has previously recognized, in the context of a procedural due process claim against a public university a different result regarding the viability of this claim would likely arise. See Belmont Univ., 2018 WL 4627033, at *7 (citing Baum, 903 F.3d at 582-584 (holding that, if a public university has to choose between competing narratives to resolve a sexual misconduct case, the university must give the accused student or his

agent some opportunity to cross-examine the accuser in the presence of a neutral fact-finder); Univ. of Cincinnati, 872 F.3d at 400-404 (6th Cir. 2017) (holding that a respondent facing suspension was entitled to cross-examination where the university was deciding between competing narratives and making a judgment as to the credibility of the accuser)). However, Vanderbilt is a private university and Z.J. brings a breach of contract claim. The Court therefore does not resolve questions of constitutional due process. Belmont Univ., 2018 WL 4627033, at *7 (reaching same result in action against private university). At present, this is not a sufficient basis for Z.J.'s breach of contract claim.

9.     Claims Based on Promise of Fundamental Fairness and Covenant of Good Faith and Fair Dealing

Finally, embedded throughout the breach of contract cause of action in the Complaint are references to Vanderbilt's "promise of fundamental fairness and the implied covenant of good faith and fair dealing." (See Doc. No. 23 at ¶¶ 106, 107, 109, 113, 116, 120, 121, 127, 130.) Z.J. relies in part upon his allegation concerning the Handbook's general promise of "Fair Procedures," by which Vanderbilt generally promises to provide "fair and appropriate procedures, including the opportunity for appeal, for addressing and resolving complaints." (Doc. No. 23 at ¶ 105.) Z.J. broadly alleges that Vanderbilt has breached this promise of fundamental fairness, and its implied duty of good faith and fair dealing, in all the same ways that it breached the implied contractual relationship embodied in the Sexual Misconduct Policy.

In Tennessee, "there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement." Shah v. Racetrac Petroleum Co., 338 F.3d 557, 572 (6th Cir. 2003) (citing TSC Indus., Inc. v. Tomlin, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987)); Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc., 395 S.W.3d 653, 660 (Tenn. 2013); see also RESTATEMENT (2D) CONTRACTS, § 205 (1979). The nature of the duty "depends upon the individual contract in

72

each case." TSC Indus., Inc., 743 S.W.2d at 173. Tennessee courts have consistently applied this principle. Dick Broad Co., 395 S.W.3d at 661. To be clear, however, under Tennessee law a breach of the duty of good faith and fair dealing "is not a cause of action in and of itself but as a part of a breach of contract cause of action." Univ. of the South II, 2011 WL 1258104, at *18 (quoting Lyons v. Farmers Ins. Exch., 26 S.W.3d 888, 894 (Tenn. Ct. App. 2000)); see also Shah, 338 F.3d at 572 ("Breach of the implied covenant of good faith and fair dealing is not an independent basis for relief.").

Accordingly, the implied covenant of good faith and fair dealing creates a duty to provide basic fairness, Univ. of the South II, 2011 WL 1258104, at *18, and that duty can be met by complying with the terms of the Handbook generally, and the disciplinary process in the Sexual Misconduct Policy specifically, that are designed to be fair. This is exactly what the Court of Appeals for the First Circuit explained, under similar contract law, in Trustees of Boston College I. The court "agree[d] . . . . that the implied covenant of good faith and fair dealing[ ] imposed on every contract . . ., applied in the context of school disciplinary proceedings, creates an independent duty to provide basic fairness," but it clarified that "whenever a school expressly promises no less than basic fairness . . . the school's implied duty becomes superfluous and the court's analysis to ensure that the disciplinary proceedings were conducted with basic fairness[ ] focuses on assuring compliance with the express contractual promise[s]." 892 F.3d at 88-89.

By means of its general promises of "Fair Procedures," Vanderbilt promises to be open, fair, cooperative, and have respect for students. (Doc. No. 23 at ¶ 105.) The Court accordingly views Z.J.'s "fundamental fairness" or implied covenant of good faith and fair dealing claim as essentially coextensive with Z.J.'s claims based on the express contractual promises rooted in the Sexual Misconduct Policy that is, itself, designed to be fair. Because the Court concludes that Z.J.

73

has not sufficiently alleged that Vanderbilt failed to perform the specific terms of that implied contract, it concludes that Z.J. also does not adequately plead that Vanderbilt has breached the covenant of good faith and fair dealing or any other aspirational "fairness" duty. See, e.g., Tr. of Univ. of Pa., 270 F. Supp. 3d at 812 (finding generic promise of "fairness" does not give rise to "fairness" procedural obligations independent of specific provisions in university's disciplinary procedures, which themselves describe procedures designed to be fair); Wallace v. Nat'l Bank of Commerce, 938 S.W.2d 684, 687 (Tenn. 1996) ("Performance of a contract according to its terms cannot be characterized as bad faith in breach of the duty of good faith and fair dealing."); see also Belmont Univ., 2018 WL 4627033, at *4 (finding it insufficient for the plaintiff to merely ascribe responsibility to a university for failing to live up to general "aspirational statements" and declining to allow breach of contract claim based on broad promises of university to nurture the campus environment); Univ. of Dayton, 2018 WL 1393894, at *7 ("Vague, hortatory pronouncements . . . are insufficient to support a breach of contract claim.") (quoting Pierre v. Univ. of Dayton, No. 3:15-CV-362, 2017 WL 1134510, at *6 (S.D. Ohio Mar. 27, 2017)); Rolph v. Hobart and William Smith Colls., 271 F. Supp. 3d 386, 407 (W.D.N.Y. 2017) (explaining that, in the context of actions brought by students, "aspirational statements . . . do not provide a valid basis for a breach of contract claim").

         10.    <u>Summary</u>

Z.J. has not articulated a sufficient basis for his breach of contract claims. Accordingly, they will be dismissed.

       E.    <u>Promissory Estoppel</u>

Next, Z.J. brings a promissory estoppel claim. (Doc. No. 23 at ¶¶ 134-137.) In Tennessee, a claim for promissory estoppel has three elements: "(1) a party made a promise which the

promisor should reasonably have expected to induce the action or forbearance of the promisee; (2) the promise does induce that action or forbearance; and (3) injustice can be avoided only by enforcing the promise." Sifuna, 2018 WL 3005814, at *2 (citing Atria, 142 F. App'x at 256); Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc., 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006) (citation omitted). As the name of the claim suggests, the key element is the promise. Chavez v. Broadway Elec. Serv. Corp., 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007). Tennessee does not liberally apply the doctrine of promissory estoppel and limits its application to exceptional cases "verging on actual fraud." Shedd v. Gaylord Entm't Co., 118 S.W.3d 695, 700 (Tenn. Ct. App. 2003); Baliles v. Cities Serv., 578 S.W.2d 621 (Tenn. 1979).

As a general matter, recovery is not available under the theory of promissory estoppel when a valid contract exists between the parties. Jones v. BAC Home Loans Servicing, LP, No. W2016-00717-COA-R3-CV, 2017 WL 2972218, at *9 (Tenn. Ct. App. July 12, 2017); Calabro v. Calabro, 15 S.W.3d 873, 879 (Tenn. Ct. App. 1999) (citing EnGenius Entm't, Inc. v. Herenton, 971 S.W.2d 12, 19-20 (Tenn. App. 1997)).  However, Tennessee courts have upheld a claim for promissory estoppel despite the existence of an enforceable contract in limited cases where an alleged promise was made at the time of contracting and operated to expand, not to add to or vary the terms of a contract. Thomas Energy Corp. v. Caterpillar Fin. Servs. Corp., No. E2014-00226-COA-R3-CV, 2014 WL 7366676, at *7 (Tenn. Ct. App. Dec. 26, 2014) (citing Bill Brown Const. Co. v. Glens Falls Ins. Co., 818 S.W.2d 1, 11-12 (Tenn. 1991) (upholding a claim for promissory estoppel when the insurer's agent's representations expanded the terms of an insurance contract)).

Z.J. alleges that the "Sexual Misconduct [P]olic[y] detailed in the [Handbook] constitutes a promise that [ ] Vanderbilt will act in a manner described," Z.J. expected Vanderbilt to rely on its promises when he enrolled and "had his scholarship money from ROTC applied there," that

75

reliance was "to his detriment," and "injustice can only be avoided by enforcement of [ ] Vanderbilt's representations." (Id. at ¶¶ 134-136.) This promissory estoppel claim is not a viable alternative to Z.J.'s breach of contract claim. Z.J. has not alleged any special situation "verging on actual fraud." Even more importantly, as discussed above, Z.J. and Vanderbilt have a contractual relationship. Z.J. has not alleged any special promise made to him that operated to expand the terms of the Handbook or Sexual Misconduct Policy. Rather, Z.J.'s promissory estoppel claim is premised on the same allegations that support his breach of contract claim. In short, Z.J.'s promissory estoppel claim fails because there is an enforceable contractual relationship between Z.J. and Vanderbilt that Z.J. does not allege was altered. See Belmont Univ., 2018 WL 4627033, at *13 (reaching same conclusion as to general promissory estoppel claim where student alleged he matriculated and incurred tuition on the university's promises of fundamental fairness but was subjected to breaches of the university's obligations under sexual assault misconduct policy);[42] Jones, 2017 WL 2972218, at *10 (promissory estoppel claim is "not available" for the purpose of seeking "to change the terms of existing, valid contract"); Thomas Energy Corp., 2014 WL 7366676, at *7 (plaintiff may not substitute promissory estoppel claim for breach of contract claim unless there is an additional promise that expands the terms of the contract between the parties); see also College of Wooster, 243 F. Supp. 3d at 895 (reaching same conclusion in university disciplinary case under similar Ohio law)

F.     Unjust Enrichment Claim

Z.J. also brings a claim for unjust enrichment. (Doc. No. 23 at ¶¶ 179-180.) In Tennessee, the theory of unjust enrichment is "founded on the principle that a party receiving a benefit desired

---

[42] In Belmont University, the Court allowed a limited promissory estoppel claim to proceed based on only one specific promise that a university official was alleged to have made to the plaintiff concerning a term of the disciplinary process. Belmont University, 2018 WL 4627033, at *13.

by him, under circumstances rendering it inequitable to retain it without making compensation, must do so." Paschall's Inc. v. Dozier, 407 S.W.2d 150, 154 (Tenn. 1966). It is a quasi-contractual theory of recovery "in which a court may impose a contractual obligation where one does not exist." Cole v. Caruso, No. W2017-00487-COA-R3-CV, 2018 WL 1391625, at *3 (Tenn. Ct. App. Mar. 20, 2018) (citing Whitehaven Cmty. Baptist Church v. Holloway, 973 S.W.2d 592, 596 (Tenn. 1998)). Importantly, courts may only impose a contractual obligation under an unjust enrichment theory "if there is no contract between the parties or the contract has become unenforceable or invalid and the defendant will be unjustly enriched unless the court imposes an obligation." Bridgeforth v. Jones, No. M2013-01500-COA-R3-CV, 2015 WL 336376, at *19 (Tenn. Ct. App. Jan. 26, 2015) (emphasis removed) (citing Paschall's, 407 S.W.2d at 154). To establish an unjust enrichment claim, a party must allege: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 525 (Tenn. 2005). As one might expect, "the most significant requirement in a claim for unjust enrichment is that the enrichment to the defendant be unjust." Cole, 2018 WL 1391625, at *3 (citing Freeman Indus., LLC, 172 S.W.3d at 525; Whitehaven Cmty. Baptist Church, 973 S.W.2d at 596).

Z.J. alleges that he conferred a benefit on Vanderbilt in the form of tuition, but "was denied his degree." (Id. at ¶ 179.) Specifically, Z.J. alleges that, "due to his wrongful expulsion," he is required to pay back $136,000 received from the ROTC program, as well as $82,000 previously paid to Vanderbilt, and will not receive a degree in return. (Id.) Z.J. claims that he "should be awarded his degree to avoid [ ] injustice." (Id. at ¶ 180.) This claim fails as a matter of law because,

as discussed above, there is an enforceable contractual relationship between Z.J. and Vanderbilt that is reflected in the terms of the Handbook and Sexual Misconduct Policy. Thus, there is no contractual void that a quasi-contractual remedy such as unjust enrichment may fill.[43]

### G.    Negligence *Per Se* Claims

Z.J. next pleads negligence *per se* claims premised upon alleged breach of Vanderbilt's statutory duties of care under Title IX and the Clery Act.[44] Negligence *per se* is the doctrine that violation of a statute in itself establishes negligence. See Martin v. Herzog, 228 N.Y. 164, 167-68 (1920) (Cardozo, J.). Generally speaking, in Tennessee a claim of negligence *per se* requires a plaintiff to prove that the defendant: (1) violated a statute, ordinance, or regulation that requires or prohibits a particular act for the benefit of the plaintiff or the general public; (2) that the injured person was within the class of individuals the legislature intended to benefit and protect by

---

[43] The Court also questions whether Z.J. has adequately pleaded that it is "unjust" for Vanderbilt to retain his tuition money. "Implicit in the unjust enrichment elements is that the plaintiff has conferred a benefit upon the defendant for which he has not been compensated." Cole, 2018 WL 1391625, at *5. As the Complaint sets forth, Z.J. was expelled at the *end* of four years of education. (Doc. No. 23 at ¶ 96.) While Z.J. alleges that Vanderbilt put a "permanent mark" on his transcript, Z.J. does not allege that he has been unable to matriculate at another school or transfer his credits. In other words, Z.J. received the benefit of almost four full years of education from a major university. While Z.J. did not receive his degree, he did receive a significant educational benefit that Vanderbilt presumably would not have offered without payment of tuition. In the real estate context, Tennessee courts have held that where consideration has been given, it is not unjust to retain the benefit. See Thomas v. Thomas, 2017 WL 1404353, at *6 (Tenn. Ct. App. Apr. 17, 2017) (collecting cases); Cole, 2018 WL 1391625, at *5 (collecting cases). It is well-settled that consideration exists when "the promisee does something that it is under no legal obligation to do," Brown Oil Co. v. Johnson, 689 S.W.2d 149, 151 (Tenn. 1985), which might include a university providing an education. That being said, in Cole the Tennessee Court of Appeals recently declined to consider whether the payment of any consideration prevents a plaintiff from recovering under an unjust enrichment claim in any context. Cole, 2018 WL 1391625, at *5. Given that this claim fails due to the existence of a contractual relationship between Z.J. and Vanderbilt, the Court need not attempt to predict how the Tennessee courts will resolve this question over time.

[44] These claims are both asserted in Count 7 of the Complaint, which is mislabeled "The Clery Act." (Doc. No. 23 at 44.) Count 6, which is mislabeled "Negligence Per Se," involves only negligence. (Id. at 43.)

enacting the statute, ordinance, or regulation; and (3) that the defendant's negligence was the proximate cause of the injured party's injury. Smith v. Owen, 841 S.W.2d 828, 831 (Tenn. Ct. App. 1992). However, "[t]he negligence *per se* doctrine is not a magic transformational formula that automatically creates a private negligence cause of action for the violation of every statute." Rains v. Bend of the River, 124 S.W.3d 580, 590 (Tenn. Ct. App. 2003). To trigger the doctrine, the statute must establish a specific applicable standard of conduct. Thomas & Assocs., Inc. v. Metro. Gov't of Nashville and Davidson Cty., No. M2001–00757–COA–R3–CV, 2003 WL 21302974, at *7 (Tenn. Ct. App. June 6, 2003); see also Atria, 142 F. App'x at 253 ("Under Tennessee law, only statutes that establish a standard of care may support a claim of negligence *per se*.")

### 1. Negligence *Per Se* Claim Based on Title IX

Z.J.'s negligence *per se* claim based on Title IX will be dismissed. This is because, as discussed above, Z.J. has failed to plausibly allege gender discrimination under Title IX, and it would be illogical for negligence *per se* liability premised on Title IX to exceed or circumvent the requirements of Title IX liability under federal law. Univ. of the South II, 2011 WL 1258104, at *14 (citing Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 287 (1998)); see also Jones v. Pi Kappa Alpha Int'l Fraternity, Inc., 2017 WL 4074547, at *11 (D.N.J. Sept. 13, 2017) (stating that a claim of negligence *per se* would be an impermissible "end-run" around the substantive requirements of Title IX); Ross v. Univ. of Tulsa, 2015 WL 4064754, at *3-*4 (N.D. Ok. July 2, 2015) (dismissing negligence *per se* claim "premised upon [university's] alleged violation of Title IX and its implementing regulations").

79

2.      <u>Negligence *Per Se* Claim Based on the Clery Act</u>

Z.J.'s negligence *per se* claim based upon the Clery Act will also be dismissed. Z.J. alleges that (1) the Clery Act created a "statutory duty of care that [Vanderbilt] was obligated to perform" and (2) Vanderbilt's violations of the Clery Act "constitute negligence *per se*." (<u>Id</u>. at ¶¶ 169-170.) "The Clery Act is a consumer protection law that aims to provide transparency around campus crime policy and statistics." <u>See</u> https://clerycenter.org/policy-resources/the-clery-act/ (last accessed Dec. 11, 2018). More specifically, the Clery Act mandates the annual publication of security policies and crime statistics for institutions of higher education participating in certain federal programs. 20 U.S.C. § 1092(f). However, the statute explicitly states that it does *not* create a private right of action *or* a standard of care. <u>See</u> 20 U.S.C. § 1092(f)(14)(A) ("Nothing in this subsection may be construed to – (i) create a cause of action against any institution of higher education or any employee of such an institution for any civil liability; or (ii) establish any standard of care."). Accordingly, the law is enforced by the United States Department of Education, not through litigation brought by individuals such as Z.J. <u>Moore v. Murray St. Univ.</u>, 2013 WL 960320, at *3 (W.D. Ky. Mar. 12, 2013); <u>Souders v. Mount Joseph Univ.</u>, 2016 WL 8671966, at *7 (S.D. Ohio Mar. 11, 2016) ("The statute explicitly states that there is no private right of action under 20 U.S.C. § 1092(f)."); <u>Doe v. United States Dep't of Health & Human Servs.</u>, 85 F. Supp. 3d 1, 10 (D.D.C. 2015) ("The Clery Act does prohibit private suits based on failure to comply with the Clery Act."); <u>Dziedzic v. State Univ. of N.Y. at Oswego</u>, No. 5:10-cv-1018, 2014 WL 7331926, at *2 (N.D.N.Y. Dec. 19, 2014) (holding plaintiff could not bring a claim against defendant university under the Clery Act because "the Clery Act specifically states that its provisions do not give rise to private causes of action against educational institutions"); Brett A. Sokolow, et al., <u>College and University Liability for Violent Campus Attacks</u>, 34 J.C. & U.L. 319, 344 (2008)

80

("The enforcing authority for the Clery Act is the U.S. Department of Education."). Z.J. cannot circumvent the lack of a Clery Act private right of action by re-characterizing the cause of action as a state law negligence *per se* claim. See Univ. of the South II, 2011 WL 1258104, at *14 (citing Kemp v. Medtronic, Inc., 231 F.3d 216, 236 (6th Cir. 2000)). Accordingly, Z.J.'s negligence *per se* claim for violation of the Clery Act fails as a matter of law.[45]

H.    Negligence and Gross Negligence Claims

Z.J. also alleges that Vanderbilt was negligent and grossly negligent. (Doc. No. 23 at ¶¶ 165-167, 173-174.) Under Tennessee law, to plead negligence a plaintiff must allege the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, causation. Merhson v. HPT TA Props. Tr., No. M2018-00315-COA-R3-CV, 2018 WL 5793564, at *2 (Tenn. Ct. App. Nov. 5, 2018) (quoting Staples v. CBL & Assocs., Inc., 15 S.W.3d 83, 89 (Tenn. 2000)). To plead gross negligence, a plaintiff must allege the elements of negligence, and also allege that the act in question was "done with utter unconcern for the safety of others, or one done with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law." Thrasher v. Riverbend Stables, No. M2007-01237-COA-R3-CV, 2008 WL 2165194, at *5 (Tenn. Ct. App. May 21, 2008) (quoting Ruff v. Memphis Light, Gas, and Water Div., 619 S.W.2d 526, 528 (Tenn. Ct. App. 1981)).

---

[45] The Court does not interpret the Complaint as bringing any claim involving the Clery Act other than a negligence *per se* claim, but, to the extent Z.J. intended to make any such claim, it too would be precluded by the Clery Act's lack of a private right of action.

However, where the alleged "breach of duty" that a plaintiff alleges occurred is a breach of contractual obligations, whether or not the defendant was negligent in attempting performance, "the action remains in contract."[46] Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992) (dismissing negligence claims because alleged damages arose from breach of contractual relationship and stating "the alleged claim for negligence sounds in contract, and dismissal was proper"); see also Harvest Corp. v. Ernst & Whinney, 610 S.W.2d 727, 728 (Tenn. Ct. App. 1980) ("[I]t matters not a whit whether the breach was an intentional one or an unintentional one caused by negligence in attempting to perform. The action still remains in contract."); America's Collectibles Network, Inc. v. Sterling Commerce (America), Inc., 2016 WL 9132294, at *19 (E.D. Tenn. Sept. 7, 2016) ("Under Tennessee law . . . [w]here the only duty alleged arises from a contractual obligation, its breach cannot form the basis of a parallel negligence claim."); Williams v. SunTrust Mort., Inc., No. 3:12-CV-477, 2013 WL 1209623, at *4 (E.D. Tenn. Mar. 25, 2013) ("[W]hen two parties enter into a contractual agreement, their obligations to each other arise out of the contract itself, so that a violation of the contractual duty supports an action in contract rather than in tort.") (citing Permobil, Inc. v. Am. Express Travel Related Servs., Inc., 571 F. Supp. 2d 825, 842 (M.D. Tenn. 2008) ("[I]f the only source of duty between a particular plaintiff and defendant is their contract with each other, then a breach of that duty, without more, ordinarily will not support a negligence action.")) (other citations omitted). Thus, where a claim for negligence is based only on breach of contract obligations, and there are no alleged extra-contractual duties, "the first element of the tort claim

---

[46] This limitation arises from the idea that, where two parties enter into a contractual arrangement, their obligations to each other generally arise only out of the contract itself. Thomas & Assocs., 2003 WL 21302974, at *6.

fails." <u>Silvestro v. Bank of Am., N.A.</u>, No. 3-13-0066, 2013 WL 1149301, at *4 (M.D. Tenn. Mar. 19, 2013).

Z.J. alleges that Vanderbilt had a duty of care to conduct itself "in a manner consistent with the [ ] Handbook and in a non-negligent manner," and it breached that duty "when it conducted the investigation in a way that was indifferent to the truth of the allegations made against [Z.J.]." (<u>Id</u>. at ¶¶ 165-166.) Z.J. further alleges that Vanderbilt was grossly negligent because it acted "recklessly" and was "callously indifferent to the effects of their conduct would have [sic] on Z.J.'s reputation, mental health, and future." (<u>Id</u>. at ¶ 173.)

Z.J. does not allege that Vanderbilt owed him a duty in addition to the obligations set forth in the Handbook and Sexual Misconduct Policy; to the contrary, Z.J. alleges only that Vanderbilt assumed and breached the duties set forth therein. Moreover, the Handbook and Sexual Misconduct Policy reflect that they are the source of Vanderbilt's obligations to Z.J. relevant to this case. (<u>See</u> Doc. No. 27-1 at 1-2 (Handbook explaining that the policies and regulations set forth therein will govern students)). Because Z.J. has not identified a source of duty outside the relationship established by the Handbook and Sexual Misconduct Policy, his negligence and gross negligence claims are an impermissible attempt to recast his contractual claims in the language of tort. These claims will therefore be dismissed. <u>See, e.g.</u>, <u>Silvestro</u>, 2013 WL 1149301, at *4 (dismissing negligence claims because plaintiff had not identified duty outside of contractual relationship); <u>Univ. of Dayton</u>, 438 F. App'x at 387 (under similar Ohio law, affirming dismissal of student's negligence claims because university's alleged duties arose from contractual obligations embodied in Honor Code and the tort claims mirrored the bases of student's breach of contract claim); <u>Pierre</u>, 2017 WL 1134510, at *9 (under similar Ohio law, holding that student

failed to state a negligence claim against university because he was "trying to use a negligence claim as another means to assert his contract claims").

I.    Declaratory Judgment Act Claim

Finally, Z.J. brings a cause of action for a declaratory judgment concerning alleged violations of Title IX and the Clery Act.[47] (Doc. No. 23 at ¶¶ 138-148.) The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The Supreme Court has indicated that this act "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995). In passing the act, Congress "created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." Id. at 288. District courts are afforded substantial discretion to exercise jurisdiction "in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and fitness of the case for resolution, are peculiarly within their grasp." Id. at 289. In considering whether a district court has properly exercised its discretion in this regard, the Court of Appeals has traditionally focused on five factors:

---

[47] This cause of action actually seeks an order of *injunctive* relief against Vanderbilt (see Doc. No. 23 at ¶ 148), but the Court will assume, arguendo, that Z.J. intended to also request a declaration of his rights. Injunctive relief, of course, is a remedy, not a cause of action. Reyes v. Wilson Mem. Hosp., 102 F. Supp. 2d 798, 801 n.1 (S.D. Ohio 1998).

84

> (1) whether the declaratory action would settle the controversy;
> (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata";
> (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and
> (5) whether there is an alternative remedy which is better or more effective.

Grand Trunk W. R.R. Co. v. Consol. Rail Co., 746 F.2d 323, 326 (6th Cir. 1984).

Here, the third and fourth Grand Trunk factors have no particular relevance, but the first, second, and fifth factors counsel against exercising jurisdiction to invoke declaratory jurisdiction. Because the Court has found that Z.J. has failed to state any claim for violation of his rights, there exists no continuing controversy between Z.J. and Vanderbilt to be settled and no justifiable basis for the issuance of a declaratory judgment at a later stage of this case. Further, addressing the question of whether Vanderbilt's policies or procedures might violate federal compliance obligations would not serve a useful purpose in clarifying the relationship between Z.J. and Vanderbilt. See Univ. of the South I, 687 F. Supp. 2d at 760. Finally, to the extent that Z.J. is concerned about whether Vanderbilt is meeting its reporting obligations under the Clery Act, there is an alternative regulatory framework that provides a likely superior remedy.[48] Id. The Court will therefore not exercise jurisdiction and dismiss Z.J.'s declaratory judgment claim. See, e.g., Marshall, 2015 WL 7254213, at *13 (dismissing declaratory judgment claim because "[w]ithout an actionable [Title IX] claim, there is no controversy to be settled"); Univ. of the South I, 687 F.

_____

[48] The U.S. Department of Education has enacted, in accordance with the Clery Act's mandates, specific regulatory guidance, rules, and potential fines that apply to every institution that participates in any federal student financial assistance program. See 34 C.F.R. § 668.46. A university's failure to comply with the mandates of the Clery Act may result in it not receiving federal funding for its student financial assistance programs. See 34 C.F.R. § 668.1.

Supp. 2d at 760 (dismissing declaratory judgment claim regarding Clery Act violations when only state law contract and tort claims remained live in case).

IV.     Conclusion

There has been a surge of litigation in the federal courts concerning how institutions of higher learning appropriately investigate and resolve complaints of sexual misconduct while assuring fairness to those who are accused of breaching student conduct policies. The Court recognizes that these are important issues to the community, as well as very personal ones to those whose lives are touched by sexual misconduct investigations. The Court's role here, however, is limited to determining whether this particular plaintiff, Z.J., has sufficiently alleged that this particular defendant, Vanderbilt University, has violated federal or state law so that this action may proceed. The Court concludes that Z.J. has not done so. Accordingly, Vanderbilt University's Motion to Dismiss (Doc. No. 26) will be granted in its entirety and this case will be dismissed.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE